1   HELANE L. MORRISON (Cal. Bar No. 127752)
    MARK P. FICKES (Cal Bar No. 178570)
2     fickesm@sec.gov
    ERIN E. SCHNEIDER (Cal. Bar No. 216114)
3     schneidere@sec.gov

4   Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
5   44 Montgomery Street, Suite 2600
    San Francisco, California 94104
6   Telephone: (415) 705-2500
    Facsimile: (415) 705-2501

7

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN FRANCISCO DIVISION
11

12  SECURITIES AND EXCHANGE COMMISSION,          Case No. C 07-4975 WHA

13          Plaintiff,

14      vs.                                       PLAINTIFF SECURITIES AND
                                                  EXCHANGE COMMISSION'S NOTICE OF
15  ALEXANDER JAMES TRABULSE,                     MOTION AND MOTION FOR
                                                  PRELIMINARY INJUNCTION;
16          Defendant,                            MEMORANDUM OF POINTS AND
                                                  AUTHORITIES IN SUPPORT OF
17      and                                       PRELIMINARY INJUNCTION

18  FAHEY FUND, L.P., FAHEY FINANCIAL             DATE:    December 6, 2007
    GROUP, INC., INTERNATIONAL TRADE &            TIME:    8:00 a.m.
19  DATA, and ITD TRADING,                        PLACE: Courtroom 9, 19th Floor

20          Relief Defendants.

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**NOTICE OF MOTION**

Please take notice that on December 6, 2007, at 8:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable William Alsup, Courtroom 9, 19th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Plaintiff Securities and Exchange Commission ("Commission") will and hereby does move the Court for an order enjoining defendant Alexander James Trabulse's violations of the securities laws while this litigation is pending.  In order to protect investor assets, the Commission also moves for ancillary relief including an order: (1) appointing a monitor to oversee defendant's and relief defendants' operations; (2) requiring a verified accounting; (3) preventing destruction of documents; and (4) permitting expedited discovery.

**GROUNDS FOR MOTION**

This motion is made on the grounds that: (1) the Commission is likely to succeed on the merits in this litigation and there is a possibility of irreparable injury; or (2) serious questions going to the merits are raised and the balance of hardships tips sharply in the Commission's favor; and (3) absent a preliminary injunction, defendant is likely to continue violating the securities laws.  In particular, there is a substantial likelihood that the defendant will continue to misappropriate funds and to deceive current or new investors in order to obtain money under the guise of trading in securities.

**SUPPORTING PAPERS**

This motion is based on this Notice of Motion and Motion and supporting Memorandum of Points and Authorities; the declarations of Erin E. Schneider, Mark P. Fickes, H. Gifford Fong, Timothy K. Ivey, Jennifer M. Good, Alex Shurchin, Corinne McKay, Eve Boudeux, Francisco A.

///

///

///

Valerio, Julia Ziegler, Evelyn M. Reinos, and Boizette Francois, with the exhibits attached thereto;

and such other written or oral argument as may be presented to the Court.

DATED:  October 18, 2007          Respectfully submitted,


                                  /s/ Mark P. Fickes
                                  Mark P. Fickes
                                  Erin E. Schneider
                                  Attorneys for Plaintiff Securities and Exchange Commission

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF THE ISSUES ......................................................................... 2

III.    STATEMENT OF FACTS .................................................................................. 2

    A.    The Defendant ......................................................................................... 2

    B.    The Relief Defendants ........................................................................... 3

    C.    Trabulse Misrepresented The Fund's Performance To Solicit
        Investments. ............................................................................................ 4

    D.    Trabulse Failed To Accurately Account For And Value The
        Fund. ........................................................................................................ 6

    E.    Trabulse Misappropriated Fahey Fund Assets. .................................... 7

    F.    Trabulse Failed To Disclose How He Used Investor Money. .............. 9

    G.    Trabulse Improperly Allocated Profits To Certain Investors. ........... 10

    H.    Trabulse Acted Knowingly And Deceptively .................................... 11

    I.     The Fahey Fund May Not Have Sufficient Assets To
        Distribute To Defrauded Investors. ..................................................... 11

IV.     LEGAL ARGUMENT ....................................................................................... 12

    A.    The Court Should Preliminarily Enjoin Defendant From
        Violating The Antifraud Provisions And Making Distributions
        Or Accepting New Funds . .................................................................... 12

    B.    Trabulse Committed Fraud And Breached His Fiduciary Duty
        To Clients In Violation Of The Securities Laws. ............................... 13

    C.    The Court Should Preliminarily Enjoin Trabulse From
        Violating The Antifraud Provisions And Making Distributions
        To Himself. ............................................................................................ 17

    D.    Other Expedited Relief Is Necessary And Appropriate ..................... 18

        1.    Accounting ................................................................................ 18

        2.    Expedited Discovery ................................................................ 18

        3.    Order Preventing Alteration Or Destruction Of
            Documents ................................................................................ 19

4.    Appointment Of A Monitor ..................................................................... 19

V.    CONCLUSION .................................................................................................. 19

1

**TABLE OF AUTHORITIES**

2

CASES

3

*Aaron v. SEC*, 446 U.S. 680 (1980) ......................................................................... 14

4

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ........................................................... 14

5

*FTC v. H.N. Singer*, 668 F.2d 1107 (9th Cir. 1982) ............................................... 18

6

7

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir.
    1990) (en banc) .................................................................................................... 14

8

9

*In the Matter of John J. Kenny*, Advisers Act Release No.
    2128 (May 14, 2003) ........................................................................................... 15

10

*Koehler v. Pulvers*, 614 F. Supp. 829 (S.D. Cal. 1985) .......................................... 14

11

*Mayfield v. First Nat. Bank of Chattanooga*, 137 F.2d 1013
    (6th Cir. 1943) ............................................................................................... 15, 16

12

13

*Navel Orange Admin. Comm. v. Exeter Orange Co.*, 722
    F.2d 449 (9th Cir. 1983) ...................................................................................... 13

14

15

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th
    Cir. 1988.) ............................................................................................................ 13

16

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180
    (1963) .............................................................................................................. 14, 16

17

18

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ................................................. 12, 17

*SEC v. Chemical Trust,* [2000 Transfer Binder] Fed. Sec. L.
    Rep. (CCH) ¶ 91,291 (S.D. Fla. 2000) ............................................................... 19

19

20

*SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998) ........................................................ 17

21

*SEC v. First Financial Group of Texas*, 645 F.2d 429, (5th
    Cir. 1981) ............................................................................................................. 19

22

23

*SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272 (9th Cir.
    1990) ..................................................................................................................... 18

24

25

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) .................................. 13

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir.1990) ................................................ 12

26

*SEC v. Zandford,* 535 U.S. 813, 122 S.Ct. 1899, 153
    L.Ed.2d 1 (2002) ............................................................................................. 14, 16

27

28

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir.
2006) ........................................................................................................... 15

*Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979) ........................................ 14

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ............................ 14

*U. S. v. Odessa Union Warehouse Co-Op*, 833 F.2d 172
(9th Cir. 1987) ............................................................................................ 13

*Vernazza v. SEC*, 327 F.3d 851 (9th Cir. 2003) ................................... 14, 16

STATUTES

15 U.S.C. § 77q(a) ....................................................................................... 13

15 U.S.C. § 77t(b) ........................................................................................ 12

15 U.S.C. § 77v(a) ....................................................................................... 19

15 U.S.C. § 78aa ........................................................................................... 19

15 U.S.C. § 78j(b) ........................................................................................ 13

15 U.S.C. § 78u(d) ....................................................................................... 12

15 U.S.C. § 80b-2(a)(11) ............................................................................. 15

15 U.S.C. § 80b-6 ......................................................................................... 14

15 U.S.C. § 80b-6(1) .................................................................................... 14

15 U.S.C. § 80b-6(2) .................................................................................... 14

15 U.S.C. § 80b-9(d) .................................................................................... 12


REGULATIONS AND RULES

17 C.F.R. § 240.10b-5 .................................................................................. 13

Fed. R. Civ. P.  26(f) .................................................................................... 18

# MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Securities and Exchange Commission ("Commission") submits this memorandum in support of its motion for a preliminary injunction and other ancillary relief.

## I.    INTRODUCTION

Prior to filing this motion, the counsel for the Commission contacted counsel for defendant Alexander James Trabulse ("Trabulse") and the relief defendants to advise them of the Commission's intention to seek a preliminary injunction and other ancillary relief.  Counsel for the respective parties have submitted for the Court's consideration a stipulation and proposed order that essentially prohibits Trabulse from: (1) making distributions to investors in his hedge funds, (2) taking new investment money from current or prospective investors, and (3) trading in certain illiquid assets on behalf of the fund.  However, the parties were unable to reach agreement on other essential relief sought by the Commission.

In addition to the injunctive relief to which the parties have stipulated, the Commission seeks to preliminarily enjoin Trabulse from withdrawing money for his personal use.  Over a period of eight years, Trabulse has sent false and misleading account statements to investors which grossly overstated the performance and value of the fund.  Any distributions made to Trabulse today will therefore be inappropriate based on the fund's inflated valuation, and would be to the detriment of investors.  Accordingly, the Commission is seeking to preserve the status quo until an accounting has been completed and the Court has had the opportunity to fully assess the scope of Trabulse's fraud.

From at least 1998 through the present, Trabulse has been defrauding investors by falsifying investor account statements to make his hedge fund look more profitable than it actually is.  He used materially false and misleading account statements to solicit new investments and convince existing investors to put additional money into his fund.  Moreover, while Trabulse has described his fund to investors as a hedge fund that invested in financial instruments like stocks, derivatives, and foreign currency, he in fact diverted a significant portion of investor money to purchase real estate (in southern California, France, and Panama), jewelry and rugs.  He hid these illiquid purchases from investors.  Trabulse also treated fund assets as if they were his own, using investors' money as a slush fund for himself and his family.  He took fund assets and paid for a myriad of improper, unauthorized

personal expenses including a home mortgage, a home theater system, and his now ex-wife's overseas shopping allowance. He even gave one relative free reign to use the fund's bank accounts for personal use.

Trabulse violated the antifraud provisions of the federal securities laws. Accordingly, in addition to the stipulated injunctive relief, the Commission seeks additional preliminary injunctive relief to stop Trabulse from further conduct that violates the securities laws and unfairly draws down the fund. In addition, the Commission is seeking by this motion an order permitting expedited discovery, a verified accounting, and directing the appointment of a monitor to oversee the fund's operations and to review the verified accounting that the Commission seeks from Trabulse.

## II. STATEMENT OF THE ISSUES

The Commission asks the Court to make the following determinations:

1.      Whether Trabulse violated the antifraud provisions of the securities laws;

2.      Whether it is reasonably likely Trabulse will engage in future conduct in violation of the securities laws, and whether, in addition to the stipulated injunctive relief, he should also be preliminarily enjoined from violating those laws and from making distributions to himself; and

3.      Whether the Court should order ancillary relief including an accounting, appointment of a monitor, expedited discovery, and preservation of evidence.

## III. STATEMENT OF FACTS

### A.      The Defendant

Defendant Alexander James Trabulse ("Trabulse"), age 60, resides in Daly City, California. He founded and controlled Fahey Fund, L.P., Fahey Financial Group, Inc., International Trade & Data, and ITD Trading. (Schneider Declaration in Support of Motion for Preliminary Injunction ("Schneider Decl."), ¶¶ 4-6, 31, Exhibits ("Exhs.") 3-5, 24.) Before filing this action, the Commission conducted an investigation in which it took sworn testimony from Trabulse. Trabulse refused to answer any of the Commission's questions (other than to state his name), asserting his Fifth Amendment right against self-incrimination. (Schneider Decl., ¶ 25, Exh. 18.) Among other subjects, Trabulse refused to testify about where his fund maintained bank or brokerage accounts,

how he calculated the fund's gains, profits, and losses, how he valued the fund's assets, and how he calculated his compensation.  (*Id.*)

**B.    The Relief Defendants**

Fahey Fund, L.P. (formerly known as Fahey Hedge Fund, L.P.) is a California limited partnership based in San Francisco.  (Schneider Decl., ¶¶ 2, 26, 31 Exhs. 1, 19, 24.)  Trabulse formed Fahey Fund, L.P. in 1997 for the purpose of investing in securities and other financial instruments.  (Schneider Decl., ¶ 31, Exh. 24.)  He is the fund's General Partner and is responsible for making all investment decisions.  (Schneider Decl., ¶¶ 26, 31, Exhs. 19, 24.)  Although the fund's partnership agreement and investor account statements claim that Fahey Fund, L.P. was located at 268 Bush Street, Suite 4232, San Francisco, California, that address actually is a mailbox located at MailBoxes Etc.  (Schneider Decl., ¶ 31-32, Exhs. 24-25.)

Fahey Financial Group, Inc. (formerly known as Delta Consulting, Ltd.) is a Nevada corporation formed in approximately 1999.  (Schneider Decl., ¶¶ 3-4, Exhs. 2-3.)  Trabulse serves as the President and Chief Executive Officer of Fahey Financial Group, Inc. ("Fahey Financial").  (Schneider Decl., ¶¶ 3-4, Exhs. 2-3.)

Trabulse collected investor money through bank accounts belonging to Fahey Fund, L.P. and Fahey Financial and transferred portions of that money to other entities which held brokerage accounts.  (Schneider Decl., ¶¶ 58-60, Exhs. 49-50.)  He used the two different entities to collect investor money purportedly so investors could defer taxes.  (Schneider Decl., ¶ 28, Exh. 21.)  But he operated Fahey Fund, L.P. and Fahey Financial as a single hedge fund (collectively, the "Fahey Fund.")  (Schneider Decl., ¶¶ 28, 58-60, Exhs. 21, 49-50.)  He ran the Fahey Fund almost entirely by himself.  (Schneider Decl., ¶ 26, Exh.  19.)

International Trade & Data is a California partnership originally formed in March 1985 between Trabulse and another individual for the purpose of conducting a general securities business.  (Schneider Decl., ¶ 5, Exh. 4.)  From approximately March 1987 through the present, Trabulse has been the sole partner.  (*Id.*)  Trabulse directed investor money deposited into Fahey Fund's bank accounts to bank and brokerage accounts held by International Trade & Data.  (Schneider Decl., ¶¶ 58-60, Exhs. 49-50.)  Trabulse made trades for Fahey Fund through International Trade & Data.

(Schneider Decl., ¶ 26, Exh. 19.)  Although International Trade & Data's brokerage accounts reflect that it is located at 747 Lewelling Blvd., Suite 40, San Leandro, California, that address actually is a mobile home in a mobile home park.  (Schneider Decl., ¶ 17, Exh. 12.)

ITD Trading is a California general partnership formed in approximately 2002 between Trabulse and another individual for the purpose of trading commodities.  (Schneider Decl., ¶¶ 6-7, Exhs. 5-6.)  Trabulse also directed investor money deposited into Fahey Fund's bank accounts to bank and brokerage accounts held by ITD Trading.  (Schneider Decl., ¶¶ 58-60, Exhs. 49-50.)  Trabulse also used ITD Trading to make trades for Fahey Fund, though on a smaller scale.  (Schneider Decl., ¶ 26, Exh. 19.)  ITD Trading's brokerage accounts reflect that it uses the same address as International Trade & Data.  (Schneider Decl., ¶ 19, Exh. 14.)

### C.    Trabulse Misrepresented Fahey Fund's Performance To Solicit Investments.

Fahey Fund began in 1997 with a few investors.  By the end of 2006, it had more than 100 investors and, according to the false statements distributed to investors by Trabulse, purportedly was valued at approximately $50 million.  (Schneider Decl., ¶ 24.)  Trabulse described the fund to investors in oral conversations and written materials as a conservative fund that invested in financial instruments like stocks, options, derivatives, futures, indexes, and foreign currency.  (Schneider Decl., ¶¶ 31, 33-34, 40, 43, Exhs. 24, 26-27, 33, 35.)  He also touted the fund's "consistent" and stable profitability.  (Schneider Decl., ¶¶ 37, 40, 61, Exhs. 30, 33, 51.)

At the end of each calendar quarter, Trabulse prepared and sent to investors an account statement and newsletter that purported to account for the changes in an investor's account balance from one quarter to the next and also identify each investor's beginning balance, gains and/or losses earned during the period, and ending balance.  (Schneider Decl., ¶¶ 23-24, 32, Exhs. 17, 25.)  The account statements also purported to include a description of the investments in which gains were earned.  (Schneider Decl., ¶ 23, Exh. 17.)

The quarterly account statements Trabulse sent to investors were materially false and misleading and bore no relation to the fund's actual performance during the quarter.  For example, for the quarter ended March 31, 2007, Trabulse distributed account statements that told investors there were "no changes" from December 31, 2006.  (Schneider Decl., ¶¶ 45-46, Exhs. 37-38; Declaration

of H. Gifford Fong ("Fong Decl."), ¶ 11, Exh. 2.) In the newsletter accompanying the March 31, 2007 statements, which were prepared by Trabulse to summarize the fund's performance, he stated: "While there was a great deal of movement in the market, our particular positions just sat there! So, there is nothing to report. Please note that <u>your statements will be unchanged from the Dec. 31, 2006 final</u>." (*Id*.) (underlining in original). In reality, two of the fund's brokerage accounts suffered trading losses of $5,267,210.[1] (Fong Decl., ¶ 12.) Additionally, the combined return of two of the fund's brokerage accounts was -2.6%. (Fong Decl., ¶¶ 11-12, Exh. 3.) Accordingly, Trabulse's claims that there were "no changes" and that the fund's positions "just sat there!" are false. (Fong Decl., ¶ 12.)

In addition to misstating the fund's performance, Trabulse also overstated in the quarterly investor account statements the fund's net assets – that is, the value of the fund itself. As of December 31, 2006, Trabulse reported to investors that the fund's collective net assets, which purportedly were composed of investor contributions and gains earned on investments in stocks, futures, derivatives, and foreign currency, totaled approximately $50 million. (Schneider Decl., ¶¶ 23-24, Exh. 17.) In reality, the fund's brokerage account records and bank statements show the fund's value was only approximately $10 million ($6.95 million in brokerage accounts and $3.05 million in bank accounts). (Schneider Decl., ¶¶ 8-22, Exhs. 7-16.) In addition, Trabulse did not have a reasonable basis upon which to assert that the fund's assets totaled approximately $50 million because he did not "mark to market" the fund's assets (Fong Decl., ¶¶ 4, 10) – that is, assign a current market price to the fund's investments at the end of each reporting period.[2] Further, because the

---

[1]    Trabulse maintained trading accounts at three separate brokerages: A.G. Edwards & Sons, Inc. ("A.G. Edwards"), Iowa Grain Company ("Iowa Grain"), and Canaccord Capital Corporation ("Canaccord"). (Schneider Decl., ¶¶ 16-22, Exhs. 12-16.) The $5.2 million loss for the three months ended March 31, 2007 is due only to trading activity in the A.G. Edwards and Iowa Grain brokerage accounts. (Fong Decl., ¶ 12.) But the balance in the Canaccord accounts at December 31, 2006 was less than $100,000 (*see* Schneider Decl., ¶ 22), making it unlikely that any gains earned at that brokerage would have a significant impact.

[2]    In finance and accounting, "mark to market" is the act of assigning a value to a position held in a financial instrument based on the current market price for that instrument or similar instruments. If the investment portfolio is not "marked to market" each time a fund provides an accounting statement or whenever a contribution or withdrawal takes place, the fund will be unable to establish the overall value of the fund and the proportionate ownership of each investor. (Fong Decl., ¶ 4.)

value of the fund at December 31, 2006 is inaccurate, and because Trabulse's current performance calculations are dependent on that prior valuation, he has no reasonable basis upon which to represent the fund's performance going forward.

Trabulse used the false and misleading account statements to recruit new investors and to encourage existing investors to increase their investments in the Fahey Fund. (Schneider Decl., ¶¶ 32, 35-36, 38-39, Exhs. 25, 28-29, 31-32.) Indeed, Trabulse touted the fund's positive performance when soliciting new investors. (Schneider Decl., ¶¶ 37, 61, Exhs. 30, 51.) Many investors decided to invest in the Fahey Fund because they heard from friends or colleagues already invested in the fund that the fund achieved spectacular returns. (Schneider Decl., ¶¶ 42, 47, Exhs. 35, 39.) Trabulse also gave certain prospective investors a list of existing investors who "ha[d] been with the Fahey Fund at least 3 to 5 years" and purportedly were willing to act as references. (Schneider Decl., ¶¶ 38-39, Exhs. 31-32.) One investor, who with his wife invested more than $2 million in 2006, called several of the individuals on the list before investing and based the investment, in part, on the recommendations he received regarding the fund's performance. (Schneider Decl., ¶¶ 38-39, Exhs. 31-32.) In memorializing his phone conversations, this investor characterized the references for the fund as "great." (Schneider Decl., ¶ 39, Exh. 32.) Certain investors made multiple contributions into the fund based on the false and misleading account statements they received from Trabulse. (Schneider Decl., ¶¶ 30, 41, 42, Exhs. 23, 34, 35.) For example, as recently as April 2007 Trabulse accepted from an existing investor an additional contribution of $30,000. (Schneider Decl., ¶ 50, Exh. 42.)

### D.     Trabulse Failed To Accurately Account For And Value The Fund.

Trabulse failed to make any effort to accurately account for and value the fund's holdings despite the fact that accurate record-keeping and reporting is fundamental to the proper management of an investment fund. (Fong Decl., ¶ 2.) Accurate record-keeping and accounting is essential to determine the proportionate ownership of each investor as well as to account for the proper distribution or contribution of cash flows. (Fong Decl., ¶ 2.) Moreover, investors need accurate information about a fund's performance and value to make decisions about their investment including

1   whether they want to stay in the fund, contribute additional assets to the fund, or withdraw part of

2   their assets from the fund.  (Fong Decl., ¶ 3.)

3          Trabulse's failure to accurately report the fund's activity and value was driven by several

4   missteps.  He failed to accurately report the fund's trading activities because he failed to "mark to

5   market" the fund's investment portfolio.  (Fong Decl., ¶¶ 4, 10, 11, 12, Exhs. 2-3.)  He also did not

6   accurately calculate the fund's return over the applicable reporting periods because he did not

7   account for the timing of external cash flows.[3]  (Fong Decl., ¶¶ 5, 10, 11, 15, Exhs. 2-3, 5-6.)

8   Trabulse also did not record in investor statements all contributions and withdrawals, which resulted

9   in an over or understatement of investors' profits and balances.  (Fong Decl., ¶¶ 10, 17-18, Exhs. 9-

10  10.)  He further failed to record certain contributions in the proper period, which resulted in an

11  overstatement of investors' profits and balances.  (Fong Decl., ¶¶ 6, 10, 16, Exhs. 7-8.)  Trabulse also

12  failed to accurately disclose and describe the types of investments being made.  (Fong Decl., ¶¶ 7, 10,

13  13-14, Exhs. 2, 4.)  Moreover, numerous of the investor account statements contain errors and

14  inconsistencies, rendering suspect all profit allocations and balances.  (Fong Decl., ¶¶ 10, 19-22,

15  Exhs. 11-15.)

16         Consequently, Trabulse had no reliable mechanism to report accurately to investors the

17  performance or value of the fund.  Thus, he had no rational basis for the reported account values or

18  the allocation of purported profits among the investors, as reflected in the investor account

19  statements.

20         **E.    Trabulse Misappropriated Fahey Fund Assets.**

21         Trabulse used the Fahey Fund bank accounts to pay for a wide variety of personal, and

22  unauthorized, expenses.  Contrary to the fund's partnership agreement, Trabulse withdrew money

23  from the fund's bank accounts as he felt like it.[4]  (Schneider Decl., ¶ 26, Exh. 19.)  It is standard

---

24  [3]    It is standard industry practice to calculate an investment fund's performance by calculating a

25  time-weighted return.  (Fong Decl., ¶ 5.)  Like "marking to market," a time weighted rate of return is
    the appropriate measure to use when calculating an investment fund's performance, as it eliminates

26  the effect of the timing of contributions and withdrawals (which usually are beyond the manager's
    control), on the rate of return of the fund.  (Fong Decl., ¶ 5.)

27  [4]    Trabulse was not entitled to a salary.  (Schneider Decl., ¶ 31, Exh. 24.)  Instead, for investors

28  who invested more than $50,000, the fund's partnership agreement allowed Trabulse to receive up to
    **Footnote continued on next page**

industry practice to segregate fund assets from personal assets. (Fong Decl., ¶ 8.) As set forth in more detail below, Trabulse used fund assets as a personal slush fund. Finally, because Trabulse never "marked to market" the fund's holdings and did not accurately account for the fund's trading activities and cash flows (Fong Decl., ¶¶ 2, 4-7, 10), he had no basis to determine how much money he could withdraw consistent with the fund's partnership agreement.

The following are some examples of Trabulse's improper use of the fund's bank accounts. On October 4, 2004, and again on August 15, 2005, Trabulse transferred a total of approximately $20,000 to his ex-wife's overseas bank account. (Schneider Decl., ¶ 55, Exh. 46.) Trabulse described in the fund's books and records the August 15, 2005 transfer as for "Paris Business Expenses." (Schneider Decl., ¶ 55, Exh. 46.) In reality, Trabulse transferred that money so his ex-wife could go shopping in France while they vacationed there. (Schneider Decl., ¶¶ 44, 55, Exhs. 36, 46.) On April 17, 2006, Trabulse transferred $65,000 to one of his ex-wife's domestic bank accounts so that she could pay her home mortgage after they separated. (Schneider Decl., ¶¶ 44, 56, Exhs. 36, 47.) On June 14, 2006 and again on July 28, 2006, Trabulse used the fund's bank accounts to buy her a home theater system costing in excess of $25,000. (Schneider Decl., ¶¶ 44, 57, Exhs. 36, 48.) Additionally, Trabulse used the fund's bank accounts to purchase for his ex-wife several rugs that she currently uses in her home; Trabulse told her they were hers to keep and never told her the rugs were for the benefit of the Fahey Fund investors. (Schneider Decl., ¶¶ 44, 51, Exhs. 36, 43.)

Between approximately January 2003 through October 2006, Trabulse transferred more than $500,000 overseas to a bank account maintained in his personal name (not the fund's name) in Paris, France. (Schneider Decl., ¶ 52.) He described certain of these transfers in the fund's books and records as for "Paris Business Expenses." (Schneider Decl., ¶ 52.) Yet, after he transferred the money, the bank account was used to pay for obvious personal consumption items here in the United States, including groceries and outdoor gear. (Schneider Decl., ¶¶ 52-54, Exhs. 44-45.)

Trabulse even authorized his daughter to use a debit card linked to one of Fahey Fund's bank accounts. His daughter used the card to buy furniture, airline tickets, and pay for her 2007

---

twenty-five (25) percent of the net profits as determined by generally accepted accounting principles. (Schneider Decl., ¶ 31, Exh. 24.)

1  honeymoon in Panama.  (Schneider Decl., ¶ 51, Exh. 43.)  Trabulse also used the fund's bank

2  accounts to purchase for his daughter several pieces of jewelry, and two rugs, that she currently keeps

3  in her home.  (Schneider Decl., ¶ 51, Exh. 43.)

4       Trabulse routinely commingled his own assets with those of the fund, without accounting for

5  who the actual owner was.  (Schneider Decl., ¶ 26, Exh. 19.)  He on numerous occasions transferred

6  money between a French bank account held in his name and bank accounts belonging to Fahey Fund,

7  L.P., Fahey Financial Group, Inc., International Trade & Data, and ITD Trading, and withdrew, or

8  authorized the withdrawal of, money from all accounts for personal use.  (Schneider Decl., ¶¶ 26, 44,

9  51-57, 60, Exh. 19, 36, 43-48.)  Moreover, even though the fund's partnership agreement required

10 him to maintain investor funds in bank accounts in the name of Fahey Fund, he in fact kept investor

11 funds in several accounts not bearing the fund's name.  (Schneider Decl., ¶¶ 8-15, 31, Exhs. 7-11,

12 24.)

13      **F.**    **Trabulse Failed To Disclose How He Used Investor Money.**

14      Trabulse told investors, in both verbal and written communications, that Fahey Fund invested

15 in financial instruments such as stocks, options, derivatives, futures and foreign currency.  (Schneider

16 Decl., ¶¶ 31, 40, 43, Exhs. 24, 33, 35.)  In reality, Trabulse used a significant portion of investor

17 money to purchase items such as pearl necklaces and other jewelry, real property, and rugs – some of

18 which he gave his family members, telling them the items were theirs to keep.  (Schneider Decl., ¶¶

19 26, 44, 51, Exhs. 19, 36, 43.)  Trabulse even used investor money to fund a start-up golf company

20 and purchase a BMW for the golf company's owner.  (Schneider Decl., ¶ 62, Exh. 52.)

21      Although it is standard industry practice to disclose fund assets and properly account for such

22 assets (Fong Decl., ¶¶ 7, 10), Trabulse failed to tell investors that Fahey Fund invested or planned to

23 invest in jewelry, real property, or rugs.  (Schneider Decl., ¶¶ 33, 37, 41, 43, Exhs. 26, 30, 34, 35.)

24 Trabulse also concealed these purchases from investors by failing to identify them in account

25 statements or elsewhere in materials provided to investors.  (Schneider Decl., ¶¶ 23, 40, Exhs. 17,

26 33.)  None of the investor account statements provided to investors report gains or balances in rugs,

27 real estate, or jewelry.  (Schneider Decl., ¶¶ 23, 32, Exh. 25).  For example, in the three months ended

28 March 31, 2007, Trabulse transferred money out of the fund's bank accounts purportedly for an

1  "artistic" investment, a "property" investment, and an "auto" investment.  (Fong Decl., ¶ 13, Exh. 4.)

2  The account statements he sent to investors for this period did not disclose these purchases.  (Fong

3  Decl., ¶ 14, Exh. 2.)  Due to Trabulse's failure to disclose these purchases, one investor considered an

4  investment in a rug "unusual" and "bizarre."  (Schneider Decl., ¶ 41, Exh. 34.)  She described an

5  investment by the fund in a pearl necklace as "not in good faith" and "odd."  (Schneider Decl., ¶ 41,

6  Exh. 34.)

7  **G.    Trabulse Improperly Allocated Profits To Certain Investors.**

8  It is standard industry practice to record contributions to an investment fund on the date the

9  fund received the money, rather than some earlier, or later, time.  (Fong Decl., ¶ 6.)  This is important

10  because to do otherwise will result in the incorrect distribution of gains and/or losses to investors.

11  (*Id.*)

12  Fahey Fund's partnership agreement provided that profits were to be allocated pro rata among

13  the investors.  (Schneider Decl., ¶ 31, Exh. 24.)  Yet, Trabulse improperly allocated to certain

14  investors profits that they were not entitled to earn, at the expense of the remaining investors in the

15  fund.  For example, he allocated to one investor purported gains of $48,100 during the first quarter of

16  2006 even though the investor did not put money into the fund until the second quarter of 2006.

17  (Schneider Dec., ¶¶ 23, 37 Exhs. 17 (FAHEY-SEC-1168), 30.)  As a result, the fund's other investors

18  held or received as a distribution $48,100 less than they should have during the first quarter of 2006.

19  (Schneider Decl., ¶¶ 23, 37, Exhs. 17 (FAHEY-SEC-1168), 30.)  Trabulse similarly allocated to at

20  least two other investors profits before they invested money in the fund.  (Fong Decl., ¶¶ 6, 10, 16,

21  Exhs.7-8.)  In addition, Trabulse never "marked to market" the fund's assets nor did he accurately

22  calculate each investor's return.  Accordingly, any distributions from the fund to investors inherently

23  are suspect because Trabulse had no rational basis upon which to assess each investor's pro rata share

24  of the fund's profits.  Nevertheless, in approximately February 2007, an investor cashed-out of the

25  fund, receiving approximately the balance Trabulse reported to her at December 31, 2006.

26  (Schneider Decl., ¶¶ 41, 48 Exhs. 34, 40.)  Additionally, Trabulse distributed over $1 million to

27  investors in the first quarter of 2007.  (Schneider Decl., ¶ 48-49, 63, Exhs. 40-41, 53.)

28

For the sake of brevity and efficiency, the Commission has limited the evidence presented in support of this motion but there are numerous other instances of Trabulse's improper and inaccurate accounting and misuse of fund assets in the fund's own records.

**H.    Trabulse Acted Knowingly And Deceptively.**

Trabulse knew the account statements he provided to investors did not accurately reflect the fund's performance.  He received bank statements, as well as daily and monthly statements for the fund's brokerage accounts, which detailed the trading activity and resulting profit and/or loss for each period.  (Schneider Decl., ¶¶ 8, 16, Exh. 7.)  He also knew that the statements omitted important information about what he was using fund assets for:  including numerous expenditures on himself and his family, and purchases of consumption items including automobiles and jewelry.  Trabulse frustrated investors' efforts to get more information about the fund or have the fund's performance reviewed by financial professionals.  For example, he told one investor who (on behalf of his financial planner) asked for additional information about the fund that he wouldn't provide the information because financial planners did not know how to value a hedge fund.  (Schneider Decl., ¶ 29, Exh. 22.)  Trabulse also expressed anger that anyone would "doubt [his] honesty" and suggested that the investor could "cash out" of his investment.  (*Id.*)

On April 26, 2007, the Commission's staff took the sworn testimony of Trabulse.  During the proceeding, Trabulse was asked to explain how he valued fund assets, how he calculated the fund's profits and losses, and how he calculated his compensation.  Trabulse declined to answer each of these questions and asserted his Fifth Amendment privilege against self-incrimination.  (Schneider Decl., ¶ 25, Exh. 18.)

**I.    The Fahey Fund May Not Have Sufficient Assets To Distribute To Defrauded Investors.**

Trabulse overstated the fund's value at December 31, 2006.  (Schneider Decl., ¶¶ 8-22, 23-24, Exhs. 7-16.)  Since that time, the fund's largest brokerage account has declined from a value of $6,224,122.68 as of December 31, 2006 to $1,416,728.24 as of August 31, 2007.  (Schneider Decl., ¶ 22, 64, Exh. 54.)  After the complaint was filed, investors contacted the Commission's staff to advise that they want to withdraw their assets from the fund.  (Declaration of Mark P. Fickes in Support of

Motion for Preliminary Injunction, ¶¶ 2-4, Exh. 1.)  If the status quo is not maintained by enjoining

Trabulse from making distributions pending an appropriate accounting, the first investors to redeem

may deplete the fund and there may not be sufficient assets to distribute to all injured investors.

Furthermore, any distributions would be suspect if based on Trabulse's representations about the

fund's value to date.

## IV.    LEGAL ARGUMENT

### A.    The Court Should Preliminarily Enjoin Defendant From Violating The Antifraud Provisions And Making Distributions Or Accepting New Funds.

Upon a "proper showing" that defendants have violated the federal securities laws, the

Commission may obtain a temporary injunction.  *See*, Section 20(b) of the Securities Act of 1933

("Securities Act"), 15 U.S.C. § 77t(b); Section 21(d) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78u(d); and Section 209(d) of the Investment Advisers Act of 1940

("Advisers Act"), 15 U.S.C. § 80b-9(d).  In particular, Section 21(d) of the Exchange Act provides in

relevant part:

> Whenever it shall appear to the Commission that any person is engaged or is about to
> engage in acts or practices constituting a violation of any provision of this title, [or]
> the rules or regulations thereunder, the rules of a national securities exchange or
> registered securities association of which such person is a member or a person
> associated with a member, the rules of a registered clearing agency in which such
> person is a participant, the rules of the Public Company Accounting Oversight Board,
> of which such person is a registered public accounting firm or a person associated
> with such a firm, or the rules of the Municipal Securities Rulemaking Board, it may
> in its discretion bring an action in the proper district court of the United States, the
> United States District Court for the District of Columbia, or the United States courts
> of any territory or other place subject to the jurisdiction of the United States, to enjoin
> such acts or practices, and upon a proper showing a permanent or temporary
> injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d).

A preliminary injunction enjoining violations of the securities laws is appropriate if the

Commission makes a substantial showing of likelihood of success as to both a current violation and

the risk of repetition.  *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998), citing *SEC v. Unifund*

*SAL*, 910 F.2d 1028, 1039-40 (2d Cir.1990).

The Commission is not required to prove irreparable injury or the inadequacy of legal

remedies, as may be required of a private litigant moving pursuant to Federal Rule of Civil Procedure

65.  Instead, the relief should be granted when the Commission meets the statutory requirement of showing a likelihood of continued violations of the securities laws, since the agency appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest." *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).  Because the Commission is bringing this action pursuant to its statutory mandate to safeguard the public interest and to enforce the federal securities laws, irreparable injury is presumed.  *See U. S. v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 174-75 (9th Cir. 1987) (holding irreparable injury presumed in federal agency action for injunctive relief); *Navel Orange Admin. Comm. v. Exeter Orange Co.*, 722 F.2d 449, 453 (9th Cir. 1983) (same.).

As discussed below, the Commission's evidence establishes that Trabulse has violated, and that there is a reasonable likelihood that Trabulse will continue to violate, the federal securities laws unless he is promptly enjoined from doing so.  By entering into the stipulation with the Commission regarding certain injunctive relief, Trabulse has essentially conceded that the Commission is entitled to preliminary injunctive relief to maintain the status quo.  Nevertheless, if Trabulse is permitted to withdraw money from the funds, there is a strong likelihood that such funds represent money to which Trabulse is not entitled, and would therefore represent an additional misappropriation of funds.[5]

## B.    Trabulse Committed Fraud And Breached His Fiduciary Duty To Clients In Violation Of The Securities Laws.

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit misrepresentations, material omissions of fact, and the use of fraudulent devices in connection with the purchase or sale of securities.  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  Section 17(a) of the Securities Act prohibits the same conduct in the offer or sale of securities.  15 U.S.C. § 77q(a).  Furthermore, conduct that violates the antifraud provisions of the Exchange Act and Securities Act may also constitute a breach of an investment adviser's fiduciary duties to his clients, under Section 206 of the Investment

---

[5]    The Commission has submitted declarations and sworn testimony in support of its motion for a preliminary injunction.  Due to the urgency of obtaining a preliminary injunction, the Court has discretion to accept hearsay and other evidence that might be inadmissible at trial.  *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988.)

1    Advisers Act of 1940 ("Advisers Act").  15 U.S.C. § 80b-6.  *See SEC v. Capital Gains Research*

2    *Bureau, Inc.*, 375 U.S. 180, 191-92, 194, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (advisers owe

3    fiduciary duty to deal with their clients in utmost good faith and complete candor).  Section 206 of

4    the Advisers Act makes it unlawful for any investment adviser: (1) to employ any device, scheme, or

5    artifice to defraud any client or prospective client, or (2) to engage in any transaction, practice or

6    course of business which operates as a fraud or deceit upon any client or prospective client.  15

7    U.S.C. §§ 80b-6(1),(2).

8         To constitute a violation of the antifraud provisions, the deception, misstatement or omission

9    must be "material."  *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (*quoting TSC Indus.,*

10   *Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  A fact is material if there is a substantial

11   likelihood that a reasonable investor would consider it important in making an investment decision.

12   *See TSC Indus.*, 426 U.S. at 449.  Although materiality is a mixed question of fact and law, courts

13   have recognized that certain basic information, such as how investor funds are used, may be material

14   as a matter of law.  *Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (material information

15   includes, at a minimum, "accurate information on the use of investor funds").

16        To prove fraud or a breach of fiduciary duty in violation of Section 10(b) of the Exchange Act

17   and Rule 10b-5 thereunder, Section 17(a)(1) of the Securities Act, or Section 206(1) of the Advisers

18   Act, "scienter" must also be shown.  *See Aaron v. SEC*, 446 U.S. 680, 695 (1980).  The Ninth Circuit

19   has expressly held that recklessness satisfies the scienter requirement.  *See Hollinger v. Titan Capital*

20   *Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc).  However, scienter is not an element of

21   violations of Section 206(2) of the Advisers Act (15 U.S.C. § 80b-6(2)) or Sections 17(a)(2) and (3)

22   of the Securities Act (15 U.S.C. §§ 77q(a)(2) & (3)).  *Vernazza v. SEC*, 327 F.3d 851, 859-60 (9th

23   Cir. 2003); *Steadman v. SEC*, 603 F.2d 1126, 1132-34 (5th Cir. 1979); *Aaron v. SEC*, 446 U.S. 680,

24   701-02 (1980).

25        The further element for a violation of Section 10(b) of the Exchange Act and Rule 10b-5

26   thereunder, that the fraud be "in connection with" the purchase or sale of a security, is satisfied if a

27   scheme to defraud (whether or not accompanied by a particular misrepresentation or omission)

28   coincides with the sale (or purchase) of securities.  *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct.

1899, 153 L.Ed.2d 1 (2002); *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1050-51 (9th Cir. 2006). Also, the further element under Section 206 of the Advisers Act, that the deception or misrepresentation be carried out by an investment adviser and directed toward a client (or a prospective client), is satisfied by the relationship between an adviser and a fund that he manages. *See* 15 U.S.C. § 80b-2(a)(11) (Section 202(a)(11) of the Advisers Act defines an "investment adviser" to include "any person, who for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities"). Trabulse acted as the investment adviser to Fahey Fund.[6]

Each of these elements for violations of the antifraud provisions is satisfied by Trabulse's numerous material misrepresentations, omissions of fact, and his deceptive acts towards the Fahey Fund and its investors, including by his misappropriation of investor funds. First, Trabulse never "marked to market" fund assets at the time he made quarterly distributions to investors or provided quarterly account statements. Consequently, his representations about the fund's value and the allocation of purported profits to individual investors were inherently misleading, and bore no relationship to reality, because they were not based on an accurate, objective valuation of the fund's assets. The account statements furnished to investors overstated the funds' net assets; he reported to investors collective net assets of approximately $50 million at a time when the fund's brokerage account records and bank statements show the fund's value was only approximately $10 million. Trabulse also misrepresented the types of investments in which the fund had earned profits or incurred losses. *See, e.g., Mayfield v. First Nat. Bank of Chattanooga*, 137 F.2d 1013, 1018 (6th Cir. 1943) (holding that fiduciary has a duty to provide detailed status report to clients of changes in assets under the fiduciary's control).

---

[6]  Similarly, because Trabulse controlled the relief defendants as their principal, he must also be deemed an "investment adviser" with primary liability under Sections 206(1) and 206(2.) *In the Matter of John J. Kenny*, Advisers Act Release No. 2128 (May 14, 2003) (finding chief executive officer and controlling shareholder of investment firm to be an investment adviser for Section 206 purposes).

1  Trabulse further failed to disclose significant information to investors that would have been

2  important to them in making decisions about investing in the fund, adding to their investment, or

3  maintaining an investment in the fund.  While he told investors that Fahey Fund invested in financial

4  instruments such stocks, options, derivatives, futures and foreign currency, he omitted the fact that he

5  used investor money to purchase illiquid items including pearl necklaces and other jewelry, real

6  property, and rugs, some of which he gave to his family.  One investor described such purchases, in

7  light of the representations made to investors in the fund, as "bizarre."  Trabulse similarly omitted to

8  inform investors of his purchase of a BMW for the owner of a golf company.  Indeed, Trabulse

9  concealed from investors these purchases, and his gifting of those items to various persons, by not

10  identifying them in account statements that purported to describe the investments of the Fahey Fund.

11  Defendant also misappropriated investor funds, using the Fahey Fund as a virtual piggy bank

12  for himself and his relatives.  Such misappropriation of funds provided by investors constitutes a

13  violation of Section 10(b) of the Exchange Act and Rule 10b-5.  *SEC v. Zandford,* 535 U.S. at 820.

14  Misappropriation also constitutes a breach of an investment adviser's fiduciary duty to his clients to

15  act with "utmost good faith" in the management of the hedge fund assets.  *See SEC v. Capital Gains*

16  *Research Bureau, Inc.*, 375 U.S. 180, 191-92, 194, 196-97, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)

17  (advisers owe fiduciary duty to deal with their clients in utmost good faith and with complete

18  candor); *Vernazza v. SEC*, 327 F.3d at 859.  Any reasonable investor would find Trabulse's

19  misrepresentations, omissions, and his misappropriation and commingling of fund assets to be

20  material.

21  Trabulse acted with scienter.  Trabulse's intent to deceive may be inferred from the very

22  nature of his conduct – fabricating account statements and commingling fund assets with his own.

23  Trabulse's failure to disclose that he had commingled fund assets with his own by itself breached his

24  fiduciary duties.  *See Capital Gains*, 375 U.S. at 191-92, 194; *Vernazza*, 327 F.3d at 859; *Mayfield*,

25  137 F.2d at 1018.  Trabulse also knew the investor account statements he provided to investors did

26  not accurately reflect the fund's performance, as he received bank statements and brokerage account

27  statements that detailed the trading activity and resulting profit or loss for each period.  In addition,

28  he knew that the fund invested in jewelry, rugs and real estate, yet he actively concealed these

1  holdings from investors.  His fraudulent intent also may be inferred from his refusal to answer

2  questions in testimony on the grounds that he might incriminate himself.  *See SEC v. Colello*, 139

3  F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the

4  court is equally free to draw adverse inferences from their failure of proof").

5

6  **C.    The Court Should Preliminarily Enjoin Trabulse From Violating The Antifraud Provisions And Making Distributions To Himself.**

7  As described above, Trabulse violated the antifraud statutes by misappropriating client assets

8  and making material misrepresentations and omissions of fact in connection with the purchase or sale

9  of securities.  His violations constitute a reasonable basis to expect that he will engage in future

10  violations of the securities laws, unless restrained and enjoined.  *Cavanagh*, 155 F.3d at 132.  The

11  nature of his violations – such as his repeated disbursements to investors of money to which they

12  were not entitled, or his distributions that were not based on a marked to market valuation of the

13  fund's assets – suggests that without the preliminary injunction against any further violations of the

14  antifraud provisions, Trabulse will cause further harm to Fahey Fund and to its remaining investors.

15  The Commission is mindful that the stipulation to certain injunctive relief between the

16  Commission and Trabulse addresses some of the concerns set forth in this motion.  However, a

17  preliminary injunction is also necessary to prevent Trabulse from making distributions to himself.  As

18  described above, any distribution by Trabulse at this point is inherently suspect, as there can be no

19  assurance that Trabulse is entitled any amount he may describe as his "share."  Consequently,

20  investors in the fund would be harmed by any distribution to Trabulse until he can accurately account

21  for the assets of the fund.  Just as importantly, Trabulse is not entitled to any of the fund's assets until

22  he can demonstrate the fund's true value.  Under his partnership agreement, he is obligated to pay

23  expenses of the fund.  Such expenses may be paid out of the portion of the fund's profits to which he

24  may be entitled (no more than 25 percent).  But, where Trabulse has not demonstrated that there are

25  any profits, any distribution to himself even for "expenses," would be a further breach of his duties to

26  his client.  Accordingly, the additional injunctive relief sought by the Commission is necessary to

27  maintain the status quo pending this litigation and to prevent Trabulse from continuing to violate the

28  securities laws.

**D.    Other Expedited Relief Is Necessary And Appropriate.**

      **1.    Accounting**

The Commission requests that this Court enter an order requiring Trabulse to submit a verified accounting for the purpose of identifying:  (i) the location and disposition of all funds received from investors; and (ii) the location and value of all personal or fund assets presently held by Trabulse, under his control, or over which he exercises actual or apparent investment authority.  This accounting will assist the Court to determine the scope of defendant's fraudulent scheme.  An accounting also is necessary simply to permit the current investors in the Fahey Fund to know what the value is of their respective share, and to permit them to liquidate their investments if they so choose at the conclusion of this litigation.  Indeed, as described above, until such an accounting is performed, any distributions would be unfair either to a liquidating investor or to remaining investors in the fund.

In addition, an order for an accounting will make it more difficult for Trabulse and his agents to conceal assets in anticipation of a final order requiring disgorgement and civil penalties.  *See, e.g., SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1274 (9th Cir. 1990); *FTC v. H.N. Singer*, 668 F.2d 1107, 1114 (9th Cir. 1982).

      **2.    Expedited Discovery**

Because of the need to rectify the situation to permit investors to liquidate assets, if they so choose, the Commission seeks the ability to immediately embark on necessary discovery.  To date, the Commission has not obtained from Trabulse or the relief defendants documentation or testimony that substantiates the fund's purported value.  Accordingly, the Commission seeks expedited discovery to subpoena documents relating to the fraudulent scheme in order to determine the disposition of investor funds obtained by Trabulse, and to preserve these funds for possible disgorgement.  The Commission also seeks discovery, including depositions and documents, from the defendant, the relief defendants, and others working with them in order to obtain additional facts related to the fraud.  Accordingly, the Commission requests that the Court permit discovery before the parties have conferred in accordance with Rule 26(f) of the Federal Rules of Civil Procedure.

### 3. Order Preventing Alteration Or Destruction Of Documents.

To protect all remaining documents necessary for full discovery in this matter, the Commission seeks an order preventing the alteration or destruction of documents. To this point, the Commission has not been provided with access to all relevant documents. An order to preserve documents is therefore appropriate to protect the integrity of this litigation. *See SEC v. Chemical Trust,* [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 91,291, at 95,642 (S.D. Fla. 2000).

### 4. Appointment Of A Monitor

The Commission asks the Court to appoint a monitor to oversee Trabulse's operation of the Fahey Fund, to assure that all efforts are made to preserve and protect the remaining investor assets. The appointment of a monitor, which is akin to appointment of a receiver, is an equitable remedy available to the Commission in civil enforcement proceedings for injunctive relief. *See e.g.*, *SEC v. First Financial Group of Texas*, 645 F.2d 429, 438 (5th Cir. 1981); Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Appointment of a monitor with the powers set forth in the Commission's Proposed Order Granting Preliminary Injunction and Ordering Other Ancillary Relief will assure that the interests of all who have invested in, purchased securities from, or loaned money to Trabulse or the relief defendants are protected.

## V. CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this Court grant the relief requested.

Dated:  October 18, 2007                    Respectfully submitted,


                                             /s/ Mark P. Fickes
                                            Mark P. Fickes
                                            Erin E. Schneider
                                            Attorneys for Plaintiff
                                            SECURITIES AND EXCHANGE COMMISSION