# EXHIBIT 19

BEFORE THE

SECURITIES AND EXCHANGE COMMISSION

In the Matter of

Fahey Fund, L.P.

File No. SF- 3211

WELLS SUBMISSION

## ON BEHALF OF A. JAMES TRABULSE, THE FAHEY FUND, THE FAHEY FINANCIAL GROUP, INTERNATIONAL TRADE AND DATA, AND ITD TRADING

KEKER & VAN NEST, LLP
Michael D. Celio - #197998
Clement S. Roberts - #209203
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for A. James Trabulse, the Fahey
Fund, the Fahey Financial Group, ITD, and
ITD Trading

FOIA CONFIDENTIAL TREATMENT REQUESTED

398784.04

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | Summary of Staff Allegations and Brief Response | 2 |
| III. | Factual Background | 2 |
|  | A. The Fahey Entities | 2 |
| IV. | The Fund Did Not Violate Federal Securities Laws | 4 |
|  | A. No investor was damaged by the alleged misstatements | 4 |
|  | B. The Commission should exercise its discretion not to bring charges in the interests of equitable treatment. | 6 |
| V. | Potential Remedies | 8 |
|  | A. The Commission should not pursue injunctive relief in this case. | 8 |
|  | B. No disgorgement is appropriate. | 9 |
|  | C. If the Commission does pursue financial penalties against Trabulse it should seek first tier penalties only. | 10 |
| VI. | Conclusion | 11 |

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

*D.E. & J. Ltd. P'ship v. Conaway,*
133 Fed. Appx. 994 (6th Cir. 2005)...................................................5

*Goldstein v. S.E.C.,*
451 F.3d 873 (D.C. Cir. 2006)...............................................1, 6, 7

*Mackie v. Rieser,*
296 F.3d 909 (9th Cir. 2002) ...........................................................5

*Monetta Finance Services, Inc. v. SEC,*
390 F.3d 952 (7th Cir. 2004) ........................................................11

*Ryan v. Foster & Marshall, Inc.,*
556 F.2d 460 (9th Cir. 1977) ...........................................................5

*SEC v. C. R. Richmond & Co.,*
565 F.2d 1101 (9th Cir. 1977) .........................................................5

*SEC v. Clark,*
915 F.2d 439 (9th Cir. 1990) ...........................................................5

*SEC v. Falstaff Brewing Corp.,*
629 F.2d 62 (2d Cir. 1980) ..............................................................8

*SEC v. Koracorp Industries, Inc.,*
575 F.2d 692, (9th Cir. 1977) ..........................................................8

*SEC v. Management Dynamics, Inc.,*
515 F.2d 801 (2d Cir. 1984) ............................................................8

*SEC v. Moran,*
944 F.Supp. 286 (S.D.N.Y. 1996) .................................................11

*Semerenko v. Cendant Corp.,*
223 F.3d 165 (3d Cir. 2000) ............................................................6

*Steadman v. SEC,*
603 F.2d 1126 (5th Cir. 1979) ......................................................10

### DOCKETED CASES

*In re KPMG Peat Marwick, LLP,*
SEC Release No. 43862, 74 SEC [2001 WL 47245]......................11

*SEC v. Xerox Corp.,*
SEC Litigation Release No. 17465, Accounting & Auditory
Enforcement Release No. 1542 .....................................................11

*In re Global Crown Capital, LLC*
(Administrative Proceeding File No. 3-12250) .......................6, 7, 8

### FEDERAL STATUTES

15 U.S.C. § 77t.............................................................................10

15 U.S.C. § 77t(d)(2)(A)...............................................................10

15 U.S.C. § 77t(d)(2)(B)...............................................................10

398784.04

ii

**TABLE OF AUTHORITIES**
(cont'd)

                                                                    **Page(s)**

15 U.S.C. § 77t(d)(2)(C) ....................................................................................10

15 U.S.C. § 78u-2 ..............................................................................................10

**MISCELLANEOUS**

Arthur B. Laby & W. Hardy Calcott, *Patterns of SEC Enforcement Under
   the 1990 Remedies Act: Civil Money Penalties*, 58 Alb.L.Rev. 5, 19
   (1994)...............................................................................................................10

L. Loss, *Fundamentals of Securities Regulation* 712 (2d ed. 1988)..........................5

## I.     INTRODUCTION

The Fahey Fund, the Fahey Financial Group and Alexander James Trabulse[1] respectfully submit that the Commission should decline to bring suit against them. First, *even if everything that the Staff alleges is true—and we vehemently deny those allegations—no investor suffered damages of any sort; to the contrary, the Staff concedes that investors were enriched by the Fahey Fund.* The absence of damages is both a substantial legal obstacle to any suit seeking money damages, and a fact of significant import from the perspective of the Commission's enforcement policies and priorities. As the Commission well knows, a lawsuit of the kind contemplated here can, and often does cause significant financial harm to small funds as investors panic. Given the Commission's role in protecting investors, it would be ironic—and unfortunate—if an enforcement action to remedy a non-pecuniary injury to the Fund's investors actually caused them financial harm. The Fahey Fund respectfully suggests that the Commission's enforcement efforts would be better served by pursuing cases in which investors were harmed.

Moreover, an action against the Fund would be grossly inequitable. The allegations that the Staff has made here are incredibly similar to those made in 2006 against another San Francisco hedge fund, Global Crown Capital, LLC (Administrative Proceeding File No. 3-12250). *The charges against Global Crown were voluntarily dropped by the Division of Enforcement on the grounds that it lacked jurisdiction to proceed under Goldstein v. S.E.C.,* 451 F.3d 873 (D.C. Cir. 2006). The SEC even refunded a $35,000 penalty that the fund had previously paid. Indeed, the allegations against Global Crown were *more* serious than those against the Fahey Fund, as Global Crown allegedly *lost* money. The Fund is at a loss to understand how the Staff can believe that it is appropriate to pursue an action against it—a hedge fund that has made money for its investors—while declining to take action against a fund that is right down the street and that lost money entrusted to it by investors. Suing some funds while voluntarily dismissing suits against others would constitute an arbitrary and inconsistent enforcement policy – especially where the case dismissed is the more serious one.

---

[1] As set forth in more detail below, Mr. Trabulse manages the Fahey Fund, the Fahey Financial Group, as well as potential relief defendants ITD and ITD Trading. For ease of reference, the potential defendants are collectively referred to as "the Fahey Fund" or "the Fund."

## II.    SUMMARY OF STAFF ALLEGATIONS AND BRIEF RESPONSE

In a "Wells letter" dated June 20, 2007, the Staff advised Mr. Trabulse's counsel that it intended to recommend that the Commission bring a civil injunctive action and/or cease and desist administrative proceedings against him on the grounds that he violated, or aided and abetted violations of Sections 5 and 17 (a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Sections 206(1) and (2) of the Investment Advisers Act of 1040, and Section 7(a) of the Investment Company Act of 1940.  Virtually identical letters were sent to the Fahey Fund and Fahey Financial Group, outlining the same alleged violations (with the exception of the potential claims under the Advisers Act). ITD and ITD Trading were simultaneously notified that they were potential relief defendants.

In a meeting with the Staff on June 22, 2007, the Staff explained that it had two primary concerns: first, that the value of the Fund as stated on the investor's statements is overstated when compared to the assets the Fund currently holds; and second, that Mr. Trabulse (who is contractually entitled to 25% of the Fund's profits) compensated himself at a higher rate than that to which he was entitled, in part by making charitable contributions.

Mr. Trabulse denies these allegations and submits that: (a) even if the Staff's allegations are true—which he denies—that no damages of any kind can possibly be alleged since the Fahey Fund was immensely profitable; (b) the evidence at trial would demonstrate that Mr. Trabulse was compensated in a manner consistent with the agreements with investors in the Fund; and (c) that an action against the Fund would be unfair and inequitable in light of the Commission's actions regarding almost-identically situated respondents.

### III.    FACTUAL BACKGROUND

A.    **The Fahey Entities**

A. James "Jim" Trabulse founded the Fahey Hedge Fund (later known simply as the Fahey Fund) in 1997.[2]  Mr. Trabulse holds degrees from the University of California (Berkeley) and Brown

---

[2] The other recipients of Wells notices in this matter are all closely related to the Fahey Fund. The Fahey Financial Group is a corporate cousin of the Fahey Fund that was set up to invest in less traditional assets such as rugs and jewels.  International Trade and Data (ITD) is simply the

University in applied mathematics, computer science and economics. He had been involved in the financial markets for more than two decades prior to founding the Fahey Fund. His first trade was in January 1976 (in wheat futures) when he was a member of the Pacific Commodities Exchange. He joined the Pacific Stock Exchange in 1978 in the then new Options Floor. Simultaneously, from 1978 to 1992 he was a consultant to corporations and large traders, specializing in soybeans, world edible oils, and Fed watching.

He founded the Fahey Fund in 1997 in response to requests from a small group of friends and colleagues who were familiar with his trading system and wanted to use it in connection with the rapidly expanding universe of financial and futures products. At that time, hedge funds were, relatively speaking, unknown. This novelty led directly to some of the unusual structures that the Staff has been investigating. For example, in 1997 Mr. Trabulse's brokerage would not permit him to open an account in the name of the Fahey Hedge Fund – indeed, it had never heard of a hedge fund. In response, Mr. Trabulse used an existing account he controlled in the name of "International Trade and Data" ("ITD") to make trades for the Fahey Fund. He has continued using that account for one simple reason: superstition. The Fahey Fund has been remarkably successful, and like a baseball player on a winning streak, he didn't want to change anything.

As witness Douglas O'Connor has testified, the trading methods the Fahey Fund uses are quite traditional and, by the standards of hedge funds, quite conservative. The Fund makes relatively few trades. It waits for historic "bargains" in stocks or in the raw materials (futures) markets, which are determined by examining decades of market activity. Once the Fund has identified its target investments, it buys and holds (or sells short) until it reaches a particular profit target. This can involve, at times, sitting on an investment for months or even years. Indeed, Mr. O'Connor explained that he left the Fund because he felt that it was too conservative and could be making even more money than it was. The Fund's investments were initially in stocks, commodities and related financial products, but in recent years have expanded to include real estate (in southern California, France and Panama),

name of the brokerage account through which the Fahey Fund makes its trades. ITD Trading was an entity set up, it had been hoped, to train Mr. Trabulse's eventual replacement at the Fahey Fund when he retires.

precious and semi-precious gems, and investment grade rugs.

Mr. Trabulse runs the Fahey Fund almost entirely by himself. His daughter is the "limited general partner" but her responsibilities are few: she pays some expenses and she would be responsible for winding up the Fund should something happen to Mr. Trabulse. Mr. Trabulse also has an assistant, Larry Sanders, who performs certain administrative functions (e.g., checking the mail, and stuffing and sending envelopes). For a time, Mr. Trabulse was also attempting to train a successor, Mr. O'Connor. As part of that effort, Mr. O'Connor and Mr. Trabulse set up a small subsidiary (ITD Trading) to allow Mr. O'Connor to make trades without risking the Fund's capital. The Staff has interviewed each of these individuals.

As the Staff has conceded during discussions with counsel, this approach has worked quite well. By any conceivable standard, the Fahey Fund has been an immense success. The Fund started with approximately $100,000 in 1997; and currently values itself at approximately $40 million. Although the Staff declined to share its precise calculations with counsel,[3] Staff indicated that it believed that the value of the Fund was less than $30 million. The Fahey Fund in no way, shape, or form concedes that the Staff's calculations are correct. But the key point is this: the factual dispute between the Staff and respondents is whether the Fund made *as many* millions for its investors as its accounting indicates. There is no allegation, to the best of counsel's knowledge, that any investor in the Fund ever lost even a single cent, nor could any such allegation be credibly made.

## IV.    THE FUND DID NOT VIOLATE FEDERAL SECURITIES LAWS

### A.    No investor was damaged by the alleged misstatements

The fact that the Fahey Fund has succeeded immensely is the bedrock fact of this dispute. Under these circumstances, it will be difficult to establish that any investor has been damaged. This presents a serious legal obstacle to any action the Commission may authorize.

First, damages are an essential element for any fraud action that seeks to recover money from the defendant—even where the SEC is the plaintiff. *See SEC v. Clark*, 915 F.2d 439, 445 (9th Cir.

---

[3] Given some of the non-traditional investments the Fahey Fund has made in recent years, the Fund is more difficult to accurately value than an investment that is focused exclusively on market-traded products.

1990) (holding in a case brought under 10-b(5) that "injury is an element of fraud or deceit.") *citing generally* L. Loss, *Fundamentals of Securities Regulation* 712 (2d ed. 1988).[4]

Even using the Staff's numbers, however, it is undisputed that the Fund's investors have made money. Specifically, the Staff indicated that it believed the fund was worth in the neighborhood of $30 million—and that the value of the fund had been overstated to its investors. But, even if this were true, the investors still would have *made*—not lost—millions by investing in the fund. Thus, even under the Staff's version of events, under Ninth Circuit law the investors have not suffered damages.

For example, in *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002) the Ninth Circuit held that only a reduction in *actual* market value can constitute damages; diminished expectations are not cognizable. As the court explained:

> The record is replete with testimony from Mackie and his experts that the infringement did not in any way influence the market value of "The Tango." … Although it is not hard to be sympathetic to his concerns, the market value approach is an objective, not a subjective, analysis. Consequently, Mackie's subjective view, which really boils down to "hurt feelings" over the nature of the infringement, has no place in this calculus.

The *exact* same thing is true in the securities context—"damages" means an economic loss *caused* by the alleged misrepresentation. *See Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir. 1977) ("only actual damages can be recovered under the Securities Acts … Actual damages mean some form of economic loss."); *D.E. & J. Ltd. P'ship v. Conaway*, 133 Fed. Appx. 994, 999 (6th Cir. 2005) ("securities-fraud actions resemble common-law fraud actions that have long required a showing that an individual suffered actual economic loss."); *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000) ("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation"). In this case the alleged misrepresentations all concern the value of the Fund. There is no claim—nor could one be credibly made—that these statements *caused* the Fund to decline in value, or were otherwise responsible for the fact that, in the Staff's view, the Fund's (idiosyncratic) assets should properly be valued at less than $30 million rather than at $40 million.

---

[4] This is true even though the SEC does not need to prove damages where the only relief sought is injunctive. *SEC v. C. R. Richmond & Co.*, 565 F.2d 1101, 1105 (9th Cir. 1977)

The fact that—even under the Staff's view of the "facts"—the investors in the Fahey Fund have not suffered any cognizable economic loss, and instead realized a *substantial* economic gain, should factor into the Commission's decision as to whether to bring suit. Indeed, given the Fund's enormous, above-market historical returns (even measured by the Staff's numbers) were the suit to proceed and were the Commission to succeed in shuttering the Fund, the *lawsuit* would cause far more economic harm to the investors than anything the Staff alleges that Mr. Trabulse has done.

**B.    The Commission should exercise its discretion not to bring charges in the interests of equitable treatment.**

Even if the absence of damages were not a legal obstacle, the Fahey Fund respectfully suggests that the Commission should exercise its discretion and decline to bring suit against it. Not only was no investor harmed by the Fund, an enforcement action against the fund would be unfair in light of the Commission's position in very similar circumstances. *In re Global Crown Capital, LLC* (Administrative Proceeding File No. 3-12250) concerned allegations that are very similar to those made here. According to the "Order Instituting Proceedings" in that matter (attached hereto as Exhibit A), the respondents formed a hedge fund in 2003 that almost immediately lost more than 20% of its value. *See id.* at ¶¶6-7. Through a series of accounting manipulations, the respondents significantly understated investors losses. *See id* ¶¶ 7-11. On March 30, 2006 the Division of Enforcement filed an action claiming violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940. *See id.* at ¶14. The Division of Enforcement also invoked its authority under various sections of the Exchange Act. *See id.,* Section III.

Not long after the *Global Crown* matter was initiated, however, the District of Columbia Circuit of the Court of Appeals issued its opinion in *Goldstein. v. S.E.C.,* 451 F.3d 873 (D.C. Cir. 2006). *Goldstein* invalidated the so-called "Hedge Fund Rule" and called into question the proper boundaries of the Commission's ability to regulate hedge funds under the Advisers Act. In light of *Goldstein*, the Division of Enforcement voluntarily dismissed its action against Global Crown. *See* Order Dismissing Proceedings (attached hereto as Exhibit B). Indeed, according to press accounts, the SEC even refunded a $35,000 penalty that the fund had previously paid. *See "SEC Drops Fraud Case*

6

Against S.F. Firm," San Francisco Chronicle, March 3, 2007 (attached hereto as Exhibit C). An attorney for the SEC, Judith Anderson, made perfectly clear to the media that she believed fraud had occurred, but that the SEC was powerless to stop it. As she stated to the Chronicle, "We didn't dismiss it because we thought we couldn't prove the facts" but because of uncertainty about "the enforceability of the statute under which they were charged." *See id.* at 2. In other words, in the opinion of at least one SEC lawyer—who was presumably an officer of the Commission for that matter—the Commission lacked the authority to regulate Global Crown's activities. And as the Commission explicitly noted in its Order dismissing the action, the Division did not seek to amend or re-file its action under any of the anti-fraud provisions of the '33 or '34 Acts.[5]

Respectfully, the Fund believes that it is entitled to equal treatment. The allegations against Global Crown were *more* serious that those that the Staff is contemplating against the Fahey Fund. Global Crown allegedly *lost* money, while the Staff concedes that the Fahey Fund *made* money. The two funds are accused of almost identical behavior: the overstatement of investor accounts. In Global Crown Capital's case it was the understatement of losses; here the allegation concerns the alleged overstatement of profits.

The Fahey Fund has repeatedly raised *Global Crown* with the Staff to no avail. The Staff's response has been that it is contemplating charges under different statutes than those at issue in *Global Crown*. But that claim is incorrect. As the Division's "Order Instituting Proceedings makes clear," *Global Crown* was brought pursuant to one of the statutory provisions at issue here: sections 206(1) and (2) of the Advisers Act. These were the same provisions at issue in the *Goldstein* case. Indeed, both the Investment Advisers Act of 1940 and the Securities Exchange Act of 1934 are listed at the very top of the first page of the order dismissing the Global Crown Capital matter. *See* Exhibit B, pg. 1. To be sure, the Commission has other statutes on which it can rely, but those same statutes were

---

[5] Just two days before this submission was due, the Commission announced its intention to adopt a new rule that, according to the Commission's press release, "will clarify the Commission's ability to bring enforcement actions under the Advisers Act." Given the exigencies of the case, counsel has not been able to assess what impact, if any, the new rule would have on this matter. If the Staff intends to use the new rule (which is at present not yet effective) to the Fahey Fund in connection with this matter, counsel would respectfully request the opportunity to make a further submission addressing the issue.

available in *Global Crown*.

The potential case against the Fund simply cannot be distinguished from *Global Crown*. While the Fund denies it did anything improper, even if the Staff somehow could prove every one of its allegations, it would still be a less egregious case than *Global Crown*. The Fund respectfully suggests that such obviously disparate treatment between two very similar funds, accused of very similar misdeeds—and located only blocks apart—would do nothing to enhance the public's confidence in the fairness and equity of the regulatory system. More important than the public perception, it would cause the SEC's enforcement policy to be actually inconsistent and, we submit, unfair.

## V.    POTENTIAL REMEDIES

The Fund does not believe that it did anything wrong, and it believes strongly that the Commission should decline to bring suit. The Fund nonetheless understands that, should the Commission decide to file an action, a protracted fight would not be in the interest of the Fund's investors and would, in fact, likely cause them economic harm. The Fund has therefore, through counsel, expressed to the Staff that it is open to a resolution of this matter. It has already proposed to the Staff a speedy resolution involving a modest, first-tier penalty.

**A.    The Commission should not pursue injunctive relief in this case.**

Even if there existed evidence that the Fund violated the securities laws, there is no basis to support the remedy of a injunction. To obtain an injunction, the Commission must prove that an individual violated the securities laws and that, unless enjoined, he is likely to violate the laws in the future. *See, e.g. SEC v. Falstaff Brewing Corp.*, 629 F. 2d 62, 77 (2d Cir. 1980). The purpose of injunctive relief is to deter future violations, not to punish the violator. *SEC v. Koracorp Industries, Inc.*, 575 F. 2d 692, 697 (9th Cir. 1977). In order to determine whether a likelihood of future violations has been shown, courts look to the severity of the violation, the defendant's intent, and the defendant's status. *See SEC v. Management Dynamics, Inc.*, 515 F. 2d 801 (2d Cir. 1984).

These factors weigh against injunctive relief. The Fund was incredibly profitable and enriched its investors. Indeed, it appears that there have been no complaints from actual investors in the fund. Counsel is informed that the initial complaint that prompted this action was not even from an investor,

8

but rather from the *girlfriend* of an investor, Herbert Tarlow. The investors are happy for a reason: regardless of how their investment is calculated, they have profited handsomely.

The likelihood that Mr. Trabulse will commit future violations is vanishingly small. He has no previous violations and is, under the direction of counsel, actively reforming the recordkeeping and accounting processes and procedures used to track the Fund's valuations. Moreover, Mr. Trabulse is now approximately 60 years old and will likely retire in the not-too-distant future (the Agreements governing the Fahey Fund expire in 2010). The stress of this investigation, his age, and his decades of faultless work in the financial industry make clear that there is no chance that Mr. Trabulse would commit any future violations.

**B.    No disgorgement is appropriate.**

As noted above, the Staff has raised concerns about whether Mr. Trabulse was fairly compensated for his work. It is undisputed that he was entitled to 25% of the Fund's profits. The Staff's concern is derivative of its concern about how profitable the Fund was; because Mr. Trabulse's compensation was based on the Fund's profits, his compensation is directly related to the Staff's concerns about the Fund's overall profitability.

Because the Fahey Fund is essentially a one-man operation, Mr. Trabulse was not paid a regular salary. Instead, he simply drew expenses from the Fund's accounts as needed, ensuring at all times that he remained well below the 25% to which he was entitled. Should the Commission authorize an action against Mr. Trabulse we believe the evidence would show that Mr. Trabulse took much less than he was entitled to, even under the Staff's calculation of the Fund's performance. Indeed, Mr. Trabulse lives an incredibly modest lifestyle for someone with a right to 25% of the profits of a successful hedge fund. Mr. Trabulse's personal residence is a modest home in Daly City, an unglamorous working-class suburb of San Francisco. He drives a 6 year-old Lexus. He does not own yachts, planes, or other extravagances. Most of his largest expenses are charitable. The records that have been produced to the Staff bear this out.

To be sure, Mr. Trabulse's informal record keeping practices have led to confusion. One example is the payment of distributions to certain investors by cashier's check. These distributions

9

appear in Fund's bank records as checks made out to "cash." The Staff has understandably—but incorrectly—attributed every distribution to "cash" as a payment to Mr. Trabulse. This is a simple matter the Staff can and should clarify before bringing suit based on such easily demonstrable facts. Moreover, this misunderstanding is the result of a record keeping system that has not grown with the success of the Fund, and that will be replaced soon.

Regardless of the reasons for the confusion, Mr. Trabulse has been compensated at a rate substantially below that to which he is contractually entitled even if the Staff's numbers are accepted as true. As a result, it follows that Mr. Trabulse did not receive any "ill-gotten gains" and has nothing to disgorge.

**C.    If the Commission does pursue financial penalties against Trabulse it should seek first tier penalties only.**

The Commission is authorized to seek civil monetary remedies under a tiered structure. 15 U.S.C. § 77t(d). A first tier penalty may be imposed for any violation. 15 U.S.C. § 77t(d)(2)(A). Second tier penalties require a showing of "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B). Third tier penalties are available only if the violation, in addition to second tier factors, "resulted in substantial losses or created significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C). The greater the sanction, the greater the Commission's burden of proof, and the greater its burden to justify the sanction. *See Steadman v. SEC*, 603 F.2d 1126, 1137-1139 (5th Cir. 1979).

In considering civil monetary penalties in an administrative proceeding, the Commission[6] routinely considers several factors, including:

> the egregiousness of a[n individual's] actions, the isolated or recurrent nature of the violation, the degree of scienter, the sincerity of a[n individual's] assurances against future violations, the [individual's] recognition that the conduct was wrongful, and the likelihood of recurring violations.

---

[6] Considerations guiding the Commission's imposition of penalties should also govern a district court's penalty determination. *See* Arthur B. Laby & W. Hardy Calcott, Patterns of SEC Enforcement Under the 1990 Remedies Act: Civil Money Penalties, 58 *Alb. L. Rev.* 5, 19 (1994) (noting that "the factors governing the SEC's discretion in applying administrative penalties are relevant to a district court's decision"). The tiered structure for civil monetary penalties is the same whether applied by the district court or the Commission. *Compare* 15 U.S.C. § 77t(d) *with* 15 U.S.C. § 78u-2(b).

*Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 957 (7th Cir. 2004) (internal citations omitted). The Commission has also indicated that it will consider "whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the [sanction] in the context of any other sanctions being sought in the same proceedings." *In re KPMG Peat Marwick, LLP*, SEC Release No. 43862, 74 SEC Docket 357, 2001 WL 47245 at *26 (Jan. 19, 2001), as well as the level of cooperation provided to the Commission's staff in conducting its investigation, *see, e.g., SEC v. Xerox Corp.*, SEC Litigation Release No. 17465, Accounting & Auditory Enforcement Release No. 1542 (Apr. 11, 2002). Finally, courts have also considered the "personal suffering [the individual has] experienced." *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

If the Commission does seek monetary penalties from Mr. Trabulse, given these criteria, it should pursue them at the lowest tier. Investors in the Fund profited handsomely. Mr. Trabulse lives modestly, especially given his circumstances. The experience of the investigation itself has been difficult for Mr. Trabulse, who has had to bear the substantial costs involved out of his own pocket – unlike many people who face an investigation he has no insurance or corporate indemnification to offset those costs. Thus, if any monetary penalties are pursued against the Fund, they should be at the lowest tier.

## VI. CONCLUSION

The Fahey Fund has made its investors very, very wealthy and has done so over an extended period by using time-tested, fundamental trading strategies. The Fahey Fund simply does not deserve to be sued; investors do not need protection from funds that provide the kind of results that it has provided. Not only does its success provide it with a powerful legal defense, it should also minimize

///

///

///

///

398784.04

11

the Fund's significance as a matter of enforcement priorities. Moreover, the Division of Enforcement

has walked away from similar actions where investors *were* harmed. Here, where they have benefited

handsomely, the Fahey Fund respectfully suggests it should do the same.

Dated:   July 13, 2007                                KEKER & VAN NEST, LLP


By: _____
MICHAEL D. CELIO
Counsel for A. James Trabulse, The Fahey
Fund, The Fahey Financial Group,
International Trade & Data, and ITD
Trading

EXHIBIT A

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION
March 30, 2006

ADMINISTRATIVE PROCEEDING
File No. 3-12250

| | |
|---|---|
| **In the Matter of**<br><br>    **GLOBAL CROWN CAPITAL,**<br>    **LLC,**<br>    **J&C GLOBAL SECURITIES**<br>    **INVESTMENTS, LLC,**<br>    **RANI T. JARKAS, AND**<br>    **ANTOINE K. CHAYA,**<br><br>**Respondents.** | **ORDER INSTITUTING ADMINISTRATIVE**<br>**AND CEASE-AND-DESIST PROCEEDINGS**<br>**PURSUANT TO SECTIONS 203(e), 203(f),**<br>**AND 203(k) OF THE INVESTMENT**<br>**ADVISERS ACT OF 1940 AND SECTIONS**<br>**15(b)(4) AND 15(b)(6) OF THE SECURITIES**<br>**EXCHANGE ACT OF 1934** |

### I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e), 203(f), and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") and Sections 15(b)(4) and 15(b)(6) of the Securities Exchange Act of 1934 ("Exchange Act") against Global Crown Capital, LLC ("Global Crown"), J&C Global Securities Investments, LLC ("J&C"), Rani T. Jarkas ("Jarkas"), and Antoine K. Chaya ("Chaya") (collectively "Respondents").

### II.

After an investigation, the Division of Enforcement alleges that:

#### Nature of Proceeding

1.    This matter involves hedge fund managers who exaggerated the fund's performance in order to conceal trading losses from the fund's investors. In the first three months of operation in early 2003, the value of the hedge fund, Cogent Capital Management, LLC ("Cogent"), declined by over 20%. In response, the fund's managers decided to form a purported "redemption reserve" of $228,000 (about 15% of the fund's value at the time) and planned to use their own cash to fund the reserve. They then calculated the fund's performance, obscuring the substantial trading loss by adding the $228,000 amount to the fund's total value. The managers never disclosed this to investors, nor did they fund the $228,000 reserve at the

time. Cogent's managers then sent Cogent investors quarterly and year-end account statements that included the purported "reserve" but failed to disclose that the reserve increased Cogent's reported performance. The statements understated the fund's actual losses by as much as 90%. By providing Cogent investors with misleading account statements for the last three quarters of 2003, the managers caused violations of Sections 206(1) and 206(2) of the Advisers Act.

## Respondents

2.    Global Crown Capital, LLC, a Delaware company founded in 2001, is based in San Francisco, California and is dually registered with the Commission as a broker-dealer and an investment adviser. Global Crown maintains approximately 300 active brokerage accounts, has approximately 70 advisory clients and about $30 million in assets under management. Global Crown, which has about 15 employees, is majority-owned and operated by two managing members, Rani T. Jarkas and Antoine K. Chaya. Global Crown served as Cogent's manager from January through July 2003.

3.    J&C Global Securities Investments, LLC is a Delaware company formed in 2003 by Jarkas and Chaya, the two principals of Global Crown. J&C is not registered with the Commission or any state securities regulator. J&C has served as Cogent's manager from July 2003 to the present.

4.    Rani T. Jarkas is a managing member and an associated person of Global Crown and serves as Global Crown's Chief Investment Officer. Jarkas is also a managing member of J&C. Jarkas holds the Series 7, 24, and 63 securities licenses. Jarkas, 33 years old, is a resident of San Francisco, California.

5.    Antoine K. Chaya is a managing member and an associated person of Global Crown and serves as Global Crown's Chief Operating Officer and Chief Financial Officer. Chaya is also a managing member of J&C. Chaya holds or has held the Series 3, 4, 7, 24, and 66 securities licenses. Chaya, 40 years old, is resident of San Francisco, California.

## Facts

6.    In January 2003, Jarkas and Chaya formed a hedge fund, Cogent, with almost $1.4 million in capital contributions from six of Global Crown's existing clients. At least five additional clients invested in Cogent subsequent to its formation. The stated objective of the fund was to achieve consistent returns in all market environments by trading equities and equity options in a manner consistent with capital preservation.

7.    In its first three months of operations, January through March 2003, the fund's value declined by over 20%. Although Cogent's offering memorandum stated that investors would receive quarterly performance summaries, Jarkas and Chaya did not provide account statements or otherwise report Cogent's first quarter performance to investors.

2

8.      As the end of Cogent's second quarter approached, Jarkas and Chaya established a purported "redemption reserve" to be added to Cogent's total assets on its financial statements. The "redemption reserve" was created to reimburse Cogent's initial investors for losses should any of them redeem their investment during Cogent's first year of operation. After estimating market performance for the rest of 2003 along with what they could afford to contribute, Jarkas and Chaya set the reserve amount at $228,000. However, no money was actually paid into the reserve at the time.

9.      Jarkas and Chaya never informed investors of the existence of the "redemption reserve." Nonetheless, they prepared second-quarter reports for certain investors that added this undisclosed "redemption reserve" in calculating Cogent's performance. On July 29, 2003, Jarkas and Chaya sent account statements to investors that reported the investor's net income or loss to date on his or her Cogent investment. As a consequence of adding the unfunded and undisclosed $228,000 "redemption reserve," Jarkas and Chaya reported to investors that they had losses ranging from 2% to 5% when in reality, without the "redemption reserve," some investors had lost as much as 18% of their investment to date.

10.      Jarkas and Chaya continued to report misleading returns to investors in subsequent quarters. On October 29, 2003, Jarkas and Chaya provided account statements to six of its ten investors for the third quarter of 2003 that once again calculated Cogent's performance using the undisclosed "redemption reserve" and significantly understated the fund's losses to date.

11.      In the second half of 2003, Cogent's investment performance improved slightly. As a result, Jarkas and Chaya reduced the "redemption reserve" amount to $158,000 (although the "redemption reserve" continued to exist solely on paper—Jarkas and Chaya had not yet paid any funds into the Cogent reserve). Again, this amount was used to calculate the performance of investors' investments for the year ended December 31, 2003 but was not disclosed to the investors. The inclusion of the undisclosed "redemption reserve" allowed Jarkas and Chaya to report losses of only 3.5% to certain investors when, in reality, they had lost as much as 16% year to date.

12.      In March 2004, in connection with an independent audit of Cogent's 2003 financial statements, Jarkas and Chaya made a cash deposit to Cogent to fund the "redemption reserve." However, Cogent investors were never informed of the cash infusion, and Jarkas and Chaya continued to report performance that reflected the cash infusion without disclosing that Cogent's returns were derived in part from the cash infusion rather than from the actual investment performance of the fund.

13.      At all relevant times, Respondents made use of the mails or means or instrumentalities of interstate commerce in connection with the conduct described above.

3

**Violations**

14.    As a result of the conduct described above, Global Crown and J&C willfully violated Section 206(1) of the Advisers Act, which makes it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud any client or prospective client, and Section 206(2) of the Advisers Act, which makes it unlawful for an investment adviser to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

15.    As a result of the conduct described above, Jarkas and Chaya willfully aided and abetted and caused Global Crown's and J&C's violation of Section 206(1) of the Advisers Act, which makes it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud any client or prospective client, and Section 206(2) of the Advisers Act, which makes it unlawful for an investment adviser to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

**III.**

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A.    Whether the allegations set forth in Section II are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;

B.    What, if any, remedial action is appropriate in the public interest against Global Crown pursuant to Section 203(e) of the Advisers Act and Section 15(b)(4) of the Exchange Act including, but not limited to, civil penalties pursuant to Section 203(i) of the Advisers Act and Section 21B of the Exchange Act;

C.    What, if any, remedial action is appropriate in the public interest against J&C pursuant to Section 203(e) of the Advisers Act and Section 15(b)(6) of the Exchange Act including, but not limited to, civil penalties pursuant to Section 203(i) of the Advisers Act and Section 21B of the Exchange Act;

D.    What, if any, remedial action is appropriate in the public interest against Chaya and Jarkas pursuant to Section 203(f) of the Advisers Act and Section 15(b)(6) of the Exchange Act including, but not limited to, civil penalties pursuant to Section 203(i) of the Advisers Act and Section 21B of the Exchange Act; and

E.    Whether, pursuant to Section 203(k) of the Advisers Act, Respondents should be ordered to cease and desist from committing or causing violations of and any future violations of Sections 206(1) and 206(2) of the Advisers Act.

## IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondents shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondents fail to file the directed answer, or fail to appear at a hearing after being duly notified, the Respondents may be deemed in default and the proceedings may be determined against them upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f), and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f), and 201.310.

This Order shall be served forthwith upon Respondents personally or by certified mail.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.


Nancy M. Morris
Secretary


5

EXHIBIT B

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Rel. No. 55318 / February 20, 2007

INVESTMENT ADVISERS ACT OF 1940
Rel. No. 2591 / February 20, 2007

Admin. Proc. File No. 3-12250

|  |  |
|---|---|
| In the Matter of<br><br>GLOBAL CROWN CAPITAL, LLC,<br>J&C GLOBAL SECURITIES INVESTMENTS, LLC,<br>RANI T. JARKAS, and<br>ANTOINE K. CHAYA | ORDER DISMISSING<br>PROCEEDINGS |

On March 30, 2006, we instituted administrative proceedings against Global Crown Capital, LLC, J&C Global Securities Investments, LLC, Rani T. Jarkas, and Antoine K. Chaya (collectively, "Respondents"). On October 10, 2006, the Division of Enforcement requested that these proceedings be dismissed and that, pending consideration of the Division's request, they be stayed. On October 16, 2006, we granted the Division's request for a stay.

The Division states that "the motion to dismiss is made in light of the potential impact of the recent decision by the District of Columbia Circuit in Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006), on the validity of claims against these Respondents under Sections 206(1) and 206(2) of the [Investment] Advisers Act [of 1940]." The Division notes that the court, in Goldstein, "vacat[ed] and remand[ed] to the Commission the rule adopted in Registration Under the Advisers Act of Certain Hedge Fund Advisers, 69 Fed. Reg. 72,054 (Dec. 10, 2004), requiring that certain hedge fund advisers register under the Advisers Act." The Division represents that "Respondents have no objection to this motion."

We conclude that, under these circumstances, it is appropriate to grant the Division's motion to dismiss the proceedings. */

---

*/      We note that the Division of Enforcement has not moved to amend the Order Instituting Proceedings ("OIP"), as authorized by Commission Rule of Practice 200(d), to allege violations of other provisions of the federal securities laws. We express no view on

(continued...)

2

Accordingly, IT IS ORDERED that the proceedings instituted on March 30, 2006 against Global Crown Capital, LLC, J&C Global Securities Investments, LLC, Rani T. Jarkas, and Antoine K. Chaya be, and they hereby are, dismissed.

By the Commission.

Nancy M. Morris
Secretary

---

*/    (...continued)
whether the facts alleged in the OIP could support findings of violation under other provisions of the federal securities laws. Nothing in this order should be interpreted as precluding any subsequent proceedings against Respondents alleging different violations based on the factual allegations in this proceeding or any other facts.

**EXHIBIT C**

**SFGate**.com  : Back
to Article
**SFGate**.com

## SEC drops fraud case against S.F. firm
### Ruling makes agency question pursuit of hedge fund advisers

Bob Egelko, Chronicle Staff Writer
Saturday, March 3, 2007

The Securities and Exchange Commission has dismissed its civil fraud case against Global Crown Capital, a San Francisco investment company, after a court ruling raised questions about the commission's authority to go after hedge fund advisers who allegedly misled investors.

The SEC announced Feb. 20 that it was dropping the case it filed in March 2006 against Global Crown and an affiliated company, J&C Global Securities Investments, along with two Global Crown managers, Rani Jarkas and Antoine Chaya. They had been accused of exaggerating the performance of a hedge fund, Cogent Capital Management, to hide losses from investors.

The dismissal illustrated hedge funds' increasing success in fending off federal controls in the aftermath of a precedent-setting June 2006 court decision. The rapidly growing industry contends it requires less government regulation than stocks or mutual funds because of the relatively small number and sophisticated nature of its investors.

The SEC alleged that Jarkas and Chaya, who formed Cogent Capital in 2003 with capital contributions from Global Crown clients, created a fictitious $228,000 reserve account and used it to understate investors' losses during their first year of operation.

Global Crown and the other defendants denied any wrongdoing. Henry Carter, Global Crown's chief counsel, said this week that the company and the SEC's San Francisco office had agreed on a settlement in September in which the discrepancies would be attributed to "an accounting issue, with no intent of fraud," and Global Crown would pay the government $35,000. The money was paid but is due to be refunded because of the dismissal, Carter said.

The ruling that led to the dismissal was in an unrelated case, Goldstein vs. SEC, decided in June by the U.S. Court of Appeals in Washington, D.C. It involved a legal requirement that hedge fund advisers register with the SEC and make financial records available if they have 15 or more clients.

Overturning an SEC rule, the court said an adviser's client is the fund itself — to which it owes the highest fiduciary duties of loyalty and candor -- and not the fund's investors. The ruling caused the commission to reassess its case against Global Crown, which was based on allegations that the company misled hedge fund investors, deliberately or negligently.

"Goldstein raises questions about whether ... the adviser to the fund owed a fiduciary duty to the fund's investors," said Judith Anderson, an SEC attorney in San Francisco who worked on the case.

"We didn't dismiss it because we thought we couldn't prove the facts," but because of uncertainty

about the "enforceability of the statute under which they were charged," Anderson said. She said the SEC is working on new rules that would prohibit fraudulent or deceptive practices by hedge fund advisers against clients and nonclients alike.

Carter, Global Crown's lawyer, said, "I'm not going to argue with their reasoning. I'm pleased with the result."

Jarkas, Global Crown's managing partner and chief investment officer, said, "We are pleased this process ended and that we can now continue servicing our clients without further interruption."

*E-mail Bob Egelko at begelko@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/03/03/BUG1NODJTP1.DTL

This article appeared on page **C - 1** of the San Francisco Chronicle

San Francisco Chronicle Sections

© 2007 Hearst Communications Inc. | Privacy Policy | Feedback | RSS Feeds | FAQ | Site Index | Contact

# EXHIBIT 20

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:            )

4                                 )   File No. SF-3211-A

5    FAHEY FUND                   )

6

7                                          COPY

8

9    WITNESS:   David Hingston

10   PAGES:     1 through 186

11   PLACE:     Securities and Exchange Commission

12              44 Montgomery Street, Hearing Room C

13              San Francisco, California   94104

14   DATE:      Friday, April 20, 2007

15

16        The above-entitled matter came on for hearing, pursuant

17   to notice, at 9:30 a.m.

18

19

20

21

22

23

24              Diversified Reporting Services, Inc.

25                      (202) 467-9200

2

1    APPEARANCES:

2    On behalf of the Securities and Exchange Commission:

3        ERIN E. SCHNEIDER, ESQ.

4        Office of Enforcement

5        United States Securities and Exchange Commission

6        44 Montgomery Street, Suite 2600

7        San Francisco, California   94104

8        (415) 293-0337

9    On behalf of the American News Publishing:

10       MARC H. AXELBAUM, ESQ.

11       Pillsbury, Winthrop, Shaw, Pittman, LLP

12       50 Fremont Street

13       San Francisco, California   94105

14       (415) 983-1000

15

16

17

18

19

20

21

22

23

24

25

31

1   paying that much attention to the Fahey Fund, would you still

2   when you got your statement, open it and look at the bottom

3   line?

4        A    Yes.

5        Q    Okay.  Now, your -- in the first third of the

6   spreadsheet on page 102, it says account as of January 1st,

7   1999 of $28,339.  Do you see that?

8        A    Yes.

9        Q    Okay.  So did you -- did you invest your money as

10  of January 1st, 1999?

11       A    No.  There would have been money before.

12       Q    Okay.  Do you recall when that was?  When you made

13  your first investment?

14       A    Not -- not exactly.  But I can -- I believe it must

15  have been '98.

16       Q    Okay.  How much did you invest in 1998?

17       A    If it was '98, I invested -- I initially invested

18  $20,000.

19       Q    Okay.  Did you make any other investments before

20  January 1st, 1999 besides the $20,000?

21       A    No.

22       Q    Okay.  So is the difference between $20,000 and the

23  $28,339, is that just due to profits that your investment

24  made?

25       A    Yes.

58

1           And for the record, Exhibit 30 is a three-page

2    document.  The first two pages have typewritten words and

3    what appears to be on the Fahey Hedge Fund letterhead dated

4    November 20th, 2000.

5           And the last page is what appears to be a

6    spreadsheet, and it bears Bates Numbers of FF-DJH0089 through

7    91.

8           Have you had a chance to look through Exhibit 30?

9                     (SEC Exhibit No. 30 was marked for

10                    identification.)

11   A    Yes.

12   Q    Okay.  Do you recognize Exhibit 30?

13   A    Yes.

14   Q    What is Exhibit 30?

15   A    A statement with a write-up.

16   Q    Can you be a little more specific.

17   A    Oh, well, it says, "Enclosed is your statement for

18   Q3 2000 July through September."  And attached to that is the

19   referenced document.  It says Q3 at the bottom.  Or towards

20   the bottom.

21   Q    Did you actually receive Exhibit 30?

22   A    Yes.

23   Q    Okay.  And how did you receive Exhibit 30?

24   A    Most likely through the mail.

25   Q    Do you have any reason to think you didn't get it

1    through the mail?

2        A    No.

3        Q    Okay.  And do you know who sent Exhibit 30 to you?

4        A    I believe Jim Trabulse did.

5        Q    So on the first page of Exhibit 30 on page 89,

6    underneath the section that says, "The Fahey Financial Group,

7    Inc. finally" --

8        A    Yes.

9        Q     -- the first paragraph that says,

10            "Those of you who have non-IRA/401K/trust

11            have been journaled over to the Fahey

12            Financial Group, Inc., a Nevada

13            corporation.  This finally allows you to

14            retain -- the right to retain profits so

15            that taxes owed are only payable in

16            disbursement not in the current year."

17            Do you see that?

18        A    Yes.

19        Q    What is your understanding of those two sentences?

20        A    I don't have much of an understanding of them,

21    frankly.  That there was some -- some means set up to allow

22    people to retain profits until -- until disbursement, at

23    which point taxes would be due.  And for people with non-

24    IRA/401K/trusts.  Isn't that what it means?

25        Q    I'm just understanding what your understanding --

137

```
 1              And for the record, Exhibit 34 appears to be a
 2    series of E-mails.  The top one says from Fund Manager.  In
 3    brackets, it says BigCheese@FaheyFund.com.  It's dated
 4    November 24th, 2006 at 9:30 a.m.  To Dave Hingston.  And the
 5    subject is Re About the Fund.
 6              And it has Bates Numbers in the lower right-hand
 7    corner DJH0016 through 0017.
 8              Do you recognize Exhibit 34, Mr. Hingston?
 9                              (SEC Exhibit No. 34 was marked for
10                               identification.)
11       A    Yes.
12       Q    What is Exhibit 34?
13    A    It's a part of an E-mail exchange between me and Jim
14    regarding a request I made for a written description of the
15    fund.
16       Q    Okay.  And who did you make the written description
17    of the fund to?
18       A    I did.  Who did I make the request to?
19       Q    Yes.
20       A    To Jim.
21       Q    Okay.  Why did you request a written description of
22    the fund from Jim?
23       A    My wife and I are in the midst of -- we had finally
24    decided to commingle our various investments and have one,
25    you know, and become David and Mariko, Inc. instead of just
```

1    David's money and Mariko's money.

2            And so we had decided to fire her financial planner

3    and close out my account, which at this point had migrated

4    over to Smith Barney.  And -- and put our money together and

5    put it in a third entity altogether.

6            So we were interviewing financial planners to go

7    with.  And in the course of this interviewing, I had showed

8    them the Fahey -- showed a couple of guys here interviewing

9    the Fahey Fund statements.

10           And one of them -- one broker then asked for more

11   information.  And so I was trying to get more information

12   from Jim.

13       Q    Okay.  So I later focus on the -- the part of

14   Exhibit 34 in the middle of the page, it says, "David

15   Hingston wrote, and then underneath it's Hi Jim."

16           Do you see that?

17       A    Yes.

18       Q    Okay.  And is that an E-mail that you wrote to Jim

19   Trabulse?

20       A    Yes.

21       Q    Okay.  So the -- the one, two, third paragraph of

22   that E-mail that the sentence starts, "By the way."

23           Do you see that?

24       A    Okay, Yes.

25       Q    And it says,

1      Q      Okay.  How did that impact you when the financial

2    planner asked that --

3      A      I thought he was --

4      Q      -- similar to that?

5      A      -- the tone of his voice was very disapproving,

6    and I didn't like it.

7      Q      Why didn't you like it?

8      A      I didn't think it was appropriate for him to rush

9    to judgment.  It was more the one than the words.  Very

10   judgmental.

11     Q      When you invested --

12     A      He was talking down to me.

13     Q      What do you mean by talking down to you?

14     A      Like scolding me.

15     Q      When you invested your initial $20,000, was it your

16   understanding that the Fahey Fund was aggressive?

17     A      Yes.

18     Q      And why was that your understanding?

19     A      Because as I said that before I understood it to be

20   in my mind there was -- the word hedge fund applied, and I

21   understood it was risky.  To me aggressive and risky

22   are synonymous in this context.

23     Q      How did Mr. Trabulse respond to your request for a

24   write-up about the fund?

25     A      Well, it's attached here.  It's part of this

1    E-mail.  He was dismissive.

2        Q    What do you mean by dismissive?

3        A    He said he wasn't going to do it initially.  I can

4    read it if you want me to.

5                  "I won't comply with their request

6                  because they don't know how to evaluate a

7                  hedge fund."

8        Q    And you're reading from the -- kind of the second

9    paragraph on page 16 or the third paragraph on page 16?

10        A    Yes.  Right.

11        Q    Did that bother you?

12        A    Yeah.

13        Q    Mr. Trabulse was dismissive?

14        A    Yes.

15        Q    Why did it bother you?

16        A    I don't like being dismissed.  You know, I don't

17    know how to explain that.  I mean, it wasn't a polite

18    response.

19        Q    Was this consistent with the way Mr. Trabulse

20    normally treats you?

21        A    It's very -- not me personally, but it is very

22    consistent -- it is very consistent with his attitude towards

23    the financial services industry.

24        Q    Why do you say that?

25        A    I just -- there had been other occasions where

185

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE

I, P.J. Kelley, reporter, hereby verify that the foregoing transcript of 184 pages is a complete, true and accurate transcript of the testimony indicated, held on April 20, 2007, at 44 Montgomery Street, San Francisco, California in the matter of: FAHEY FUND. I further testify that this proceeding was recorded by me, and that the foregoing transcript was prepared by Elena Lara under my direction.

Date: 4/30/07

Official Reporter:

Diversified Reporting Services, Inc.

186

## PROOFREADER'S CERTIFICATION

In the Matter of:          Fahey Fund

Witness:                   David Hingston

File Number:               SF-3211-A

Date:                      April 20, 2007

Location:                  44 Montgomery Street

                           San Francisco, California


This is to certify that, I, Elena Lara, do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been completed to the reporting or recording accomplished at the hearing.

_Elena Lara_            _4/30/07_

# EXHIBIT 21

**Pillsbury
Winthrop
Shaw
Pittman** LLP

50 Fremont Street
San Francisco, CA 94105
Tel 415.983.1000
Fax 415.983.1200

**MAILING ADDRESS**
P. O. Box 7880
San Francisco, CA 94120
www.pillsburylaw.com



**RECEIVED**

APR 6 2007

**SEC San Francisco**

April 6, 2007

Marc H. Axelbaum
Phone: 415.983.1967
marc.axelbaum@pillsburylaw.com

## FOIA CONFIDENTIAL TREATMENT REQUESTED

### *HAND DELIVERED*

Erin E. Schneider, Esq.
Staff Attorney, Division of Enforcement
United States Securities and Exchange Commission
44 Montgomery Street
Suite 2600
San Francisco, CA 94104-4613

     Re:    <u>In the Matter of Fahey Fund, SF-3211</u>

Dear Ms. Schneider:

Enclosed are documents numbered FF-DJH 0001 to FF-DJH 0111, which are responsive to the SEC's subpoena for documents dated March 19, 2007 to David J. Hingston. This firm, Pillsbury Winthrop Shaw Pittman LLP, represents Mr. Hingston with regard to the subpoena.

We consider this letter (together with enclosures) to remain the property of Mr. Hingston for purposes of the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"). In the event that this letter, or any part of it, is determined to be an agency record within the meaning of FOIA, we request confidential treatment pursuant to FOIA and the applicable rules of the Commission, including but not limited to Rule 83 of the Commission's Rules on Information and Requests, 17 C.F.R. § 200.83. In this regard, please be advised that we have submitted to the Commission a request for confidential treatment under FOIA. A copy of our FOIA letter request is enclosed.

This letter is not intended to, and does not, waive any applicable privilege or other legal basis under which information may not be subject to production. Our production of any material subject to any applicable privilege or other legal basis under which information may not be subject to production is inadvertent.

Erin E. Schneider, Esq.
April 6, 2007
Page 2

Please call me at 415-983-1967 if you have any questions.

Sincerely,

Marc H. Axelbaum

Enclosures

cc:    FOIA and Privacy Act Office (w/o enclosures)




*The* FAHEY HEDGE FUND
268 Bush Street, Suite 4232
San Francisco, CA 94104
(800) 783 -2233

Nov. 20, 2000

Dear Dave:

**Enclosed is your statement for Q3 2000, that is, Jul. 1, 2000 through Sep. 30, 2000-Up 5.50% - yawn...but, considering what the market has been through, at least VERY safe.**

Nothing great happened, but, if I could relive the quarter, a short sale would have been in order. My excuse is that I was basically recovering from stress. It happens.

The main profits came from soybeans. In fact, the coming quarter (Oct-Dec) will add A LEAST that amount, but perhaps much more.

**THE FAHEY FINANCIAL GROUP, Inc.-FINALLY!**

Those of you who have <u>non-IRA/401(k)/Trusts</u> have been journaled over to the Fahey Financial Group, Inc., a Nevada Corporation. This FINALLY allows you the right to retain profits so that taxes owed are only payable upon disbursement, not in the current year.

Since virtually all our investors who use their own private (non-IRA) funds must pay tax on open positions, this has been averted for the year 2000. If you withdraw money, etc., that would be taxable, depending on the nature of the withdrawal, etc., etc.

The reason for the name is that, under current regs, a domestic hedge fund is only allowed to be a limited partnership. Hence, the only way for a person to enter the Fahey Financial Group, Inc. is by already being in the Fahey Hedge Fund, lp OR by referral. Confused? Me too!

The regulations state that hedge funds must be limited partnerships. Limited partnerships have to file K-1's, and taxes have to be paid on profits, *realized or not, withdrawn or not.* There is no provision for reinvestment. Hence, in a corporate form, we can reinvest profits of the stockholders.

But, *a domestic hedge fund may not be a corporation.* So, to take advantage of the corporate form, thus deferring taxes legitimately, we cannot be, state, or advertise the Fahey Financial Group as a Hedge Fund!

If you are wise, you will NOT try to explain this to your accountant, or he/she will run screaming. The proper action to take is <u>no action at all.</u> You will not owe taxes for 2000. You will have no reporting until you sell some or all of your stock. You will also not have many details of how this works, because the lawyers are still setting it up. Everything will be complete by February.

Bottom line, if your investments are non-IRA types, you will be put into the Fahey Financial Group, Inc., unless you insist on staying in the hedge fund. You will have no liability unless you sell your stock (to me, or others). Finally, you will have no real change in access to your money, safety, etc.

NOTE: IF YOU HAVE YOUR MONEY IN A RETIREMENT OR TRUST ACCOUNT, THAT WILL STAY IN THE <u>FAHEY HEDGE FUND,LP.</u>  Nothing changes at all in that regard. You will get your quarterlies, etc.

**REPORTING AND STATEMENTS**

Corporate law requires quarterly statements, so you will get financial statements, but the nature and source of the profits or losses will not be spelled out in any great detail, except in a general way by the CEO. The statements will look nearly identical with the ones we use now. Those of you who have both retirement and private money will get TWO statements, one from Fahey Financial group, Inc., and the other from Fahey Hedge Fund, lp.



➢   Over please

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-DJH 0089

We will have bank accounts, real activity and corporate headquarters in Nevada, etc., We WILL in fact will be an active corporation, not a shell for tax purposes. That would be disallowed.

The reason, by the way, for a Nevada corporation is that the costs, reporting and state taxes (none) are highly favorable versus California. We considered a Delaware corp., but there were mostly physical reasons for favoring Nevada.

**THANK YOU AGAIN-Next Quarter Looks Good, but the Coming Year-Huge potential for Us**

The coming six months will be difficult for most investors, even some experienced ones, because of the prospect of very high oil/heating oil prices hurting businesses. Yet, certain classes of stocks and certain futures will really be hot, especially those overly battered infrastructure stocks both here and in the EEC.

Look for the dollar to finally weaken. Look for severe political instability, which should cause excess movement in stocks and indexes. Look for high oil prices, and weather problems. The main opportunities here will be 1) extreme moves, making technical plays of SOLID companies very secure. 2). Great options volatility plays, perhaps even three or four in the course of a year; and 3) strong recovery in double-decade low futures prices.

This is a good year to be conservative and cautious and patient in your large matters, business, investments, and so on. But, in the futures markets and certain sectors of the stock market, it could give us a shot at a big year. I hope it comes to pass

Thank you for your support. Keep in touch with me.

Sincerely,
James Trabulse
Fund Manager, General Partner

PS: If you have an IRA with us, we have experienced some technical and reporting problems with Sterling Trust. I am in close contact with the manager of that department (Sterling is big: the second largest in the world) who apologizes for delayed account balances, double-billing of annual fees (which WE pay), etc. But, he is trying to track down the problem. It is primarily caused by growing faster than they can hire and train. *JT*

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-DJH 0090

**REDACTED**

**DAVID J. HINGSTON**

The Fahey Hedge Fund, l.p.
268 Bush St., Suite 4232
San Francisco, CA 94104
Partnership Documentation
Quarterly Statement Q4, 2000

(H)

Mail to:home address
DHC Electronic Marketing
David Hingston Consultants

Phone: (B)
FAX
eMail

Sterling Trust
IRA Account #    N/A

| UNITS | Date | Total |
|-------|------|-------|
| Account # | | |

Account as of Jan 01, 2000    $52,913.96

| Trade(s) | Date Entered | BOT | Date Closed | SOLD | Gain | Loss | Withdrawal Deposits | Net Gain/Loss | Cumul. Acct Bal. |
|----------|--------------|-----|-------------|------|------|------|---------------------|---------------|------------------|
| Q1 2000 | | | | | | | | | |
| Internet Stock | Oct-99 | | | | 2,645.70 | | | 2,645.70 | 59,925.06 |
| Soybean | Jan/Feb | | | | 4,365.40 | | | 4,365.40 | 57,279.37 |
| Q2 2000 | | | | | | | | | |
| Soybean | Mar/Apr/May | | | | 2,397.00 | | | 2,397.00 | 62,322.07 |
| Stocks | Apr-May | | | | 2,996.25 | | | 2,996.25 | 65,318.32 |
| Loan Charges on $10,000.00 June 19 (charged Quarterly @ 8.00% annual) | | | | | | (26.28) | | (26.28) | 65,292.04 |
| Guaranteed Payment | Jul-17 | | | | | | (2,000.00) | | 63,292.04 |
| Guaranteed Payment | Aug-11 | | | | | | (2,000.00) | | 61,292.04 |
| Q3 2000 | | | | | | | | | |
| Guaranteed Payment | Sep-17 | | | | | | (2,000.00) | | 59,292.04 |
| Guaranteed Payment | Oct-17 | | | | | | (2,000.00) | | 57,292.04 |
| Loan Charges on $10,000.00 June 19 (charged Quarterly @ 8.00% annual) | | | | | | (26.28) | | (26.28) | 57,265.75 |
| Q3 2000 | | | | | | | | | |
| Soybeans | Jul/Aug/Sep | | | | 3,591.06 | | | 3,591.06 | 60,856.82 |
| Calculation based on Balance BEFORE loans, that is, on $65,292.04) | | | | | | | | | |
| **Note: your ANNUAL statement for this account will be issued as The Fahey Financial Group, Inc., in Jan/Feb. | | | | | | | | | |
| Subtotals, all trades | | | | | 15,995.42 | (52.57) | | 15,942.85 | |
| TOTAL :09/30/00 | | | | | | | Year-to Yr Percentage Incr/Decr | +30.13% | $60,856.82 |

A CALIFORNIA Limited Partnership

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-DJH 0091

# EXHIBIT 22



**Pillsbury**
**Winthrop**
**Shaw**
**Pittman** LLP

50 Fremont Street          **MAILING ADDRESS**
San Francisco, CA 94105    P. O. Box 7880
Tel 415.983.1000          San Francisco, CA 94120
Fax 415.983.1200          www.pillsburylaw.com

COPY

**RECEIVED**

APR 6 2007

**SEC San Francisco**

April 6, 2007

Marc H. Axelbaum
Phone: 415.983.1967
marc.axelbaum@pillsburylaw.com

## FOIA CONFIDENTIAL TREATMENT REQUESTED

*HAND DELIVERED*

Erin E. Schneider, Esq.
Staff Attorney, Division of Enforcement
United States Securities and Exchange Commission
44 Montgomery Street
Suite 2600
San Francisco, CA 94104-4613

        Re:    <u>In the Matter of Fahey Fund, SF-3211</u>

Dear Ms. Schneider:

Enclosed are documents numbered FF-DJH 0001 to FF-DJH 0111, which are responsive
to the SEC's subpoena for documents dated March 19, 2007 to David J. Hingston. This
firm, Pillsbury Winthrop Shaw Pittman LLP, represents Mr. Hingston with regard to the
subpoena.

We consider this letter (together with enclosures) to remain the property of Mr. Hingston
for purposes of the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA").
In the event that this letter, or any part of it, is determined to be an agency record within
the meaning of FOIA, we request confidential treatment pursuant to FOIA and the
applicable rules of the Commission, including but not limited to Rule 83 of the
Commission's Rules on Information and Requests, 17 C.F.R. § 200.83. In this regard,
please be advised that we have submitted to the Commission a request for confidential
treatment under FOIA. A copy of our FOIA letter request is enclosed.

This letter is not intended to, and does not, waive any applicable privilege or other legal
basis under which information may not be subject to production. Our production of any
material subject to any applicable privilege or other legal basis under which information
may not be subject to production is inadvertent.

700668647v1

Erin E. Schneider, Esq.
April 6, 2007
Page 2

Please call me at 415-983-1967 if you have any questions.

Sincerely,

Marc H. Axelbaum

Enclosures

cc:      FOIA and Privacy Act Office (w/o enclosures)

**From:** Fund Manager [bigcheese@faheyfund.com]
**Sent:** Friday, November 24, 2006 9:30 AM
**To:** David Hingston
**Subject:** Re: RFI about the fund

Hi

Well!

I NEVER could get ANYONE in the 'Wall Street" crowd to see the sense of what I was doing. But consider: the Hedge Fund business went from 400 when you invested in 1997 to over 4000 today!

I won't comply with their requests, because they don't know how to evaluate a hedge fund. You have had 10 years with me so there you go. If they doubt my honesty, then you may cash out. Sorry if that stings, but I am not taking shit from financial planners. I have such a degree myself, but my license to practice has been allowed to lapse.

Finally, your investment is not tax deferred, but a stock, which, when you sell, has capital gains due. Tax deferred is for IRA's, etc.

I hope you are well. Sorry about not wanting the BMW, but I have too many cars anyway.

Say hi to M. for me
Jim

David Hingston wrote:
>
> Hi Jim,
>
> I would like to get a write-up about the fund, explaining how it works.
>
> The reason is, ... Mariko and I have decided to get ourselves a
> financial planner -- an independent financial planner -- to help us
> with tax and retirement planning, as well as with investments. This
> is driven in part by the shared agreement, finally, that the
> non-Fahey stuff we own has not been making enough money because it has
> been entirely "managed" by software programs predicated almost
> entirely on CYA. We have interviewed three financial planners and I
> think we've all but decided on one of the three, whom I'd be pleased
> to tell you about, if you want. Two of the financial planners had
> questions about of the Fahey Fund; and one had questions, raised
> eyebrows and a comment or two (or three) -- "Are you always this
> aggressive?," "You realize, this is off-the-charts speculative." My
> answers didn't cause either of them to say "I get it!" Both asked
> for more information ("Do you have a prospectus?"). And, in
> particular, they expressed a desire/need to better understand (better
> than I was able to explain) how it is that the fund is tax-deferred.
> I suppose my accountant could explain some of aspects of the fund's
> tax-deffered status, but, rather than deal with the need for more
> information about the fund by going to her for this and to you for
> that, it would please me greatly to have something in writing from the
> fund, itself, outlining everything that a competent, independent, straight-shooting
> financial planner should know.
>
> By the way, the one I like best kind of reminds me of you -- for one
> thing, he wasn't the one whose eyebrows went up, and, for another, he
> doesn't dress for financial-services-industry success, if you know
> what I mean.. As I say, I'll tell you more if you want to know more.
>
> I left a phone message for you and for your assistant Larry -- I was
> hoping I wouldn't have to bother you. Perhaps this is something your
> charming and capable daughter can handle.



EXHIBIT

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-DJH 0016

1

```
>
> Trust you are well.  All the best,
>
> David Hingston
>
> .
```

2

FOIA CONFIDENTIAL
TREATMENT REQUESTED

# EXHIBIT 23

1   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3   In the Matter of:            )

4   FAHEY FUND, L.P.             ) FILE NO. SF--3211-A

5

6   WITNESS:  James Wojack                COPY

7   PAGES:    1 through 132

8   PLACE:    Securities and Exchange Commission

9             44 Montgomery Street, Suite 2600

10            San Francisco, CA

11  DATE:     Friday, April 13, 2007

12

13      The above-entitled matter came on for hearing, pursuant

14  to notice, at 9:12 a.m.

15

16

17

18

19

20

21

22

23

24              Diversified Reporting Services, Inc.

25                      (202) 467-9200

2

1  APPEARANCES:

2

3  On behalf of the Securities and Exchange Commission:

4       ERIN E. SCHNEIDER, ESQ.

5       ROBERT LEACH, ESQ.

6       Division of Enforcement

7       Securities and Exchange Commission

8       44 Montgomery Street, Suite 2600

9       San Francisco, CA 94104

10      415-293-0337

11

12

13  On behalf of the Witness:

14      MARC H. AXELBAUM, ESQ

15      Pillsbury Winthrop Shaw Pittman

16      50 Fremont Street

17      San Francisco, CA 94105-2228

18      415-983-1000

19      Fax 415-983-1200

20

21

22

23

24

25

1      Q    Have you been employed at all since February of

2   2004?

3      A    No.

4      Q    So, you've just been retired?

5      A    (No audible response.)

6      Q    You have to answer audibly?

7      A    Oh, I'm sorry.  Yes, I've just been retired.

8      Q    Okay.  Do yo hold or have you ever held any

9   professional licenses?

10     A    No.

11     Q    What I want to do is, I want to take you through

12  your investments and then we'll go back and talk a little bit

13  about why you invested.  But, I want to start by kind of

14  going through the time line and the history of your

15  investment with Fahey Fund.

16          MS. SCHNEIDER:  If I could have the Court Reporter

17  mark this next document as Exhibit 11.

18               (SEC Exhibit No. 11 was

19               marked for identification.)

20          MR. AXELBAUM:  This is Exhibit 11.

21          MS. SCHNEIDER:  Yes.

22          BY MS. SCHNEIDER:

23     Q    Mr. Wojack, I'm now handing you what's been marked

24  as Exhibit 11, and I'm just going to describe it for the

25  record.  Exhibit 11 is a multi-page document which is Bates

1   numbered in the lower right hand corner FFJMW0001 through

2   FFJMW0035.  And the top of the first page it says The Fahey

3   Hedge Fund LP, Special Gold Fund.

4           Go ahead and look through Exhibit 11, Mr. Wojack,

5   and let me know when you're ready?

6   A    All of these?

7   Q    Yes.

8   A    I have looked at the before, there were some things

9   out in the opened.  If you ask me about these, I'd have to

10  read but, the actual figures are in front of me.

11  Q    Well, what I'm going to ask you just initially is,

12  what Exhibit 11 is.  So, just take the time to look through

13  Exhibit 11 to answer that question?

14          MR. AXELBAUM:  Erin, I'm sorry to interrupt the

15  flow but it just occurred to me that I forgot to request that

16  this confidential treatment under the FOIA laws of this

17  transcript be followed to the letter.

18          BY MS. SCHNEIDER:

19  Q    Have you had a chance to review Exhibit 11?

20  A    Yes, Ma'am.

21  Q    Okay.  Do you recognize Exhibit 11?

22  A    Yes.

23  Q    What is it?

24  A    They appear to be copies of my statements.

25  Q    When you say copies of your statements, copies of

1   what statements?

2       A    Copies of statements from the Fahey Fund in regards

3   to my investment.

4       Q    Okay.  And you said they appear to be copies.  Do

5   you have any reason to think that these aren't the copies of

6   your actual statements?

7       A    No.

8       Q    Okay.

9       A    But I'm not positive either, so I just say it

10  appears to be.

11      Q    Okay.  Why aren't you positive?

12      A    Well, I don't have the originals with me to put

13  them against, so I'm taking you at your word that they're an

14  accurate reproduction.

15      Q    Okay.  And did the Commission send you a Subpoena

16  asking for documents to be produced in this investigation?

17      A    Yes.

18      Q    And did you actually produce documents in response

19  to that subpoena?

20      A    Yes.

21      Q    Okay.  And okay -- that's fine.  So, who were the

22  documents in Exhibit 11, or how did you get the documents

23  that are in Exhibit 11?

24      A    Through the U.S. Mail.

25      Q    Okay.  And there are multiple statements in here

1   for various years.  Did you get all of your statements

2   through the mail?

3       A    Yes.

4       Q    Okay.  So, there was never a situation where you

5   received one of them by email or anything like that?

6       A    No.

7       Q    Okay.  And where did you receive them in the mail?

8       A    At my legal address, the one I had given you.

9       Q    Okay.  The one in Chicago?

10      A    Yes.

11      Q    Okay.  Do you know who sent the document in Exhibit

12   11 to you?

13      A    The Fahey Fund.

14      Q    Okay.  Do you know who at the Fahey Fund?

15      A    No.

16      Q    Okay.  What's your understanding of who runs the

17   Fahey Fund?

18      A    Mr. Jim Trabulse.

19      Q    And do you understand what Mr. Trabulse's position

20   is there?

21      A    Actual title, no.

22      Q    Okay.  What's your understanding of what he does?

23      A    That he's the one who runs the fund.

24      Q    And what do you mean by run the fund?

25      A    I would think makes the decisions on investments.

1    Q    Okay.  Generally speaking, when you received a

2    statement like the one on page six, did it have something on

3    the back of it?

4    A    Yes, ma'am.

5    Q    Okay.  So, page six could have had something on the

6    back of it, you're just not sure today?

7    A    Yes, ma'am.

8    Q    Okay.  What is your understanding of what page six

9    shows?

10   A    Page six shows my original investment and it shows

11   earnings for quarters one, two and four, of year 2003.  This

12   says June 30, 2003 on the bottom.  I can't tell you what that

13   is.  But it shows the earnings in my investment from  year

14   ending December 31, 2003.

15   Q    Okay.  So, at the top it says, the Fahey -- well,

16   let me ask you a slightly different question.  Do you see the

17   column where it says "Deposits and Withdrawals"?

18   A    Yes, I do.

19   Q    Okay.  And in that column there's a $25,000 figure?

20   A    Yes.

21   Q    What does that represent?

22   A    That represents my original investment.

23   Q    Okay.  So, you originally invested $25,000?

24   A    Yes.

25   Q    Okay.  Are those all the -- is that all the

1    deposits you made in 2003?

2         A    Yes.

3         Q    Okay.  And did you make any withdrawals in 2003?

4         A    No.

5         Q    Okay.  So, at the top of page six it says, "The

6    Fahey Hedge Fund LP, Special Gold Fund, 268 Bush Street,

7    Suite 4232, San Francisco, California 94104."  Do you see

8    that?

9         A    Yes, I do.

10        Q    What is your understanding of what this 268 Bush

11   Street, Suite 4232 address refers to?

12        A    I believe it's where his office is, or the Fahey

13   Hedge Fund is.

14        Q    Why do you believe that?

15        A    Well, it's a business and it's a letterhead on an

16   official, I would think, correspondence from the business, so

17   that's why I think that's what that is.

18        Q    Okay.  Did you ever have any conversations with

19   Mr. Trabulse about the fact that his office was at that

20   location?

21        A    No.

22        Q    Okay.  Did Mr. Trabulse ever tell you that that

23   actually is a mailbox at a Mail Box Etc. building?

24        A    No.

25        Q    I want to take you through a couple more things on

1      A      Either money that I put in the account or money

2   that I withdrew from the account.

3      Q      And did you ever withdraw money from your Fahey

4   Fund investments?

5      A      Yes.

6      Q      When did you withdraw money?

7      A      April 1st of this year.

8      Q      How much did you withdraw?

9      A      $25,000.00.

10     Q      Why was that?

11     A      I had some personal things that I want to take care

12   of.

13     Q      Okay.  Now, moving over from the

14   Deposits/Withdrawal column, there's a "Net Gain/Loss" column,

15   do you see that?

16     A      Yes.

17     Q      What's your understanding of what that column

18   represents?

19     A      That's the column we just talked about and that's

20   the money that my account has earned.

21     Q      Well, do you have any understanding as to the

22   difference between the Gain/Loss column over on the lefthand

23   side versus the Net Gain/Loss column on the right hand side?

24     A      I, again making the assumption that adding the two

25   together that you'd come up with the net gain or net loss.

1      A      No, ma'am.

2      Q      Did you have conversations with anyone from the

3   fund about that?

4      A      No, ma'am.

5      Q      Okay.  So, the cumulative account balance, going

6   down to the bottom of the page, it comes down to $32,342.34,

7   do you see that?

8      A      Yes, ma'am.

9      Q      What's your understanding of what that number

10   represents?

11     A      The net gain for the four quarters of that year,

12   added to the initial investment.

13     Q      Okay.  Did you have any -- if you had wanted to

14   withdraw money at this time, when you received this statement

15   that's represented by page six, how much would you be able to

16   withdraw?

17     A      I'm making an assumption all of it.

18     Q      And I'm just interested in what you think,

19   Mr. Wojack, it's not like there's a right answer or anything.

20   I'm just interested in what you think and why you think it.

21            Okay.  So, you understand that you could withdraw

22   the full $32,000 if you wanted to, is that right?

23     A      Yes.

24     Q      Okay.  And do you have -- why do you think that?

25     A      Whatever trades are done, they're completed and

1  that's the figure at the end of the year.

2      Q    Okay.  And did you ever have any conversations with

3  Mr. Trabulse about whether you would be able to withdraw this

4  full $32,000?

5      A    No.

6      Q    Okay.  Did Mr. Trabulse ever say anything to make

7  you think you could not withdraw this full $32,000?

8      A    No.

9      Q    Okay.  So, I'd next like to turn to -- we're on the

10  same Exhibit, Exhibit 11, but I'd like to turn to the page

11  that's marked FF-JMW-00016.  Are you there, Mr. Wojack?

12      A    Yes, ma'am.

13      Q    Okay.  And did you also receive page 16 in the

14  mail?

15      A    Yes, ma'am.

16      Q    Okay.  What is your understanding of what page 16

17  is showing?

18      A    Page 16 shows my initial investment and my IRA

19  rollover and it's got the first quarter, the second quarter,

20  the third quarter and the fourth quarter of the year 2004.

21      Q    Okay.  So, is it fair to say that page 16 is

22  essentially showing the same thing as page six, except for

23  the year 2004?

24      A    In a different part of it.  This is my IRA.

25      Q    Can you explain that a little bit?

1    it says, "Opening Balance Jan 1, 2004, $150,000.00", do you

2    see that?  In the first box.

3            MR. AXELBAUM:  She's referring to this right here.

4            THE WITNESS:  Oh, okay.

5            BY MS. SCHNEIDER:

6    Q    In the first box it says, "Opening Balance January

7    1, 2004, $150,000.00?"

8    A    I see that.

9    Q    Okay.  Now, according to the information that I

10   have, you didn't actually provide $150,000.00 into the Fahey

11   Fund until sometime in March of 2004, is that consistent with

12   your understanding?

13   A    That's when it got transferred, yes.

14   Q    That's when you got transferred?

15   A    That's when the money got transferred, yes.

16   Q    Okay.  And when you say transferred, do you mean

17   from another IRA account?

18   A    Yes.

19   Q    Okay.  So, why does it say opening balance as of

20   January 1, 2004, when your money wasn't transferred until the

21   end of March?

22           MR. AXELBAUM:  Objection, calls for speculation.

23           MS. SCHNEIDER:  You can answer that.

24           THE WITNESS:  Okay.  Well, we had a handshake

25   agreement when my money was -- when I retired, that I'd send

1      Q     Okay.  So, about a month after the end of the

2  period?

3      A     Of the quarter, correct.

4      Q     Okay.  And talking specifically about the fourth

5  quarter 2003 statement, do you recall whether you received it

6  in the beginning of the month or the middle of the month, end

7  of the month?

8      A     I do not recall.

9      Q     Okay.  So, what was the next contribution that you

10  made to the Fahey Fund after your $25,000.00?

11      A     That was the opening of the account to transfer

12  from my IRA, from the City of Chicago to Sterling Trust, and

13  then to the Fahey Hedge Fund.

14      Q     Okay.  How much was that?

15      A     Initial investment was $150,000.00.

16      Q     Okay.  Why did you decide to invest the

17  $150,000.00?

18      A     Well, there are many reasons.

19      Q     I'm interested in all of them?

20      A     Okay.  I wasn't satisfied with the amount of return

21  I was getting from the investment I was in.

22      Q     Okay.  And can I just stop you, what were you in?

23      A     I was in the Deferred Compensation Plan from the

24  City of Chicago Administrative Employees.

25      Q     Okay.  So, you weren't happy with the returns you

1    were getting your Deferred Comp Plan from the City of

2    Chicago?

3          A       There were many options but I didn't like any of

4    them.

5          Q       Okay.  What other, were there other reasons?

6          A       Yes.  By this time I was already aware of Kathy's

7    gains with her investment with the fund.

8          Q       Okay.

9          A       And I, myself, already had gains from my investment

10   in the Gold Fund.

11         Q       Okay.  And why did you think you already had gains

12   from being invested in the Gold Fund?

13         A       The statements that I received.

14         Q       Okay.  And I know you said earlier that before you

15   invested in the Gold Fund you never saw Kathy's statements.

16   In between this time period, when you invested the first

17   $25,000 and then the second $150,000, did you ever see any of

18   her account statements?

19         A       No.

20         Q       Okay.  Have you ever seen her account statements?

21         A       No.

22         Q       Okay.  So, you weren't happy with the returns you

23   were getting in your Deferred Comp Plan.  You were aware of

24   Katy's gains in the Fahey Fund, and then you had already

25   received gains in the Gold Fund.  Were there any other

1    A    One of the largest in the world took a beating on

2    that one.  So, obviously they can't be trusted either.

3    Q    Okay.  But, you don't know -- you have no knowledge

4    about whether the --

5    A    No, no, I don't.

6    Q    Okay.  Do you know whether the Fahey Hedge Fund or

7    the Fahey Fund had a tax preparer?

8    A    No, ma'am, I don't know.

9    Q    Okay.  And do you know if the Fahey Fund or the

10   Fahey Hedge Fund filed tax returns?

11   A    No, ma'am.

12   Q    Did Mr. Trabulse ever tell you that he wasn't going

13   to file tax returns for the fund?

14   A    No -- (laughing) -- I just think that's humorous.

15   I mean how could you get away from the government?

16   Q    I'm going to have the Court Reporter mark this next

17   document as the next exhibit.

18        MR. AXELBAUM:  This is 12.

19                      (SEC Exhibit No. 12 was

20                      marked for identification.)

21        BY MS. SCHNEIDER:

22   Q    So, Mr. Wojack, I'm handing you what's been marked

23   as Exhibit 12 in this matter.  And I'm just going to describe

24   it for the record.  Exhibit 12 appears to be a Fahey Hedge

25   Fund Partnership Agreement, dated January 2003.  And it has

 1   Bates numbers in the lower right hand column of FF-JMW0042

 2   through 0050.  Take you time looking through that,

 3   Mr. Wojack, and let me know when you've finished.

 4   Mr. Wojack, I'm just going to ask you whether you recognize

 5   that and whether you received it, so, take the time that you

 6   need to look through it for that and then I am going to ask

 7   you specific questions about it, but --

 8        A    Yes.

 9        Q    Have you had enough time to look at Exhibit 12 to

10   know whether you recognize it or not?

11        A    I recognize it.

12        Q    Okay.  What is Exhibit 12?

13        A    Exhibit 12 is what I had asked earlier, I said

14   there's a document here, eight or ten pages, whatever, how

15   many pages this is, regards to the Fahey Hedge Fund and what

16   it represents and what their investments would be, and this

17   is what I was referring to.  This describes what the

18   partnership agreement is.

19        Q    Okay.  This meaning Exhibit 12?

20        A    Um-hum.

21        Q    Okay.  And now when did you get Exhibit 12?

22        A    Well, it says revised January 2003.  I wasn't a

23   member of the fund then.  I'm going to say, when I joined the

24   fund that this is one of the things I received in the mail.

25        Q    So, after you invested the $150,000?

1      A      I'm going to say yes.

2      Q      Okay.  Not before?

3      A      No.

4      Q      Okay.  Do you think you received Exhibit 4 before

5  you invested your $76,000?

6      A      It's possible.

7      Q      And how did you get Exhibit 12?

8      A      Through the mail.

9      Q      Okay.  And who sent it to you?

10     A      The Fahey Fund.

11     Q      Do you know specifically who?

12     A      I'm going to assume, again, that it was

13 Mr. Trabulse, since he's the whatever it says here -- he had

14 a title here of some type.  But, I made the assumption it was

15 Mr. Trabulse.

16     Q      Did you ask for information about the fund and

17 that's why this was sent to you or did he just send this to

18 you?

19     A      This was sent to me.

20     Q      Okay.  It's not something that you asked for?

21     A      No.

22     Q      Okay.

23     A      I guess I'm not a wise investor.

24     Q      I'm sorry?

25     A      I guess I'm not a wise investor.

131

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE


    I <u>Patrick J. Kelley</u>, reporter, hereby verify that the foregoing transcript of <u>130</u> pages is a complete, true and accurate transcript of the testimony indicated, held on <u>Friday, April 13, 2007</u>, at <u>44 Montgomery Street, Suite 2600, San Francisco, California</u>, in the matter of: <u>Fahey Fund LP.</u> I further certify that this proceeding was recorded by me and that the foregoing transcript was prepared by <u>Maryann Loverro</u> under my direction.



Date: <u>4/23/07</u>


Official Reporter: <u>PJ Kelly</u>


Diversified Reporting Services, Inc.



Diversified Reporting Services, Inc.

Phone: (202)467-9200 Fax: (202)296-9220

132

## PROOFREADER'S CERTIFICATE

In the Matter of:  Fahey Fund LP

Witness:  James Wojack

File Number:  SF-03211-A

Date:  Friday, April 13, 2007

Location:  San Francisco, California


This is to certify that I, <u>Maryann Loverro</u>, do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.


_Maryann Loverro_                    4/25/07

# EXHIBIT 24



**Pillsbury
Winthrop
Shaw
Pittman** LLP

RECEIVED

APR 1 2 2007

SEC San Francisco

| 50 Fremont Street | MAILING ADDRESS |
| San Francisco, CA 94105 | P. O. Box 7880 |
| Tel 415.983.1000 | San Francisco, CA 94120 |
| Fax 415.983.1200 | www.pillsburylaw.com |

April 12, 2007

Marc H. Axelbaum
Phone: 415.983.1967
marc.axelbaum@pillsburylaw.com

## FOIA CONFIDENTIAL TREATMENT REQUESTED

***HAND DELIVERED***

Erin E. Schneider, Esq.
Staff Attorney, Division of Enforcement
United States Securities and Exchange Commission
44 Montgomery Street
Suite 2600
San Francisco, CA 94104-4613

Re:    <u>In the Matter of Fahey Fund, SF-3211</u>

Dear Ms. Schneider:

Enclosed are documents numbered FF-JMW 0001 to FF-JMW 0109, which are
responsive to the SEC's subpoena for documents dated January 31, 2007 to James M.
Wojack. This firm, Pillsbury Winthrop Shaw Pittman LLP, represents Mr. Wojack with
regard to the subpoena.

Please note that we have redacted portions of several of the documents on privacy
grounds. The redacted portions do not pertain in any way to the scope of your
investigation as we understand it.

We consider this letter (together with enclosures) to remain the property of Mr. Wojack
for purposes of the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA").
In the event that this letter, or any part of it, is determined to be an agency record within
the meaning of FOIA, we request confidential treatment pursuant to FOIA and the
applicable rules of the Commission, including but not limited to Rule 83 of the
Commission's Rules on Information and Requests, 17 C.F.R. § 200.83. In this regard,
please be advised that we have submitted to the Commission a request for confidential
treatment under FOIA. A copy of our FOIA letter request is enclosed.

This letter is not intended to, and does not, waive any applicable privilege or other legal
basis under which information may not be subject to production. Our production of any

700672366v1

Erin E. Schneider, Esq.
April 12, 2007
Page 2

material subject to any applicable privilege or other legal basis under which information
may not be subject to production is inadvertent.
Please call me at 415-983-1967 if you have any questions.

Sincerely,

Marc H. Axelbaum

Enclosures

cc:     FOIA and Privacy Act Office (w/o enclosures)

Pillsbury Winthrop Shaw Pittman LLP



# Fahey Hedge Fund

Profiting from Fundamental and Technical Imbalances in Listed World Markets

*268 Bush Street, Suite 4232 · San Francisco, CA 94104 · 800- 783-2233*

# Fahey Hedge Fund
# Partnership Agreement
*Rev Jan 2003*

*[handwritten: —a d Fund same, but will follow up in 30 days with a replacement]*



FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-JMW 0042

# FAHEY HEDGE FUND

PARTNERSHIP AGREEMENT

A California Limited Partnership

This Partnership Agreement made on April 1, 1997, and revised Apr 1, 1999 by Alexander James Trabulse, replacing prior agreements under this name and made with any future signatory who is hereafter admitted to the partnership pursuant to the terms of this Agreement, hereinafter referred to as "partners."

## RECITALS

*In consideration of the mutual covenants contained in this instrument, the partners agree to form a limited partnership (hereinafter referred to as "partnership") pursuant to the California Limited Partnership Act, for the purposes and under the terms, provisions and conditions set forth below.*

## IT IS *THEREFORE AGREED:*

## ARTICLE I. *NAME AND PLACE OF BUSINESS*

Section 1.01 Name of Business. The partnership and activities shall be conducted under the name of "The Fahey Hedge Fund" in the State of California and under variations of this name which may be necessary to comply with the laws of other states in which the partnership transacts business and makes investments. PLEASE NOTE THAT IN THE REMAINDER OF THIS AGREEMENT, the phrase(s) "limited partnership," or "partnership" will be referred to as "the Fund," except where technical legal language is required.

Section 1.02. Place of Business. The Fund's principal place of business shall be located at 268 Bush Street, Suite, San Francisco, CA 94104 or at such other place as may be determined from time to time by the General Partner or by the giving of written notice to each limited partner at least ten (10) days before such a change.

## *ARTICLE II. FUND PURPOSES*

Section 2.01. Primary Purpose. The Fund's primary purpose shall be to use listed stock, futures, options and index opportunities to gain consistent compound rates of return. The Fund will utilize both its proprietary technical trading system (the "RED/GREEN System") along with classical Fundamental Analysis to identify and time these opportunities. The trading vehicles will be chosen from among, but not limited to, the following: Stocks (NYSE, NASDQ, AMEX, etc.) Indexes, Warrants, Stock options, Futures and their options, forward contracts, Cash market (physical commodities) transactions and similar financial instruments.

Section 2.02. Secondary Purpose. The Fund's secondary purpose shall be to provide a vehicle whereby qualified trustees may invest the Fund into their Self Directed IRA or Keogh, 401(k), intending to defer capital gains and consequent tax exposure in profitable years. Not all partners, however, qualify or chose this option.

## ARTICLE III. *FUND TERM*

Section 3.01 Fund Continuation. The Fund shall be in operation until Dec. 31, 2007. When this term expires, final results may be distributed to the partners, along with the option to renew their respective investments, at, above, or

FOIA CONFIDENTIAL
TREATMENT REQUESTED

below original levels. If the Fund is in fact renewed, it will be for the purposes as stated in Article II, with relevant modifications as needed. Such renewals shall then be year-to-year.

## ARTICLE IV. *MEMBERS OF THE FUND*

Section 4.01. General Partner. The General Partner shall be Alexander James Trabulse, 268 Bush Street, Suite 4232, San Francisco, CA 94104.

Section 4.02. Limited General Partner. The limited General Partner shall be: Easter Trabulse, 2040 Polk Street, Suite 321, San Francisco, CA 94109.

Section 4.03. Limited Partners.

Section 4.04 Admission of Additional Partners. Subject to any other provision of this Agreement, after the initial formation of this Fund, other persons, partnerships, or business entities may be admitted as limited partners only with the consent of the General Partner, not to exceed ninety-nine (99) total members.

## ARTICLE V. CONTRIBUTIONS TO THE PARTNERSHIP

Section 5.01. Initial Contributions. The General Partner agrees to provide all resources for trading of this type: 1) the RED/GREEN technical system; 2) his expertise and experience with derivative vehicles, including but not limited to, futures, option and stock trading since 1976; and, 3) all record keeping, brokerage, computation and notification of partners. The General Partner will 1) use his best efforts to both make profits; 2) cease trading if capital declines to under 70% of the original capital and notify partners of this condition, giving partners the option to continue in the Fund; and, 3) promote the Fund, to derive both income and new capital.

Section 5.02. Initial Contribution of Limited General Partner. The limited General Partner will provide services to the Fund in the day-to-day management of the business, and such contributions will be aimed at providing maximum efficiency and economy in the orderly activities of the Fund.

Section 5.03. Initial Contribution of Limited Partners. The minimum initial contribution of Limited Partners shall be $100,000. Increments will be calculated on units of $10,000. New Limited Partners may, upon the judgment of the General Partner contribute less than the initial amount. This will be evaluated on a case-by-case basis, subject to limitations.

The Fund reserves the right to waive minimum requirements for friends and family. The Fund must be closed, by law, non-exempt partners (including partnerships as partners) reaches 99.

Section 5.04. Additional Permitted Capital Contributions. In addition to his initial contributions each limited partner or the General Partner may voluntarily make additional contributions to the capital of the Fund subject to approval by the General Partner. Such additional contributions, whether the result of direct cash payments or from accumulations of profits at the time of normal distributions, shall result in the profit-loss share of the limited partners being recomputed on a *pro rata* basis for each limited partner's new total capital contribution. In no event shall the profit-loss share of the General Partner be affected by the contribution of additional capital by a limited partner.

Section 5.05. Limitations and Additional Capital Contributions. No limited partner will be required to contribute to the capital of the Fund or to its creditors any additional money or property. The liabilities of the limited partners are limited to the amount of their initial capital contribution as set forth in this agreement and any additional voluntary contributions which may be made.

Section 5.06. Interest on Capital Contributions. No partner shall receive any interest on his contributions to the Fund capital, unless such interest is earned in the nature of the various business activities. However, all non-utilized

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-JMW 0044

capital will normally draw interest, which shall be used to defray Fund expenses. This may be waived by the General Partner.

Section 5.07. Contributions Secured. All partners grant to the General Partner liens on their interests in the Fund to secure the payment of contributions and the performance of obligations required under this agreement.

Section 5.08. Withdrawal and The Return of Capital. No partner may withdraw any portion of the capital of the Fund and no partner, general or limited, shall be entitled to the return of his contribution except as specified hereinafter. Such a withdrawal will be made only after written notice to the General Partner. Ninety days (90) after receipt of such notice by the General Partner, the Fund shall pay such withdrawing limited partner an amount equal to said partner's capital account plus or minus all accrued profits or losses attributable to said partner as of the date of distribution. In emergencies, the funds may be returned as soon as possible to a partner. If, in the General Partner's absolute discretion the withdrawal of any limited partner or partners would cause the Fund to be left with inadequate capital, the General Partner may elect to return the capital contributions plus or minus all accrued profits or losses to all the limited partners and declare the partnership terminated. In the event of the withdrawal of any limited partner, the portion of the future Fund profits and losses in open positions, if any, attributable to the terminating partner shall thereafter be redistributed among the remaining partners on a *pro rata* basis, according to his percentage share.

Section 5.09. Profits and Losses. The limited partners shall not be liable or subject to any obligations, losses, debts, or liabilities of the Fund in excess of the amount in each of their capital accounts. Any losses of the Fund in excess of such amount shall be borne by the General Partner only, and not by the limited General Partner. However, any capital losses that are suffered by the Fund shall be deemed to be *pro rata* capital losses to each limited partner and charged toe their accounts respectively.

Section 5.10 Method of Tax Accounting for Tax Purposes. The partnership shall be kept on a cash basis with the fiscal year concurrent with the calendar year.

Section 5.11. Loans to Fund. No partner may loan or advance money to the Fund without the unanimous written consent of the partners. Any loan by a partner to the Fund shall be separately entered in the Fund books as a loan to the Fund, shall bear interest at a rate agreed upon by the General Partner, and shall be evidenced by a promissory note delivered to the lending partner and executed in the name of the Fund by the remaining partners.

Section 5.12. Books of Account. The partnership shall keep at its principal place of business complete and accurate records of all partnership transactions, including but not limited to: a current list of the names and addresses of the partners, together with the contributions and shares in profits and losses of each partner; a copy of the Certificate of Limited Partnership, including all amendments thereto; copies of Federal, State and local informational tax returns; a copy of the original partnership agreement with amendments and addenda, and a financial statement of these records. Any partner may inspect the above documents at any reasonable time, with sufficient notice to the General Partner.

Section 5.13 Capital Accounts. Each partner shall have a separate capital account maintained. Initially, the capital account of each limited partner shall have a balance equal to the amount of his capital contribution to the partnership. If net income is generated by the partnership, or net loss is suffered, allocation will be as set forth below.

Section 5.14. Division and Distribution of Profits and Losses. All Fund profits and losses will be determined at the completion of each trading campaign. These profits will be allocated as to the ratio of each partner's capital account to the Fund's total capital. Thereafter, 25% of the net profit of each limited partner shall be payable and distributable to the General Partner. Partners with under $50,000 shall pay a 20% distribution. Losses shall be charged against the General Partner up to his share of the profits from the beginning of the three fiscal years before the partners losses are calculated. Thereafter, losses shall be charged to each partner on a *pro rata* basis to their capital accounts. *See Art V, Sec 5.01*

FOIA CONFIDENTIAL
TREATMENT REQUESTED

Section 5.15. Tax statements. The books of the Fund shall be closed and balanced at the end of each calendar year and statements shall be delivered to each partner within ninety (90) days after the expiration of said fiscal year showing the income, profit and loss, together with a balance statement showing the accounts of each partner, the distribution to each partner, and each partner's share of profits and/or losses, reportable as IRS 1065 K-1 forms to the Federal and State taxing authorities. Quarterly informational statements will be issued to each partner, with updates on each account.

Section 5.16 Definition Of Profits and Losses. The terms "net profits" and "net losses" used in these Articles mean the net profits and net losses of the Fund as determined by generally accepted accounting principles for each accounting period provided for in these articles.

Section 5.17. Bank Accounts. All Fund funds not otherwise invested shall be deposited in accounts in the name of the Fund at such a bank(s) as selected by the General Partner. All withdrawals from any such accounts(s) may be made only by check or other written instrument, signed by the General Partner. In the absence, incapacity or death of the General Partner, the limited General Partner shall have the duty to issue withdrawals, or on the written extension of authority by the General Partner to the limited General Partner, beyond the proscribed duties of Article VI.

# ARTICLE VI. *RIGHTS, POWERS, DUTIES AND RESTRICTIONS OF PARTNERS*

Section 6.01. General Partner's Exclusive Right to Manage. The General Partner shall have full and exclusive charge and control of management, conduct, and operation of the Fund in all respects and in all matters. Duties delegated to the limited General Partner shall be subject to alteration, elimination or redefinition by the General Partner and be appended to these articles in writing at such time as necessary.

Section 6.02. Devotion of Time to Fund. The General Partner shall devote such time to the Fund as shall be necessary in his absolute discretion to conduct the business of the Fund in an efficient manner.

Section 6.03. Restriction on the General Partner. Except as otherwise expressly provided in this Agreement, the General Partner shall have all the rights and powers of a partner in a Fund without limited partners and shall be subject to the restriction imposed on the General Partners by the California Revised Limited Fund Act, or imposed on a partner in a Fund without limited partners.

Section 6.04. Limited General Partner Duties and Limits. The limited General Partner shall in no way manage, decide, or have control in the decision-making of the Fund, except in an executive capacity directed by the General Partner. The limited General Partner shall be able to issue checks in payment for Fund expenses against a valid bill, invoice, or for other legitimate Fund expenses; he shall be responsible for maintaining the accounting documents of the Fund. In the case of the incapacity, injury, insanity, debilitation or death of the General Partner, the limited General Partner shall assume the duties of the General Partner to dissolve or to suspend operation of the Fund, to distribute assets and/or liabilities to the limited partners; and take a management position of the General Partner's account until the General Partner resumes his duties. Notification of the limited partners will be done by the limited General Partner that a suspension or dissolution and distribution will be effected by a given date by which time all financial documents, assets, records, etc., will be available to all partners for final review. No notice of suspension or dissolution, however, will allow the limited General Partner the right to manage the Fund's business, except to facilitate liquidation.

Section 6.05. Non-Participation in the Management by Limited Partner. The limited partners shall contribute no services and shall take no part in, or interfere with, the management or control of Fund business. They shall have no right or authority to act or bind the Fund. In the event that a limited partner has the ability to provide services, such services shall be accepted only in the context of employment.

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-JMW 0046

Section 6.06. Salaries. No partner shall be entitled to any salary, but the General Partner shall receive the right to draw expenses consistent with prudent and sound management of the trading activities, such expenses being charged against his share.

Section 6.07. Voting Rights of Limited Partners. Notwithstanding any other provision in this agreement, the limited partners are hereby given the right to vote on, or call a meeting of the partners, and to vote on any or all of the following matters which affect the basic structure of the Fund: (a) the dissolution, and winding up of the Fund; (b) the sale, exchange, lease, mortgage, pledge or other transfers of all or a substantial part of the assets of the Fund other than in the ordinary course of business; (c) a radical change in the nature of the Fund's business; (d) a transaction in which the General Partner has an actual or potential conflict of interest with the limited partners or the Fund; and (e) the removal of a limited or General Partner. On each of the above-mentioned matters, each partner general and limited, shall have one (1) vote for every $100,000 of capital attributable to their account, based on an accounting taken for the day (or current month) in which the vote is called. A majority of the partners representing a majority of the Fund interest must affirmatively agree for any of the above activities to be undertaken, excepting the replacement of the General Partner, which shall require a two-thirds (2/3) vote.

Section 6.08. Fund Activities Not Exclusive. Except as otherwise provided in this agreement, any of the partners, general or limited, may engage in or possess interests in other business ventures of every nature and description, independently or with others. Neither this Fund, nor the partners, shall have any rights by virtue of this agreement in and to such independent ventures or to the income or profits derived therefrom. Without limiting the generality of the foregoing, the General Partner is entitled to make independent investments with his own funds.

Section 6.09. Risk. It is understood by all limited partners that the business purpose of this Fund is to undertake the utilization of a trading system in a speculative environment, which could create a risk of capital loss. It is further understood that risk implies potential loss of capital. It is further understood that the General Partner is under no obligation to meet the standard of reasonable and prudent investment as if he were a trustee or other fiduciary. The General Partner is empowered to make any investment in derivative instruments, such as commodities, futures, precious metals, financial instruments, indexes, options or option strategies, as well as listed stocks and their options and indexes, or any such like. It is expressly understood that all the limited partners waive any claims against the General Partner for adopting any particularly high-risk investment strategy so long as the General Partner is not guilty of fraud or intentional misconduct.

## ARTICLE VII. *RESTRICTIONS ON TRANSFER*

Section 7.01 Transfer of Interest. Except as other wise noted in this agreement, no partner may sell, assign, hypothecate, encumber or otherwise transfer their Fund interest without the prior written consent the General Partner, and shall not pass title to any Fund interest in the absence of such consent. Any transfer prohibited under this section shall be void, and any attempt by a partner to dispose of a partnership interest in violation of this section shall constitute a material default under this agreement.

Section 7.02. Assumption of Interest. Any transferee who is a recipient of a partnership interest in accordance with the terms of this agreement agrees to be bound by all the terms and conditions of this agreement. No assignee or other transferee shall take title to a partnership interest without a written agreement to accept and assume the terms and conditions of this agreement. No assignee will be accepted if to do so would create more than 99 limited partners.

## ARTICLE VII. *TERMINATION OF THE FUND*

Section 8.01. Termination by General Partner. The General Partner may withdraw from the partnership at any time he deems such a decision appropriate.

Section 8.02. Termination by a Limited General Partner. The limited General Partner will be free to withdraw from the partnership upon the giving of ninety (90) days written notice to the General Partner. If such termination is a legitimate emergency, seven (7) business days will prove adequate notice.

Section 8.03. Termination by a Limited Partner. Each limited partner shall be free to withdraw from the partnership upon the giving of ninety (90) days written notice to the General Partner. If such termination is a legitimate emergency, withdrawals will be granted, provided such haste will not seriously injure the Fund capital position.

Section 8.04. Termination by Mutual Consent. At any time during the term of this agreement, the Fund may be terminated by the mutual written consent of all parties subject to such conditions as may be imposed by such written consent.

Section 8.05. Death or Bankruptcy of Limited Partner. Should a limited partner die or be adjudged bankrupt by any court of competent jurisdiction, the remaining partners shall have an option to purchase the partnership interest of the limited partner by paying to the person legally entitled thereto within ninety (90) days after the date of such death or adjudication, the then-present book value of such interest as it appears on the partnership books on the date of such death or adjudication. If more than one (1) partner remains, each partner shall have the right to purchase such proportionate share of deceased or bankrupt limited partner's interest in the partnership as such remaining partner's interest in the profits of the partnership bears to the total interest in such profits of all other remaining general and limited partners, provided, however if any such remaining profits or losses are suffered by the partnership shall be deemed to be *pro rata* capital loss to each general and limited partner.

Section 8.06. Death, Insanity or Insolvency of General Partner. Upon the death, insanity or insolvency of the General Partner, the partnership shall be immediately be dissolved. Partnership assets shall be distributed as specified below. In this event, , the limited General Partner shall act as the Agent of the Partnership for the purpose of winding up the partnership affairs. Such agency shall under no circumstances increase the liability of any limited partners or of the limited General Partner beyond the amount previously invested by said limited, or limited General Partners in the partnership. Furthermore, the assets and the capital account of the General Partner shall revert to the Partnership until such time as the General Partner shall revert to competency.

Section 8.07. Winding up of the Fund Business. Upon termination of the Fund, for any reason, the General Partner shall wind up the affairs of the Fund, liquidate the Fund assets, and pay the debts of the Fund in the following order: (a) to creditors, including partners who are creditors, to the extent permitted, in satisfaction of the liabilities of the Fund other than liabilities for distribution to partners; (b) except as provided in this agreement, the partners and former partners in satisfaction of liabilities for distribution; and (c) the partners in accordance with any other rights which they have under this agreement. Thereafter, the General Partner shall file a Certificate of Dissolution of Limited Fund with the California Secretary of State's office.

## ARTICLE IX. *COMPLIANCE WITH THE LAW*

Section 9.01. Certificate of Limited Partnership. The General Partner shall execute acknowledge and file a Certificate of Limited Partnership with the California Secretary of State's office.

Section 9.02 Power of Attorney. The limited partners hereby appoint the General Partner as their attorney in fact, in their place, name and stead, to make, execute, acknowledge and file any documents necessary as advantageous by the partnership to complete.

FOIA CONFIDENTIAL
TREATMENT REQUESTED

Section 9.03. Terms and Conditions. The standard terms and conditions, if any, are attached hereto and incorporated herein by reference apply to the partnership agreement.

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-JMW 0049

Dedication and Acknowledgment

The Fahey Hedge Fund is so named as an outward sign of respect and affection for the memory of Fr. Denis Fahey, C. S. Sp., (1883-1954). Father Fahey, was born in Kilmore, Golden in County Tipperary, Ireland. He was perhaps the first person in the early 20th century to investigate and comprehend both the effects of modern central banking and the gold standard, and to elucidate their flaws and dangers. His humble sounding book, The Church and Farming, is a classic document on how both inorganic fertilizers undermine productivity and health, and how speculative farming and forestry has led to the wholesale and rapid destruction of the soil and the world's forests. A full professor of Philosophy and Church History, he was fluent in German, French, Italian, as well as Celtic and of course, Latin and Greek. The Fund hopes to be guided by such an order of wisdom and insight as Fr. Fahey.

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-JMW 0050