# EXHIBIT 31

SEC
SAN FRANCISCO

2007 FEB -8 PH 3: 16

February 7, 2007

Dear Erin E. Schneider,

Enclosed are copies of all the documents I have concerning your request.

I met Jim Trabulse at a few social functions in 2003. In March of 2004 I spoke with him concerning his Fund and requested that he mail me information.

In May of 2006 I decided to look into the fund further and requested references that I could contact to evaluate if I might be interested in investing with the fund. Soon after talking to several investors, I decided to proceed with opening and funding my accounts. This took place on June 16, 2006 when I met with Jim at the Alta Sierra Country Club.

I have had a few email correspondences with Jim concerning opening the account but have not retained any of these as I normally delete old emails that are no longer of service.

Also I have spoken with Jim a number of times on the phone between May 2006 and the present. I have no record of these calls (I use a calling card for all long distance calls) and no recollection of specific dates or content except to say they either concerned paperwork or questions about my investments or were purely social in nature.

I have numbered each of the copies and followed this number with a letter corresponding to the type of documents produced as you identified on pages 2 and 3 of the subpoena attachment.

I believe I have met my obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena and sending it to you.

Sincerely,

Karl Hillemann

REFERENCES, FAHEY HEDGE FUND, LP

## PARTIAL LIST OF ORIGINAL AND CURRENT INVESTORS WILLING TO RECEIVE YOUR CALLS *(WHO HAVE BEEN WITH THE FAHEY FUND AT LEAST 3 TO 5 YEARS)*

| JIM OSELLA | Pennsylvania |
|------------|--------------|
| TOM WALSH | Southern California |
| HARALD HAERTER | Switzerland |
| JAMES HIRST | Northern California |
| KATHY GOSS | Southern California |
| MARTIN BUTTON | Northern California |
| DAVID HINGSTON | Northern California |
| PER MADSEN | Northern California |
| KATHY RANZ | Indiana |
| M. COVITZ | Washington State |
| DON SATHER | Northern California |
| ERIC STEEG | Northern California |

### MORE AVAILABLE ON REQUEST

You are welcomed and encouraged to call our investors. To protect their privacy, ask the General Partner for emails/phone numbers. You may call some, or all of the above. It is best to do so AFTER you have our materials and you feel more seriously inclined to invest in the Fund. *In any event you are perfectly free to contact them after you have received the phone numbers/emails from us.*

### TO EMAIL THE FAHEY HEDGE FUND, LP

ref.phone@faheyfund.com

### CALL THE FUND:

**1-800-783-2233**

### BANKING REFERENCES, National or International

On request only, by telephone please. Ask for the General Partner.

### WOULD YOU LIKE TO VIEW A REAL QUARTERLY STATEMENT (with the personal details blocked off)?

Request one to be sent to you by FAX or email.

---

## ORIGINAL REFERENCES (PRE-1997)

### A. James ("Jim") Trabulse

Jim has been a trader since 1975. His first trade was in CBOT Wheat, Jan. 1976, when a member of the Pacific Commodities Exchange. He joined the Pacific Stock Exchange in 1978 in the then new Options Floor. Simultaneously, from 1978-92, he consulted with corporations and large traders, specializing in soybeans, world edible oils, and Federal watching. The Fahey Fund began, in the mid-90s, in response to requests from friends and colleagues who wanted to benefit from the explosion of financial, and futures products. Their newness required expertise such as his in fundamental and technical analysis, and computer and Internet skills. Jim is an experienced bond trader, options trader, and stock picker. An alumnus of Brown and UC Berkeley, he holds degrees in Applied Mathematics, Computer Science and Economics. Below are pre-Fahey Fund friends and associates, some since the 1970s.

### Bernard T. Rocca, Jr.

BERNARD T. ROCCA, JR., AND CO.
SAN FRANCISCO, CA 94104
B. T. Rocca Jr. has been a cash and futures trader since the 1940's. During the active part of his career, he was the largest individual Coconut and Palm Oil trader in the U.S. Jim considers Barney his mentor, having known him since 1975. Mr. Rocca, now retired, has written a personal letter of recommendation, a copy of which is on the reverse, with an interesting article about his successes. He prefers no phone calls at this time.

### Mr. Peter Franks

TAMALPAIS TRADING
SAN RAPHAEL, CA 415-381-4363 (AFTER 2:00 PM ONLY)
Peter has known Jim since 1976. He is a Futures Fund manager, his specialty being the "big moves"—the fundamentally driven markets in Futures and Stock Indexes.

### Steve Hawthorne

BATTALION CHIEF, DALY CITY FIRE DEPARTMENT
(415) 991-8250
Steve is a friend—the first to put money with Jim during the testing phase of my Red/Green system in 1994-96. He can tell you of his experience and why he wishes to be a reference. Since Steve's schedule varies, call and leave a message for him.

### Richard Ackerman

rackerman@MARKETWISE.COM 303.543.0489.
Former Columnist, S. F. Examiner, Sunday BusiPress Section called "Market Directions" and Publisher, editor of Little Black Box Forecasts. His amazing forecast of a crash in the Stock Market two years ago, led to his purchase by MARKETWISE, with its elite clientele. Rick and Jim met in 1985 while on the PSE.

### James Edwards

A. G. EDWARDS AND CO., NAPA BRANCH 800-456-6135
James ("Jamie" to me) has been a friend since 1976, and one of my personal brokers since the early 1980's, when he was with Paine Webber, San Francisco. He is a successful broker, graduate of Williams College, and at the risk of prejudice, you should do all your personal stock business with him! Calls from 7AM to 4PM. ◆



# EXHIBIT 32

SEC
SAN FRANCISCO

2007 FEB -8 PM 3: 16

February 7, 2007

Dear Erin E. Schneider,

Enclosed are copies of all the documents I have concerning your request.

I met Jim Trabulse at a few social functions in 2003. In March of 2004 I spoke with him concerning his Fund and requested that he mail me information.

In May of 2006 I decided to look into the fund further and requested references that I could contact to evaluate if I might be interested in investing with the fund. Soon after talking to several investors, I decided to proceed with opening and funding my accounts. This took place on June 16, 2006 when I met with Jim at the Alta Sierra Country Club.

I have had a few email correspondences with Jim concerning opening the account but have not retained any of these as I normally delete old emails that are no longer of service.

Also I have spoken with Jim a number of times on the phone between May 2006 and the present. I have no record of these calls (I use a calling card for all long distance calls) and no recollection of specific dates or content except to say they either concerned paperwork or questions about my investments or were purely social in nature.

I have numbered each of the copies and followed this number with a letter corresponding to the type of documents produced as you identified on pages 2 and 3 of the subpoena attachment.

I believe I have met my obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena and sending it to you.

Sincerely,

Karl Hillemann

 Yahoo! Mail - karlandrachein@yahoo.com

 REDACTED

 powered by **OUTSIDE IN** HTML EXPORT

Page 1 of 2

Klt 4-A

**YAHOO! MAIL**

Print - Close Window

Partial List of Original and Current Investors Willing to Receive Your Calls *(Who have been with the Fahey Fund at Least 5 to 8 Years)*

| Button, Martin | ███████, X | martin@███████ | Northern California | *Got Msg Great* |
| Covitz, Misti | ███████ | miscovi@███████ | Washington State | Left Msg |
| Goss, Kathy | ███████ | kgoss@███████ | Southern California | Got Msg Great |
| Haerter, Harald | ███████ | gittakahle@███████ | Switzerland | |
| Hingston, David | ███████ | davidh@███████ | Northern California | Just Rang |
| Hirst, James | ███████ | jhirstcei@███████ | Northern California | Left Great |
| Madsen, Per | ███████ | rackittm@███████ | Northern California | Left Msg Great |
| Osella, Jim | ███████ | osella@███████ | Pennsylvania | Great ! |
| Ranz, Kathy | ███████ | k.ranz@███████ | Indiana | Got Modem |
| Sather, Don | ███████ | satherarch@███████ | Northern California | Great ! |
| Steeg, Eric | ███████ | | Northern California | |
| WALSH, Tom | ███████ | | Southern California | |

MORE AVAILABLE ON REQUEST!

You are welcomed-and encouraged- to call our investors.

*Les Bordes Golf Estate*

**To email the Fahey Fund, *lp***

bigcheese@faheyfund.com

**Call the Fund:**

**1-800-783-2233**

**Manager Easter Trabulse 707-812-5487**

 *Eastwise*

 EXHIBIT EX 7

# EXHIBIT 33

SEC
SAN FRANCISCO
2007 FEB -8 PM 3: 16

February 7, 2007

Dear Erin E. Schneider,

Enclosed are copies of all the documents I have concerning your request.

I met Jim Trabulse at a few social functions in 2003. In March of 2004 I spoke with him concerning his Fund and requested that he mail me information.

In May of 2006 I decided to look into the fund further and requested references that I could contact to evaluate if I might be interested in investing with the fund. Soon after talking to several investors, I decided to proceed with opening and funding my accounts. This took place on June 16, 2006 when I met with Jim at the Alta Sierra Country Club.

I have had a few email correspondences with Jim concerning opening the account but have not retained any of these as I normally delete old emails that are no longer of service.

Also I have spoken with Jim a number of times on the phone between May 2006 and the present. I have no record of these calls (I use a calling card for all long distance calls) and no recollection of specific dates or content except to say they either concerned paperwork or questions about my investments or were purely social in nature.

I have numbered each of the copies and followed this number with a letter corresponding to the type of documents produced as you identified on pages 2 and 3 of the subpoena attachment.

I believe I have met my obligations under the subpoena by searching carefully and thoroughly for everything called for by the subpoena and sending it to you.

Sincerely,

Karl Hillemann



*The* FAHEY HEDGE FUND
268 BUSH STREET, SUITE 4232
SAN FRANCISCO, CA 94104
(800) 880-6003   bigcheese@faheyfund.com



> The enclosed Fahey Fund materials are designed to show you who we are; what we aim to achieve for you; why our approach works successfully either in rising or crashing markets and then give you our track record and references of our most seasoned investors.

Now that the Fahey Fund is into our sixth year, we may humbly say that our original plan has worked well.

✓ We said we would, of course, gain from *up markets*, like anyone else. RESULT: We profited during the final wild Bull years until Spring 2000. Of course, the big difference between the majority and us is that we sold out by Spring 2000, as well as building a short position which we felt would take the Dow under 8,000.

### Fig. 1: Our Reno Air Takeover Trade, 1998-99





✓ We said we would "sell short" in persistent *down markets*, thus doubling our opportunities. RESULT: going short, we rode the violent roller coaster down as the bull crashed nearly in half. Our investors made great gains in what was supposedly an "impossible" atmosphere. In fact, only short-selling, or bear, funds consistently made money in the past 2-½ years.

### Fig. 2: Our Short Sales Campaign: recent collapse of the Dow



### Fig. 3: Long from $255: Sudden boom in gold in 1999



✓ We originally said that dozens of major opportunities are lost each year by investors who avoid-or are unaware of-the world's largest, *non-stock, markets*: gold, Euro currency, copper, interest rates, hogs, soybeans, and so on. There are about 50 in all. RESULT: We placed our investors, with LESS risk than stocks, into markets such as: hedging the dollar against the Swiss Franc and Euro. Buying Hogs at the lowest price since 1938. Selling the Dow Jones Stock Index short. We gained from the drought and late, wet planting season in the Corn Belt, grabbing a piece of the price boom.

✓ *Perhaps best news to you who must preserve your capital, this was done with a minimum risk rarely exceeding 5-8%. The gains returned between 15-22%. These opportunities take time to form and take time to mature, but they are worth waiting for. Since we have this long-term outlook, we are pleased to inform you that not one single investor has left the Fund. Those few who have been with us more than five years are drawing-or able to draw-quarterly income supplements while their investments still grow. Plus, an interesting point is that all-new investors since 1999 are by personal referral.*

### IS IT REASONABLE TO EXPECT SIMILAR RESULTS WITH YOUR INVESTMENT?

All disclaimers state: *Past performance is no guarantee of future results.* Of course, this is true but partially. An investment strategy can also make sense, proving itself over time. The graph of the Fahey Fund's performance follows below, shows the stability of our results. Without going into it too deeply, we would like you to understand how we make trading decisions. It is logical, fairly simple, and based in common sense. We maintain that it is so simple that anyone can understand it. We will go a step further: it is so simple that anyone (with the time and inclination) could do it! So, we have the best of all demonstrations: a track record and a repeatable approach.

EXHIBIT
EX 5
SF-03211-A



265,000
240,000
215,000
190,000
165,000
140,000
115,000
90,000
Fahey Fund STOCKS Only, Initial $100,000
SP 500 compounded, $100,000 starting
SP 500 compounded. If short selling
Short Stocks
Fahey if we traded stocks and indexes ONLY-note how few trades in five years
Short Stock Index
Stocks: Sep 11 bounce
Short PGE Short Stock Index
SP 500 if short sales were used since Q2 2000. This nearly outperforms the Fund.
CMGI/CPTH Internet Stocks
Custom Tracks (CUST) Calls
SP 600 long only, but compounded per quarter. With No short sales, net equity
S & P Short Sale
RENO Air
Q4 97
Q1 98
Q2 98
Q3 98
Q4 98
Q1 99
Q2 99
Q3 99
Q4 99
Q1 00
Q2 00
Q3 00
Q4 00
Q1 01
Q2 01
Q3 01
Q4 01
Q1 02
Q2 02
Q3 02
Q4 02

## THE FAHEY FUND APPROACH: SIMPLE AND LOGICAL

What is our approach, in which we have such rock-like confidence? We would say it consists of three obvious things and one not-so-obvious one.

- ✓ First, we wait for THE real, major low price of the year or decade, whatever (or high price--we will use low from now on to avoid repetition but the same principles apply to short selling). To discover this price, we investigate over 50 principal core stocks that are the keys to the indexes. We simultaneously investigate prices of raw materials, especially those which have futures contracts, such as copper, cotton, interest rate costs, currencies, etc. To keep abreast of these, we have to closely follow those 40+ futures contracts with broad liquidity. These raw materials are the expense side of the ledger for corporations. If material costs rise, profits shrink. Hence: buy raw materials, sell stocks.

- ✓ Secondly, when a market is found to be approaching a very low price, we measure the total financial risk to us of buying near what we THINK is a bottom or top. But, a bottom is not quite enough. We need to have a very high probability that 1) this price recovery will return 3 or 4 times our initial risk; and, 2) that it can happen within three to nine months.

- ✓ Thirdly, when the conditions are met, we take a modest, initial position-normally at the fund's <u>own risk</u>! Then we wait until it (the trial position) works or fails. If it works, we add the rest of the position; sit tight until we reach our minimum financial targets of 15-20% rate of return. We try to do this at least two times per year.

- ✓ The not so obvious tool we have is a proprietary price system linked to heavy information flows from the Internet. This allows us to be very well informed and extremely selective. A one-two punch!

## RISK MANAGEMENT AND MONEY MANAGEMENT ARE KEYS TO BUSINESS OF ANY KIND

Even though it is possible to make amazing percentages in stock and futures markets, doing so entails way too much risk. It is always best to *minimize* the financial exposure. One has to risk enough to make it worthwhile, but also make enough to cover losses AND increase the trading capital. What we do is try to find about three or four markets during the year which are clearly going to rise (fall) in such a way that we can make AT LEAST 15-20%. This figure is about 3 to 4 times our FINANCIAL risk. A current example is Microsoft (MSFT) trading under $50. It has risen from under $45 *consistently* for over 16 years. It typically runs up to over $62-65, so that the return on that "meaningless" rally is still close to 45%! If we take a position of one-half of our assets we still make 22%. So, if we do this three times a year, and fail once, losing 5 percent, we still net out 44 percent minus 5 percent or 39 percent. If we lose three times in a row, or 15%, and win only one time, we still make 7%. The financial odds are in our favor.

So, by being plodding, cautious, deliberate, patient, and heavily capitalized, we avoid the trader's worst nightmare: being financially overextended. But, this approach takes time. It is not quick, but over time, those little 5 and 8 percents add up. On a large capital base, I love to say: 8% of $5 million is more spendable than 50% of $100,000! It takes about three to five years for a chunk of your capital to begin returning real money, which is our goal. A strong, heavily capitalized fund, patient, and willing to take a prudent-sized position in any important market is what we are. That is how the biggest and brightest do it and so must we.

The FAHEY HEDGE FUND
Page 3



## SO, REPEATING: OUR APPROACH IS SIMPLE, PRUDENT AND LACKING ANY EXTERNAL FINANCIAL PRESSURE TO PROVE ANYTHING

The Fahey Fund makes money in such an unremarkable manner that anyone with a little time and patience could do likewise.

To say it again: waiting watching, and investing at what appears to be the annual low (or high). This is especially easy for us since we *have no financial pressure either personally or professionally to make trades*. The annual goal is to find a few good trades which--even if they "fail"--will fail in a predictable percentage, around 5-8%. As the "young" traders are trying to make fast money, and the day traders are only concerned with minute-to-minute details, they are under those kinds of pressures. Mutual fund managers, no matter how astute, must make investment decisions more or less by committee.

Think about it. I am sure if you had the time and temperament, you could do it. Why isn't everyone else doing it? The good ones ARE! In fact, the really large mountains of capital out there rarely diminish. The best fund managers and traders are difficult to locate, don't toot their horn(s), and certainly avoid the press with its typical jealousy and skepticism.

Now, concerning mutual funds: despite the impression of being "Investment Vehicles," they are actually limited by law to buying and holding, or sitting on cash. They rarely sell, cannot sell short or hedge, or cannot "wait it out" for months if necessary. The culture of mutual funds also makes it difficult to recruit mature traders, primarily because mutual funds are not allowed to pay strictly by performance. Also, mature traders don't need the fund.

## IS THE APPROACH FOR YOU? OR, EVEN: IS THIS APPROACH BEST FOR A PART OF YOUR INVESTMENT CAPITAL?

Now we come to you. You should understand that traders in the know make bigger returns than is generally reported. The opportunities certainly are there, so others as well as us are grabbing them. Great traders trade on the *both sides* of the market, whether rising or crashing, cashing in. Shouldn't you be doing the same, or at least shouldn't your broker or your investment fund? We think it should be and that is why the Fahey Fund began.

If you look at the chart on page two, you will see something telling about stock trading. The three lines represent 1) the Fahey Fund's stock market trades only; 2) the S&P500 traded every quarter from the long side; and, 3) the S&P500 if traded quarterly from the **long** side until June, 2000 and from the **short** side from June 2000 until now. The results show how expensive it is to only be a bull, or "buy and hold."

If you just traded the S&P 500 from the long side only, your $100,000 in Sep, 1997 is worth $94,000 right now! But, if you bought the S&P right into Spring 2000 and then shorted it, today, your $100,000 would be worth $240,000! Had you invested in the Fahey Fund (which shorted stocks) your $100,000 is worth about $250,000. And that does NOT COUNT the futures trades (about 7 in six years). My point: ignore modern market trading tools and lose.

So, welcome to this approach. My suggestion is to invest between 25% and 40% of your IRA (it has to be self-directed). Also, other trading capital should be placed in the Fund. The coming five years seem to promise significant financial opportunities with a great varieties of stocks, raw materials, interest rates, and new businesses trades.




*The* FAHEY HEDGE FUND
Page 4

## Frequently Asked Questions

**QUESTION:** *I have an IRA that got hit badly by the stock market. What do I do to roll it over to the Fahey Fund?*

**ANS:** To do this requires two things. One, your IRA/SEP/ROTH/401(k) must be <u>self-directed</u>; two, we encourage you have it paid to you directly. Then you in turn invest it directly with the Sterling Trust Company. Sterling is the largest company who handles self-directed IRAs, etc. <u>As long as proceeds are re-invested within 60 business days</u>, there is no penalty.

Fahey has all the setup forms, and Sterling also has a web site for downloading. Fahey will gladly assist you in filling out the forms, in less than fifteen minutes.

**QUESTION:** *If the Fund Manager is unable to trade, what happens?*

**ANS:** Trading halts, the partners are notified, and given the option of cashing out, or awaiting the return of the Fund Manager. Also, the partners may opt to have auxiliary traders utilize part, or all, of their present account.

**QUESTION:** *Is interest paid on non-invested balances?*

**ANS:** Generally no. Special arrangements can be made for larger investors.

**QUESTION:** *Is there a delay on withdrawal of funds?*

**ANS:** Your funds are normally available at once unless a very large withdrawal. Even so, the delay cannot exceed 30 days.

**QUESTION:** *Are you actually saying that losses are absorbed by the Fund?*

**ANS:** Yes, up to a very generous point. Since the Fund has been around nearly six years and has had a very solid run, the traders have large profits and the fund puts aside large reserves against "drawdown," and initial position losses.

These reserves are the result of our share of YOUR profits. So, if we have a losing quarter, why should you lose and not us? We decided to go all the way and put our entire share on the line for the prior THREE YEARS, subject to certain limitations. This approach encourages conservative behavior, minimum trading, and small, "exploratory" initial positions.

**QUESTION:** *What are the minimums? Can I invest less?*

**ANS:** Minimum investments are $100,000. This can be received over a three or six month period. Smaller amounts are allowed, when investments

would exceed 25 to 40 percent of your capital. No referral is refused.

**QUESTION:** *What is the worst-case scenario?*

**ANS:** The answer: if the Fund exhausts the reserves (3 years worth) *and* then draws investors accounts down by 15%, the Fund suspends all trading, liquidates to cash, and canvasses investors if they would like to proceed (try again) or liquidate.

HOWEVER, since we have 1) survived <u>and</u> profited from Sep. 11; 2) survived <u>and</u> profited during Fall, 1998, when Indonesia, Mexico and "emerging markets" crashed; 3) survived <u>and</u> profited from the crash in US stocks since Spring 2000, we have proved to be not foolish with our own capital, since it is the first to go! In any event, if there were a problem, we would halt trading with a drop of 15-18%. WE HAVE NEVER HAD A DRAWDOWN EXCEED 10%.

**QUESTION:** *How do I get started?*

**ANS:** Very simple. Just fill out the enclosed form called "Subscription and Signature Page." Make your check payable to "The Fahey Hedge Fund, lp." if you wish to use wire transfer, contact us. When we receive your investment, we copy the check, the Subscription agreement, and create a new account for you. We send all this back with the Partnership certificate.

**QUESTION:** *IS THE FAHEY FUND OFFERING ANY NEW INVESTMENT VEHICLES?*

**ANS:** The Fund is offering a new Reserve Fund with a fixed rate of return AND a guarantee of <u>no</u> original capital loss. It is for the risk-averse investor desiring a predictable return and a partial share in the Fund's profits. If you put $100,000 in the Reserve fund, you will get 5% above the five-year Treasury-note rate each year for three years, about 9% per year. I order to insulate your initial capital, we put aside a special Reserve Fund, equal to <u>at least</u> 15% of your investment. IF we manage to keep th reserve intact for three years, we will pay you 1/4th of the Reserve at the end of three years, about 4 ½%—or as high as 7 ¼%. This fund appeal to Safety First, with a little risk. What is th risk? If the Reserve is lost, the investment will only gain the 5-year note yield. So, it is like a savings account in a CD. However, it participates in hedge fund profits, while 100% insulated against losses, drawdowns, or financial shocks. It is very safe, yet still a low-risk way to share indirectly in the Hedge Fund successes.

<u>Maximum</u> investment per person/group is $500,000 This fund closes at $5 million. Call for details.

**QUESTION:** *Can I call the references?*

**ANS:** Yes, Please do! Just ask us for some, or all, the numbers you want to call. We will emai or FAX them to you

# EXHIBIT 34

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:            )

4                                 )    File No. SF-3211-A

5    FAHEY FUND                   )

6

7

8

9                                        COPY

10    WITNESS:    Suzanne Gregg

11    PAGES:      1 through 121

12    PLACE:      Securities and Exchange Commission

13                44 Montgomery Street

14                San Francisco, California  94104

15    DATE:       Wednesday, April 25, 2007

16

17        The above-entitled matter came on for hearing, pursuant

18    to notice, at 9:19 a.m.

19

20

21

22

23

24                Diversified Reporting Services, Inc.

25                        (202) 467-9200

2

```
 1   APPEARANCES:

 2   On behalf of the Securities and Exchange Commission:

 3        ERIN E. SCHNEIDER, ESQ.

 4        Office of Enforcement

 5        United States Securities and Exchange Commission

 6        44 Montgomery Street, Suite 2600

 7        San Francisco, California   94104

 8        (415) 293-0337

 9   On behalf of the Witness:

10        MARC H. AXELBAUM

11        Pillsbury, Winthrop, Shaw, Pittman, LLP

12        50 Fremont Street

13        San Francisco, California   94105

14        (415) 983-1000

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      A    No.

 2      Q    You remember when your first investment with the

 3  Fahey Fund was?

 4      A    I don't clearly remember, but I'm looking at the

 5  quarterly statement.  It was in '01.

 6      Q    Can you just explain for the record where you're

 7  looking?

 8      A    On page 2.

 9      Q    Okay.

10      A    Of Exhibit 51.

11      Q    Okay.  And where exactly on page 2?

12      A    Top right corner.

13      Q    Okay.  There's a box that says Sterling Trust

14  Company?  You see that?

15      A    Yes.

16      Q    Okay.  And there's a date column in that box that

17  says October 30th, 2001.  Do you see that?

18      A    Correct.

19      Q    Okay.  And to the right, it says $50,934.86?

20      A    Yes.

21      Q    So sitting here today, is it your recollection that

22  you invested approximately $50,000 approximately in October

23  of 2001?

24      A    Yes.

25      Q    Okay.  And do you have any reason to think that's
```

24

1    not the date that you invested $50,000?

2         A    No.

3         Q    Okay.   Looking underneath the October 30th, 2001

4    date there's date that says August 15th, 2002.   Do you see

5    that?

6         A    Yes.

7         Q    Okay.   To the right of that, it says $12,000.

8         A    Yes.

9         Q    Did you make an additional $12,000 investment?

10        A    Yes.

11        Q    Okay.   When did you make the additional $12,000

12   investment?

13        A    Approximately August 15th, '02.

14        Q    Okay.

15        A    According to my notes, I mean, the statement.

16        Q    According to your statement on page 2?

17        A    Yes.

18        Q    Okay.   Do you have any reason to think that you

19   didn't make that $12,000 investment around August of 2002?

20        A    No.

21        Q    Okay.   And underneath, then, the August 15th, 2002,

22   it says, October 15th, 2002.   Do you see that?

23        A    Yes.

24        Q    And to the right of that, it says $20,000.

25        A    Yes.

1    Q    Did you make an additional $20,000 contribution to
2    the Fahey Fund?
3    A    I believe so, Yes.
4    Q    Okay.  And when did you make that additional
5    $20,000 contribution?
6    A    On or about October 15th, '02.
7    Q    Okay.  And is that based on your recollection, or
8    is that based on what's on page 2?
9    A    Based on what's noted here.
10    Q    Okay.  Do you have any reason to think you
11    didn't --
12    A    No.
13    Q    You have to wait until I finish asking, I'm sorry,
14    Ms. Gregg.
15         Do you have any reason to think you didn't make the
16    additional $20,000 contribution in approximately October of
17    2002?
18    A    No.
19    Q    Okay.  So let's -- were there any quarterly periods
20    that you did not receive a statement for?
21    A    Not that I recall.
22    Q    Okay.  Let's turn to page 6 of Exhibit 51.  Did you
23    actually receive page 6?
24    A    In this package?
25    Q    Just focusing on page 6, did you actually receive

1   you make any other investments in the Fahey Fund other than

2   those three?

3           I'm just asking for your recollection.

4           MR. AXELBAUM:    So if you recall.

5           THE WITNESS:    No.

6           BY MS. SCHNEIDER:

7       Q   Okay.  Just those three investments?

8       A   I did make a later investment, but found out

9   through my tax consultant that I had overpaid out of

10  my -- I'd over-estimated what I made and I could only make a

11  certain amount in the way of a payment for -- this was my SEP

12  IRA.  You can only invest a certain amount based on your

13  income.

14          So I actually had to remove that from the

15  investment.

16      Q   Okay.  So at some point you made a contribution but

17  then you had to take it out because it was too much under the

18  tax rules?

19      A   Correct.

20      Q   Okay.  Other than that additional contribution, did

21  you make any others?

22      A   No.

23      Q   Okay.  Did you ever make any withdrawals from your

24  Fahey Fund account?

25      A   I've had loans from my account.  And I took a one-

1    time $70,000 distribution.  And I divested entirely from the

2    fund in February of this year.

3        Q    Okay.  So from time to time you had loans from your

4    account.  You took one $70,000 distribution, and then in 2007

5    you took all your money out?

6        A    Correct.

7        Q    Okay.  Do you recall -- tell me about the loans you

8    had?  How many loans did you have throughout the course of

9    your investment with the Fahey Fund?

10       A    In reviewing these documents --

11       Q    When you say these, what are you referring to?

12       A    These quarterly statements.  There's been -- I

13   mean, I only remember taking a loan of $200,000, but on the

14   quarterly statements there's another one reflected of

15   $100,000.  But I don't really remember that.

16       Q    Okay.

17       A    It's been, again, a number of years ago.

18       Q    Okay.  When you say these quarterly statements, are

19   you referring to just the ones that are in Exhibit 51?

20       A    Yes.

21       Q    Okay.  Okay.  Do you, sitting here today, your only

22   recollection is you took a $200,000 loan?

23       A    Right.

24       Q    Okay.  When was that?

25       A    That was in June of '05 or '06.  June '05.

```
 1      A      No.
 2      Q      Okay.  Okay.  So then you made an additional
 3   $12,000 investment I think we said sometime in 2002; right?
 4      A      Uh-huh.
 5      Q      Why did you decide to invest the additional
 6   $12,000?
 7      A      Annually, I can make a contribution to my IRA.
 8      Q      Okay.
 9      A      That was the amount that was my estimated amount
10   that I thought I could make.  And figured I'd put it in with
11   the same -- the same fund where the rest of my SEP IRA was.
12             So I was happy with the returns to that date, and
13   decided to make another investment.
14      Q      Why were you happy with the returns?
15      A      Because they were positive.
16      Q      And --
17      A      I wasn't losing money.
18      Q      Why did you think they were positive?
19      A      I wasn't losing money.
20      Q      And why did you think you weren't losing money?
21      A      Because the statement reflected I was making money.
22      Q      Okay.  And any other -- any other reasons why you
23   invested the additional $12,000?
24      A      No.
25      Q      Okay.  And then you made an additional $20,000
```

1    investment; right?

2        A    Yes.

3        Q    Okay.  Why did you invest the additional $20,000?

4        A    The same reasons I invested the additional $12,000.

5        Q    Okay.  Any other reasons why you invested the

6    additional $20,000?

7        A    No.

8        Q    Did you have any conversations with Mr. Trabulse

9    before you put in your initial approximate $50,000 about

10   whether the Fahey Fund was going to report the performance in

11   your investment?

12       A    I'm sure I asked him how would I get my statements

13   and how often.

14       Q    Okay.  Do you recall anything about --

15       A    No.

16       A    -- what he said?

17       A    No.

18       Q    Before you put in your approximately $50,000, did

19   you expect that the statements relating to your investment

20   were accurate?

21       A    Yes.

22       Q    So why did you expect that?

23       A    I trust that they would.  There wasn't -- I mean,

24   no other reason.  You trust that someone's going to give you

25   the accurate information.

1    your statements are or are not accurate.

2              Did Mr. Trabulse ever say anything to you at any

3    point like I'm not the best bookkeeper?

4        A    No.

5        Q    Okay.  Did he ever tell you that he had -- he had

6    difficulties in accounting for investments in the Fahey Fund?

7        A    No.

8        Q    Okay.  When you -- when you put in your initial

9    $50,000, did you expect that your money would be used to

10   purchase Persian carpets?

11       A    No.

12       Q    Okay.  Did you ever have any conversations with

13   Mr. Trabulse about whether the fund would invest in things

14   like Persian carpets?

15       A    No, we never had that conversation.

16       Q    Okay.  Was it your intention to invest in a fund

17   that invested in Persian carpets?

18       A    No.

19       Q    Why not?

20       A    I just think that's unusual.

21       Q    Why do you think it's unusual?

22       A    I just do.  I wouldn't imagine people investing in

23   Persian carpets in a hedge -- in a fund -- in a financial

24   investment fund.  Seems bizarre.

25       Q    Okay.  When you -- when you initially invested your

1    approximately $50,000, did you expect that your money would

2    be used to purchase property in France?

3        A    No.

4        Q    Okay.  Did Mr. Trabulse -- did you have any

5    conversations with Mr. Trabulse about whether the fund would

6    invest in property in France?

7        A    No.

8        Q    Was it your intention when you put in your $50,000

9    to invest in a fund that invested in property in France?

10       A    No.

11       Q    Why not?

12       A    I'm sorry, why didn't we have that conversation?

13   It just never came up.

14       Q    I asked you -- the last question I asked you was it

15   your intention to invest in a fund that invested in property

16   in France"?

17       A    No.

18       Q    And why not?

19       A    I just never came up.

20       Q    Okay.  Was it your intention to invest in a fund

21   that invested in real estate?

22       A    No.

23       Q    And why not?

24       A    Well, the only thing that I assumed was being

25   invested in was on my quarterly statement.  And I don't know.

1    It was just never discussed.

2        Q    Did you ever have any discussions with Mr. Trabulse

3    about whether the Fahey Fund was going to invest in property

4    in Panama?

5        A    No.

6        Q    Okay.

7        A    I knew that he was interested in Panama.  And

8    property in Panama.  But it was never discussed that the fund

9    was going to invest --

10       Q    And when --

11       A    -- in property down there.

12       Q    And when you say he was interested, who do you

13   mean?

14       A    Jim Trabulse.

15       Q    Okay.  You said you knew that Jim Trabulse was

16   interested in buying property in Panama?

17       A    I said that he was interested in Panama in general.

18       Q    Okay.  What did you mean by that?

19       A    Myself and Chris Garlington had had conversations

20   about that recently.  In the last year or so.

21       Q    Conversations about what relating to Panama?

22       A    Our interest in Panama, he said he was interested

23   in Panama.

24       Q    Okay.  What was your interest in Panama?

25       A    A general interest for a real estate deal there.

1    The potential growth.

2        Q    Okay.  When you invested your initial 50,000, did

3    you expect that your money would be used to purchase things

4    like Native American jewelry or baskets?

5        A    No.

6        Q    Did Mr. Trabulse ever tell you that the fund was

7    going to invest in Native American jewelry or baskets?

8        A    No.

9        Q    Was it your intention when you put in your $50,000

10   to invest in a fund that invested in Native American baskets

11   or jewelry?

12       A    No.

13       Q    Why not?

14       A    I wouldn't think that would be a good investment.

15       Q    Why not?

16       A    I don't know anything about it, frankly.

17       Q    Okay.

18       A    But again, that was never discussed.

19       Q    When you put in your initial $50,000, did you

20   expect that you money would be used to purchase things like

21   pearl necklaces?

22       A    No.

23       Q    Did you ever have any conversations with Mr -- or

24   Mr. Trabulse ever tell you that the Fahey Fund was going to

25   invest in a pearl necklace?

```
1      A    No.
2      Q    Okay.  And when you put your initial $50,000, was
3  it your intention to invest in a fund that invested in a
4  pearl necklace?
5      A    No.
6      Q    Okay.  When you -- you eventually said that you in
7  2005 invested cash of $270,000; right?
8      A    Yes.
9      Q    Okay.  Was it your intention when you put in that
10 $270,000 to invest in a fund that invested in a pearl
11 necklace?
12     A    No.
13     Q    Why not?
14     A    That's -- even the question sounds bizarre to me,
15 frankly.
16     Q    Why does it sound bizarre?
17     A    It just doesn't seem like he acted in good faith.
18 I mean, that's -- that's an investment?  I don't know.
19     Q    I'll represent to you that the fund has told me
20 that the fund has invested in a pearl necklace.
21     A    Okay.
22     Q    Does that bother you?
23     A    Somewhat.
24     Q    Why?
25     A    A pearl necklace doesn't come up on my statement.
```

```
 1                  MR. AXELBAUM:    Objection, foundation, to your
 2     question.
 3                  THE WITNESS:    Yeah.
 4                  BY MS. SCHNEIDER:
 5        Q    You can answer the question.
 6        A    The pearl necklace does not -- is not reported on
 7     my investment statement in the trade description category.
 8        Q    Why does it bother you that the pearl necklace is
 9     not reported in the trade description category?
10        A    It doesn't bother me of that.  It just bothers me
11     that -- that would have been purchased with the fund.
12        Q    Why does it bother you?
13        A    It just seems odd.
14        Q    Why does it seem odd?
15        A    It just seems odd.  That's it.
16        Q    Can you give me any reasons why it seems odd?
17                  MR. AXELBAUM:    She's answered your question.
18                  THE WITNESS:    Yeah, I've answered the question.
19                  BY MS. SCHNEIDER:
20        Q    When you invested your -- your $50,000, did you
21     expect that your money would be used to purchase crystals?
22        A    No.
23        Q    Did Mr. Trabulse ever tell you that the Fahey Fund
24     was going to invest in crystals?
25        A    No.
```

1      Q    Okay.  You said you completely divested of your

2    Fahey Fund investment in 2007?

3      A    Yes.

4      Q    What was the total amount that you received?

5      A    2 -- about $200,000.  Just over 200, like 203 or

6    something.

7      Q    Okay.  And how -- how did you receive that just

8    over 200,000?

9      A    A check.  In overnight mail.

10     Q    Do you recall who's bank account the check was

11   drawn on?

12     A    The Fahey -- the Fahey Financial Group, I think.

13     Q    Okay.  And was the -- was the check generated by a

14   computer?

15     A    No.  It was handwritten.

16     Q    Okay.  The check was handwritten.  And who signed

17   the check, if you remember?

18     A    I don't remember looking.

19     Q    Okay.

20     A    As long as it was signed was good for me.

21     Q    Did you get a 1099 form in connection with the

22   divestiture?

23     A    Not yet.  But I'm expecting one.

24     Q    Okay.  Why are you expecting one?

25     A    There's an E-mail to that effect.  I asked for it.

120

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE


I, <u>William Kleinhans</u>, reporter, hereby verify that the foregoing transcript of <u>119</u> pages is a complete, true and accurate transcript of the testimony indicated, held on <u>April 25, 2007,</u> at <u>44 Montgomery Street, San Francisco, California</u> in the matter of: <u>FAHEY FUND.</u>  I further testify that this proceeding was recorded by me, and that the foregoing transcript was prepared by <u>Elena Lara</u> under my direction.


Date: 5/4/07

Official Reporter: _Wm A. Kleinhans_

Diversified Reporting Services, Inc.

121

## PROOFREADER'S CERTIFICATION

In the Matter of:        Fahey Fund

Witness:                 Suzanne Gregg

File Number:             SF-3211-A

Date:                    April 25, 2007

Location:                44 Montgomery Street

                         San Francisco, California


This is to certify that, I, Elena Lara, do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been completed to the reporting or recording accomplished at the hearing.

_Elena Lara_                    5/4/07

# EXHIBIT 35

1   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3   In the Matter of:            )

4   FAHEY FUND, L.P.            ) FILE NO. SF--3211-A

5

6   WITNESS:  James Banister

7   PAGES:    1 through 129

8   PLACE:    Securities and Exchange Commission

9             44 Montgomery Street, Suite 2600

10            San Francisco, CA

11  DATE:     Monday, April 23, 2007

12

13        The above-entitled matter came on for hearing, pursuant

14  to notice, at 9:00 a.m.

15

16

17

18

19

20

21

22

23

24            Diversified Reporting Services, Inc.

25                    (202) 467-9200

2

```
 1   APPEARANCES:

 2

 3   On behalf of the Securities and Exchange Commission:

 4        ERIN E. SCHNEIDER, ESQ.

 5        ROBERT LEACH, ESQ.

 6        Division of Enforcement

 7        Securities and Exchange Commission

 8        44 Montgomery Street, Suite 2600

 9        San Francisco, CA 94104

10        415-293-0337

11

12

13   On behalf of the Witness:

14        ETHAN A. BALOGH, ESQ.

15        Coleman & Balogh LLP

16        255 Kansas Street Suite 340

17        San Francisco, CA 94103

18        415-565-9606

19

20

21

22

23

24

25
```

29

1  about it.

2          MS. SCHNEIDER:  Okay.  Let's go off the record at

3  10:22 a.m.

4          (Off the record at 10:22 a.m.)

5          (On the record at 10:26 a.m.)

6          MS. SCHNEIDER:  We're back on the record at 10:26

7  a.m.

8          I'd like to have the Court Reporter mark this next

9  document as the next Exhibit.

10          (SEC Exhibit No. 42 was

11          marked for identification.)

12          BY MS. SCHNEIDER:

13     Q   Mr. Banister, I'm handing you what's been marked as

14  Exhibit 42.  I'm just going to describe it for the record.

15  Exhibit 42 appears to have a copy of a checking deposit slip

16  dated May 7, 2005 for $40,000, and also a copy of a check

17  drawn on Wells Fargo Bank for James P. Banister and Michelle

18  M. Banister, it's number 4827 and appears to be dated

19  4/28/2005 for $40,000.

20          Mr. Banister, do you see the copy of Check No. 4827

21  on Exhibit 42?

22     A   Yes.

23     Q   Is the copy of check 4827, is that a true and

24  correct copy of the check that you wrote to Fahey Fund on

25  4/28/2005?

1           MR.   BALOGH:   Objection, compound and assumes facts

2    not in evidence.

3           BY MS. SCHNEIDER:

4       Q    You can answer the question.

5       A    Can't answer?

6       Q    You can.

7           MR.   BALOGH:   If I instruct you not to answer, I'll

8    be clear about that.   I'm just making objections for the

9    record.

10          THE WITNESS:   Yes, it appears to be the check I

11   wrote.

12          BY MS. SCHNEIDER:

13      Q    Okay.   Do you have any reason to think you did not

14   write this check?

15      A    No.

16      Q    Okay.   And so the check appears to be dated

17   4/28/2005, did you actually write that date in there?

18      A    Yes.

19      Q    Did you write it on 4/28/2005?

20      A    I don't recall that.

21      Q    Okay.   Do you have any reason to think that you

22   wrote it on a different date other than 4/28/2005?

23      A    No.

24      Q    Okay.   Do you know why your statement on Doc 4A

25   says the share liquidation value at Janua7ry 1, 2005 is

34

1    money?

2        A    I did, but I don't know if it was '05 or '06, I'd

3    have to look at the statements, or a canceled check.

4        Q    Okay.

5        A    I can't give you a specific date.

6        Q    Okay.  So, what would help refresh your

7    recollection?

8        A    If you -- I mean on here it's showing a deposit and

9    this is an '05 statement.

10       Q    When you say this, what are you referring to?

11       A    To document 4A, showing deposits on there.  But, I

12   don't have a specific date.

13       Q    Okay.  Do you see the deposit withdrawal column on

14   Doc 4A?

15       A    Yes.

16       Q    Okay.  And the first number in that column is

17   $110,000?

18       A    Yes.

19       Q    Okay.  Did you make $110,000 contribution to the

20   Fahey Fund in 2005?

21       A    Yes.

22       Q    Okay.  Do you recall when you made that

23   contribution?

24       A    No.

25       Q    And the second number in the deposit withdrawal

1   column says $120,000, do you see that?

2       A    Yes.

3       Q    Did you actually make $120,000 contribution to the

4   Fahey Fund in 2005?

5       A    Yes.

6       Q    Do you remember when?

7       A    No.

8       Q    Okay.  Looking back on Exhibit 42, and I'm

9   referring to check No. 4827 on Fahey Fund 42, the check is

10  made out to Fahey Fund LP, do you see that?

11      A    Yes.

12      Q    Okay.  Who wrote Fahey Fund LP?

13      A    I did.

14      Q    Do you know why you wrote it to Fahey Fund LP?

15      A    I believe on the application that was what it was

16  to be made out to.

17      Q    Okay.  How did you get the application?

18      A    It was dropped off or mailed, I believe it was

19  dropped off because there were two, a friend of mine and I

20  were signing up and I was on vacation that day, so he hand

21  delivered the paperwork to me.

22      Q    Who hand delivered the paperwork to you?

23      A    Mike Rostad.

24      Q    Mike Rostad is the person who was signing up at the

25  same time?

1       Q    Okay.   For your investment with the Fahey Fund?

2       A    Yes.

3       Q    Okay.   Now, do you see over on the far lefthand

4    column there's a column that says "Investment"?

5       A    Yes.

6       Q    Okay.   Is your understanding of what that column

7    represents the same as what you testified to in connection

8    with the 2005 statement?

9       A    Yes.

10      Q    Okay.   And do you see the gain/loss column right

11   next to that?

12      A    Yes.

13      Q    Is your understanding of what the gain/loss column

14   represents the same as what you testified to as the 2005

15   statement?

16      A    Yes.

17      Q    And going all the way over to the right, do you see

18   the cumulative account balance column?

19      A    Yes.

20      Q    Is your understanding of what that column

21   represents the same as what you've testified to in connection

22   with the 2005 statement?

23      A    Yes.

24      Q    Did you make any additional contributions to the

25   Fahey Fund in 2006?

1     A     According to the statement it appears $48,000.

2     Q     Do you recall making any additional contributions

3  to the Fahey Fund in 2006?

4     A     I don't recall the actual date but, reviewing this

5  document, I'm recalling that I did, based on reviewing this

6  document.  But I have to go by memory that I have a specific

7  date in 2006.

8     Q     Do you have any reason to think that you didn't

9  make a $40,000 contribution to the Fahey Fund in 2006?

10    A     No.

11    Q     Okay.  Did you make any other contributions to the

12 Fahey Fund in 2006, other than $40,000?

13    A     Not that I'm aware of.

14    Q     And did you make any withdrawals in 2006?

15    A     No.

16    Q     So, if we look over in the investment column,

17 three's a line item that says "First quarter total",

18 underneath it it says, "Euro FX Plus Gold", and then

19 underneath that it says, "Purchase of Shares, 40 shares at

20 $1,000 each", do you see that?

21    A     Yes.

22    Q     Did you make the $40,000 contribution to the Fahey

23 Fund in the first quarter of 2006?

24    A     I don't recall.

25    Q     Sitting here today, what is your understanding of

1      A     Yes.

2      Q     Okay.  Do you think this conversation happened any

3    earlier than 2004?

4      A     I don't think so.

5      Q     Okay.  How did this conversation occur?  Let me ask

6    you a different question.  Was this conversation with Peter

7    Migale face to face?

8      A     Yes.

9      Q     Okay.  Was anyone else there?

10      A     Mike Rostad.

11      Q     Anyone else?

12      A     No.

13      Q     Did you have any conversations with Peter Migale

14    about how his investment wit the Fahey Fund had performed?

15      A     I believe that he had averaged 30 percent, as long

16    as he had been in there but, I don't recall how long.

17      Q     Okay.  Did Peter Migale actually say that he'd

18    averaged 30 percent?

19      A     I believe that's true.

20      Q     Okay.  Did you see any of Peter Migale's

21    statements?

22      A     No.

23      Q     At this time that you spoke with Peter Migale, did

24    you know any other people who were invested in the Fahey

25    Fund?

1    Q    Why do you believe that?

2    A    Because he said he'd try to get a hold of Jim to

3    send us applications.

4    Q    Okay.  Did you ever speak with Mr. Trabulse before

5    you invested in the Fahey Fund?

6    A    I believe close to the time I sent my check, I

7    talked to him.

8    Q    So, sometime in 2005?

9    A    Yes, or it's possible the end of 2004 but, I don't

10   recall the actual date.

11   Q    Okay.  How many times did you speak with

12   Mr. Trabulse?

13   A    Once.

14   Q    Was that a face to face conversation?

15   A    No.

16   Q    Okay.  How did the conversation occur?

17   A    Over the phone.

18   Q    Who initiated the call?

19   A    I don't recall.  I may have called and then he

20   called back.

21   Q    Okay.  What did you and Mr. Trabulse talk about?

22   A    We talked about like I believe what investments,

23   gold, you know, types of investments made, gold, Euro,

24   stocks.

25   Q    Did Mr. Trabulse say that the Fahey Fund had

 1  invested in anything other than gold, Euros or stocks?

 2      A    I don't recall, he may have.  I know there was one

 3  page of notes that I was taking notes.  There may be

 4  something else on that page.  I don't recall anything at this

 5  time.

 6      Q    Okay.  Would the type of investment that the Fahey

 7  Fund was invested in, was that important to you?

 8      A    No.

 9      Q    Why not?

10      A    Because I mean I don't have expertise in that area.

11      Q    What else can you recall about the conversation

12  with Mr. Trabulse?

13      A    That's all I can really recall at this time.

14      Q    Okay.  What was your understanding, during this

15  conversation with Mr. Trabulse, about what type of investment

16  vehicle the Fahey Fund was?

17      A    They invest in commodities, the ones that he had

18  mentioned.

19      Q    Did you understand, before you invested your

20  $40,000, that the Fahey Fund was a hedge fund?

21      A    Yes.

22      Q    And how did you have that understanding?

23      A    Just that's what it was called, that it was a hedge

24  fund.

25      Q    You mean that it's title was a hedge fund?

77

1              MS. SCHNEIDER:   Let's go off the record at 11:32

2    a.m.

3              (Off the record at 11:32 a.m.)

4              (On the record at 12:06 p.m.)

5              BY MS. SCHNEIDER:    Okay.  We're back on the record

6    at 12:06 p.m.

7              BY MS. SCHNEIDER:

8         Q    Mr. Banister, before we broke, we were talking

9    about the reasons why you invested the initial $40,000 in the

10   Fahey Fund.  And if I remember correctly, I think you said

11   because of the fund's past performance.  Is that right?

12        A    Yes.

13        Q    Okay.  And you also said you had wanted to

14   diversify, is that right?

15        A    Yes.

16        Q    Okay.  Were there any other reasons why you

17   invested the initial $40,000?

18        A    No.

19        Q    Okay.  So, we talked about the fact that you then

20   invested an additional $110,000 in 2005, right?

21        A    Yes.

22        Q    Why did you invest the additional $110,000?

23        A    For the same reason as the initial investment.

24        Q    Can you be more specific than that?

25        A    Just continue, it appeared that the fund was

1   gaining value and I wanted to continue that.

2       Q    Why do you say it appeared the fund was gaining

3   value?

4       A    Because on the statements showing gains.

5       Q    Okay.  So, from the statements that you received

6   from the Fahey Fund regarding your investment?

7       A    Yes.

8       Q    Okay.  Were there any other reasons why you

9   invested the additional $110,000?

10      A    No.

11      Q    And then you invested an additional $120,000 in

12  2005, is that right?

13      A    Yes.

14      Q    Okay.  Why did you invest the additional $120,000?

15      A    The same reasoning.

16      Q    Just for the record, can you be more specific?

17      A    To further an investment in something that I felt

18  comfortable doing.

19      Q    Why did you feel comfortable doing it?

20      A    Because I felt it was gaining money and I felt fine

21  to further an investment.

22      Q    And why did you feel like it was gaining money?

23      A    Based on the statements.

24      Q    Okay.  Based on the statements that you received

25  from the Fahey Fund regarding your investment?

1       A      Yes.

2       Q      And then you invested an additional $40,000 in

3   2006, is that right?

4       A      Yes.

5       Q      Okay.  And why did you make the additional $40,000

6   investment?

7       A      Just trying to add to buy more shares to increase

8   the value, based on previous performance, realized by the

9   statement.

10      Q      I didn't quite understand what you said?

11      A      Essentially the same reasoning for the last

12  additions to the account.

13      Q      Okay.  So, you invested the additional $40,000 in

14  2006 because it appeared that the Fahey Fund was earning

15  money?

16      A      Yes.

17      Q      Okay.  And that's based on the statements that you

18  actually received from the Fahey Fund regarding your

19  investment?

20      A      Yes.

21      Q      Are there any other reasons why you invested the

22  additional $40,000 in 2006?

23      A      Yes.

24      Q      Are there any other reasons why you invested the

25  additional $40,000 in 2006?

1     A     No.

2     Q     Additionally, or earlier in the day we talked about

3     the fact that you first heard about the Fahey Fund from Peter

4     Migale?

5     A     Yes.

6     Q     How did that conversation start?

7     A     I don't really recall how it started.

8     Q     It's possible the other person I work with --

9           MR.     BALOGH:  Don't guess what's possible, but tell

10    us what you recollect.

11          THE WITNESS:  I just don't know how it started.

12          MS. SCHNEIDER:  Okay.

13          BY MS. SCHNEIDER:

14    Q     Did Mr. Trabulse ever tell you that the statements

15    provided to you by the Fahey Fund did not accurately reflect

16    the gains that your investment actually earned?

17    A     No.

18    Q     Did anyone from the Fahey Fund ever tell you that?

19    A     No.

20    Q     Did anyone, did Mr. Trabulse ever tell you that the

21    statement provided to you by the Fahey Fund did not

22    accurately reflect your cumulative account balance?

23    A     No.

24    Q     Did anyone from the fund ever tell you that?

25    A     No.

1   recollection of that specifically.

2       Q     Okay.  And when you're saying the percentage, are

3   you referring to the 26 percent that's to the right of

4   stocks, options and futures?

5       A     Yes.

6       Q     Okay.  And then I guess kind of underneath the 26

7   percent it says, "Soybeans, gold, Euro", and then "interest

8   rate play", do you see that?

9       A     Yes.

10      Q     Okay.  Why did you write that down?

11      A     My recollection is that that's a continuation of

12  that fifth dash that you just mentioned and those are

13  examples of items that have been and maybe in the future

14  would be invested in.

15      Q     Okay.  Did you have any conversations with

16  Mr. Trabulse about whether the Fahey Fund would invest in

17  things other than stocks, options, futures, soybeans, gold,

18  Euro or interest rate play?

19      A     Not that I'm aware of, or that I recall.

20      Q     Okay.  Now, down at the kind of bottom on the

21  lefthand side of the first page of Exhibit 48, there are

22  numbers.  There's a number one with a bracket that says

23  "Super Privacy" afterwards, do you see that?

24      A     Yes.

25      Q     Why did you write that down?

113

1   Mr. Trabulse about ITD?

2       A    No.

3       Q    What about International Trade and Data?

4       A    No.

5       Q    Did Mr. Trabulse ever tell you that the Fahey Fund

6   was going to invest in Persian carpets?

7       A    No.

8       Q    Did anyone from the Fahey Fund ever tell you that?

9       A    No.

10      Q    If the Fahey Fund did invest in Persian carpets,

11  would that have been something you would have liked to have

12  known before you invested the initial $40,000?

13           MR.  BALOGH:  Objection, calls for hypothetical.  I

14  instruct you not to answer.  It's an improper question.

15           MS. SCHNEIDER:  Do you have any basis for

16  instructing him not to answer?

17           MR.  BALOGH:  You're not allowed to ask

18  hypothetical questions of lay witnesses.

19           MS. SCHNEIDER:  What's that based on, Mr. Balogh?

20           MR.  BALOGH:  I've made my objection.  If I'm

21  wrong, have a court tell me so.

22           MS. SCHNEIDER:  Okay.

23           BY MS. SCHNEIDER:

24      Q    Did you ever discuss with Mr. Trabulse whether or

25  not the Fahey Fund was going to invest in property in France?

114

1    A    I did not.  I heard that from him after you had an

2    investigation opened.

3    Q    Okay.  Can you tell me about that conversation?

4    A    Just that he had invested in, I believe, a country

5    club or something in France, that any member of the fund

6    could use, as an owner, because you're a partial owner, I

7    believe.

8    Q    Okay.  And that's what Mr. Trabulse said?

9    A    Yes.  I believe it was still in -- not finalized

10   so, it wasn't anything that was brought about in an

11   explanation on a statement, is my understanding.

12   Q    I'm sorry, I didn't understand the last part of

13   what you said?

14   A    Just as any -- there may be pertinent information

15   from a statement that's in written form on the rear or the

16   second page of a statement, it may have been something that

17   could have been included in that, but I don't believe it was

18   finalized, whatever was going on with the property in France.

19   Q    Oh, okay.  Do you know where this piece of property

20   was?

21   A    No.

22   Q    And you said the first time you had heard about

23   this was after my investigation began?

24   A    Yes.

25   Q    Okay.  Do you have any understanding as to whether

1    the Fahey Fund has any other investments in France?

2        A    I'm not aware of any.

3        Q    What about any other European country?

4        A    I'm not aware of any, other than a Euro investment

5    is European currency, so.

6        Q    Okay.  Did you ever have any conversations with

7    Mr. Trabulse about whether or not the fund was investing in

8    property in Panama?

9        A    No.

10        Q    Do you have any understanding as to whether the

11    fund has any investments in any other country, other than

12    this country club that you've described?

13        A    No.

14        Q    Did you ever have any conversations with

15    Mr. Trabulse about whether or not the fund was going to

16    invest in art?

17        A    I don't recall any, no.

18        Q    Did you have any discussions with anyone fro the

19    Fahey Fund about whether or not the fund was going to invest

20    in Native American jewelry or baskets?

21        A    No.  I'm not aware of it.

22        Q    Did you ever have any conversations with

23    Mr. Trabulse about whether or not the fund was going to

24    invest in pearl necklaces and bracelets?

25        A    I believe, again after your investigation, some

116

1   statement to that effect was made, but specific statement I'm

2   not, I don't know.

3       Q    You had a conversation with Mr. Trabulse about

4   pearl necklaces?

5       A    Yeah, that was an investment?

6       Q    Okay.  What did he say in that regard?

7       A    Just that there was an investment in pearls and

8   they had made money, or increased in value.

9       Q    Can you recall specifically what Mr. Trabulse said,

10  did he say they made money or did he say they increased in

11  value?

12      A    I believe increased in value.

13      Q    Okay.  And I'm sorry, when was the first time you

14  were made aware of these pearls?

15      A    After conversation after your investigation was

16  opened.

17      Q    Okay.  Do you know where these pearls are?

18      A    No.

19      Q    Did you ever have a conversation with Mr. Trabulse

20  about whether or not the fund was going to invest in

21  crystals?

22      A    I don't recall the conversation regarding that.

23      Q    Did you ever have any conversation with

24  Mr. Trabulse about whether the Fahey Fund was going to invest

25  in vehicles?

128

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE

    I Patrick Kelley, reporter, hereby verify that the foregoing transcript of 127 pages is a complete, true and accurate transcript of the testimony indicated, held on Monday, April 23, 2007, at 44 Montgomery Street, Suite 2600, San Francisco, California, in the matter of: Fahey Fund LP. I further certify that this proceeding was recorded by me and that the foregoing transcript was prepared by Maryann Loverro under my direction.


    Date: 5/1/07

    Official Reporter:


Diversified Reporting Services, Inc.



Diversified Reporting Services, Inc.

Phone: (202)467-9200 Fax: (202)296-9220

129

PROOFREADER'S CERTIFICATE

In the Matter of:  Fahey Fund LP

Witness:  James Banister

File Number:  SF-03211-A

Date:  Monday, April 23, 2007

Location:  San Francisco, California


    This is to certify that I, Maryann Loverro, do
hereby swear and affirm that the attached proceedings before
the U.S. Securities and Exchange Commission were held
according to the record and that this is the original,
complete, true and accurate transcript that has been compared
to the reporting or recording accomplished at the hearing.



_____              _____
                                                      5/1/07

# EXHIBIT 36

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:          )

4                              )   File No. SF-3211-A

5    FAHEY FUND, L.P.           )

6

7

8

9    WITNESS:   Catherine O'Riley

10   PAGES:     1 through 166

11   PLACE:     Securities and Exchange Commission

12              44 Montgomery Street, Suite 2600

13              San Francisco, California  94104

14   DATE:      Wednesday, June 13, 2007

15

16        The above-entitled matter came on for hearing, pursuant

17   to notice, at 9:00 a.m.

18

19

20

21                        COPY

22

23

24              Diversified Reporting Services, Inc.

25                       (202) 467-9200

2

```
 1   APPEARANCES:

 2   On behalf of the Securities and Exchange Commission:

 3       ERIN E. SCHNEIDER, ESQ.

 4       Office of Enforcement

 5       United States Securities and Exchange Commission

 6       44 Montgomery Street, Suite 2600

 7       San Francisco, California   94104

 8       (415) 293-0337

 9   On behalf of the Witness:

10       ISMAIL RAMSEY, ESQ.

11       Ramsey & Ehrlich, LLP

12       803 Hurst Avenue

13       Berkeley, California   94710

14       (510) 548-3600

15

16

17

18

19

20

21

22

23

24

25
```

18

1       A    Not exactly sure, but it must have been around

2   2002, I think.  I'd have to go back into the paper work and

3   look.  I'm fairly sure as I was going through my paper work

4   that that's when it was.

5       Q    All right.  Did you invest before or after the

6   marriage ceremony with Mr. Trabulse?

7       A    I don't remember.  I honestly don't.

8       Q    How much did you invest?

9       A    Really, without looking at the paper work, I -- how

10  much did I invest?  It must have been somewhere around

11  250,000, maybe.  I'd have to look at the paper work, though.

12  I'm not positive.

13      Q    When you say initially you put money in 2002, you

14  think it was somewhere around $250,000?

15      A    I think so.  I'm not positive of that, though.

16      Q    All right.  How many times did you contribute money

17  to the Fahey Fund?

18      A    Well, there was -- there were rather three, I

19  believe, initial investments.  And then after that, I --

20  there was -- I didn't do it any more.

21      Q    So you physically contributed money three times?

22      A    Yes.

23      Q    All right.  And you said three initial investments.

24  What did you mean by that?

25      A    One of them he doesn't have any more.

19

1    Q    And what do you mean by that?

2    A    Well, I made these three investments, and one of

3    the three I pulled out within a year of investing it.  But

4    the other two stayed with him.

5    Q    Can you explain to me what the three investments

6    were?

7    A    Yes.  One was a Roth IRA that I rolled over from, I

8    believe it was, Fidelity Fund to him.  One was -- it must

9    have been more like 2003 because when I retired from my job,

10    the retirement-like -- I can't remember exactly.  It was like

11    a 401 like.  What are they called?  I'm blanking.

12    Q    Some sort of a --

13    A    Some sort of a --

14    Q    -- tax-deferred retirement account?

15    A    -- right, exactly.  And I rolled -- when I

16    retired, I took that out and rolled that over to him.  And

17    then I invested some of my cash assets with him, and

18    that's -- those are the things that I then took out within

19    that year.

20    Q    All right.  And you keep saying him, do you mean

21    Mr. Trabulse?

22    A    Oh, I'm sorry.  Him.  James Trabulse.

23    Q    All right.  So -- so you're still invested in the

24    Fahey Fund by way of your Roth IRA and by way of another

25    retirement account?

1      A      Yes, and it's an IRA also now.

2      Q      All right.  Now do these -- did these three

3  investments add up to $250,000?

4      A      Approximately.  I just don't remember the numbers

5  without looking.

6      Q      All right.  I appreciate that.  I'm just trying to

7  get a sense of the general amount that you invested.

8      A      It was something like that.

9      Q      Okay.  So you said you pulled -- you pulled your

10  cash assets out.  When did that happen?

11      A      Within the same year they were in, I believe.  Or

12  it could have been the next year.

13      Q      Why did you pull out the cash assets?

14      A      Because he had set up that cash in a foundation.

15  And I didn't realize that if the cash was in a foundation,

16  that I no longer had access to my cash.

17              And when my accountant pointed that out to me, I

18  immediately closed the foundation down.

19      Q      What was the name of the foundation?

20      A      The Magdalene Preservation Foundation.

21      Q      Now, you said you closed down the foundation.  What

22  does that mean?

23      A      It means that I went to the bank where the

24  foundation money was being kept, and I withdrew the entire

25  amount in the foundation and put it into another private

60

1    Q    Did you ever observe him conducting any other
2  business other than his investment business?
3    A    No.
4    Q    Okay.  Since the time you met Mr. Trabulse, what
5  have you done for a living?
6    A    My job since 1975, which -- were you born then?
7    Q    I was.
8    A    Nurse anesthetist.
9    Q    How long did you hold that job?
10   A    I was a nurse anesthetist in various hospitals from
11 1975 until I retired in what probably was around 2003.  I
12 don't remember the exact year that I retired.
13   Q    All right.  What were your sources of income, if
14 any, after you retired from your nurse anesthetist position?
15   A    I had a very small retirement from my job with
16 Alameda County.
17   Q    Any other sources of income?
18   A    Personal income, No.
19   Q    What do you mean by personal income?
20   A    Well, Mr. Trabulse, you know, helped pay the bills.
21 So if you want to consider him a source of income.  Other
22 than that, nothing.
23   Q    All right.  Did you ever take money out of your
24 investments with the Fahey Fund?  Other than the cash assets
25 that you said you withdrew?

61

1      A      No.

2      Q      So you never took any other distributions from your

3  Fahey Fund investments?

4      A      No, because they were in the IRA's, and I never,

5  you know, I just had the two IRA's, and you're supposed to

6  leave IRA money alone.  So I never took any money out of

7  them.

8      Q      Okay.  So you said Mr. Trabulse would help with the

9  bills.  How did that work?

10     A      That worked by him putting money into a joint

11  account, and then he would use the joint account for

12  whatever, and I would use it to pay the bills.

13     Q      Where was the joint account?

14     A      At Wells Fargo.

15     Q      Who were the signors on the account?

16     A      Mr. Trabulse and myself.

17     Q      And you said he would put money into the joint

18  account.  How did he do that?

19     A      I don't know.  Money would just appear.

20     Q      Did it appear on a regular basis?

21     A      It -- No, it was random.  When the account ran

22  down, money would go in.

23     Q      So it's not like a specific amount was put in every

24  month?  Anything like that?

25     A      No, not -- not in the early days.

62

1    Q    What do you mean by the early days?

2    A    Well, when -- when we split up, we had a verbal

3    agreement that he would put a certain amount of money in my

4    account quarterly.

5    Q    What was that agreement?

6    A    How much you mean?

7    Q    Yes.

8    A    Quarterly.  $15,000 quarterly.

9    Q    When did that begin?

10    A    In the beginning of 2006.  And also if there was an

11    extraordinary expense, he would add some more if I really

12    needed it for some thing that happened, say, to my house or

13    whatever.

14    Q    Is that documented anywhere?

15    A    Well, the deposits show up on my bank statements

16    that we have here.

17    Q    Is your agreement documented anywhere?

18    A    Oh, that, No.

19    Q    What other financial arrangements, if any, did you

20    come to with Mr. Trabulse when you split up?

21    A    That he would pay off my house.  The remaining

22    mortgage on my house.

23    Q    How much is remaining on your mortgage?

24    A    $65,000.

25    Q    Has that happened?

1      A      Yes, that happened.

2      Q      Do you know how it happened mechanically?

3      A      No.  Money showed up in my account.

4      Q      Okay.  So money showed up in one of your bank

5  accounts?

6      A      Right.

7      Q      And then you paid off the mortgage?

8      A      Yes.

9      Q      All right.  Did $65,000 appear in your bank

10  account?

11      A      It was approximately that much, Yes.

12      Q      What bank account did that appear in?

13      A      That went into my Bank of America account.

14      Q      When did that go into your Bank of America account?

15      A      It was either June or July of 2006.  Because I

16  remember paying off the bank in July of 2006.

17      Q      Okay.  And what bank held the mortgage?

18      A      Chase Manhattan.

19      Q      Did you come to any other financial arrangements

20  with Mr. Trabulse when you split up?

21      A      He set up another account for me.

22      Q      What do you mean by that?

23      A      He decided that he wanted to set up an account for

24  just me, and I would be allegedly, you know, the only one

25  that would be trading -- or be able to get the money out of

67

1    A    Right.  Not my own art collection before that.

2    Q    That's right.  But did you say that there was art

3  that also came in, or were you still referring to just the

4  rugs and the Geodes:

5    A    Oh, other -- well, to me art is anything that has

6  to do with a craft.

7    Q    Okay.  So we've got rugs.

8    A    We've got rugs.  We've got Geodes.  We've

9  got -- let's see, there's a -- there's a couple of like

10  Navajo items.  Like a piece of pottery.  One lovely piece of

11  pottery.  And there's like a sand painting.

12        There's just like, you know, other odds and ends

13  that when I was with him, I bought.  But I can't say who's

14  money, you know.  It could have been my money that was used.

15        Nothing of great value, though.

16    Q    All right.  So -- so you are in -- so these are

17  rugs that you are referring to?

18    A    Yes.

19    Q    Is it your testimony that you have -- that you own

20  those rugs?

21    A    No.  I'll tell you how it's understood about the

22  rugs.

23        Mr. Trabulse bought the rugs.  And but his house is

24  small, and there was no way these rugs were going to fit into

25  his home.  And so he put them into my home.

1          But the understanding is upon my death, if he

2     outlives me in the will, he will get the rugs, and/or if he

3     is not alive, his daughter will get the rugs.

4          So I am the keeper of the rugs.  But they're not

5     mine to sell if I wanted to sell them.  I'm just the keeper

6     and the vacuum cleaner of the rugs.

7     Q    All right.  Where are these rugs from?

8     A    Like what country or where did he purchase them?

9     Q    Where did Mr. Trabulse purchase them from?

10    A    There are some rugs that he purchased from a man

11    who sold them out of his garage at his home who was a Kurdish

12    man who's name I don't know.

13         And but that was -- that was early on when he was

14    collecting rugs.  And then he realized that there were better

15    rugs, and then he bought those rugs from a place called Magic

16    Carpet in Nevada City.

17         And I think the guy's name is Paul Jorgensen or

18    Jurgensen or something like that.

19    Q    Do you know whether Mr. Trabulse purchased the rugs

20    from anywhere else?

21    A    Seemed to me he told me once he purchased a rug

22    from somebody else somewhere, but I don't believe I have that

23    rug.  So I don't know about anybody else he purchased rugs

24    from really.

25    Q    All right.  So you were -- you were testifying

1   about this agreement that you have that he will get the rugs

2   after -- if you die first?

3       A    Right.  And then if he's not alive, his daughter

4   gets the rugs.  That's the agreement.

5       Q    Okay.

6       A    And that I'm the keeper.

7       Q    And is that documented anywhere?

8       A    No.

9       Q    Okay.  Anywhere in an E-mail, anything like that?

10      A    No, just a verbal agreement.

11      Q    Do you know if anyone else is aware of this

12  agreement?

13      A    I'm not aware, you know.  He may have told

14  somebody.  I'm not aware.

15      Q    Was there ever anyone else present when the two of

16  you were discussing this agreement?

17      A    No.

18      Q    Now, you were using the word he.  Is it your

19  understanding that the rugs go to Mr. Trabulse as an

20  individual?

21      A    Yes.

22      Q    Not to his investment business?

23      A    No.  That's my understanding.  But I don't know.

24      Q    All right.  And I don't want to ask you about the

25  substance of the communication given the objections that have

1    been raised.

2              But what is that understanding based on?

3    A    That Mr. Trabulse, you know, said to me --

4    Q    I don't want --

5    A    No, we can't do that.

6    Q    It's based on a communication between you and

7    Mr. Trabulse?

8    A    Yes.  Yes.

9    Q    Is it based on anything else?

10   A    No.

11   Q    Okay.  How many rugs do you have in your house?

12   A    We would have to wait while I shut my eyes and

13   started counting.  Many.

14   Q    I do want to get a sense of what you mean by many.

15   A    Okay.  22 pop into my mind right away.  But it

16   could be more.

17   Q    Are they in storage at your house?

18   A    One is rolled up because there's no place to put

19   it.  And all the others are out either on the floor -- oh, I

20   forgot that one.  So there's going to be more.  Well, now 23

21   pop into my mind.

22             They're -- No, they're just all over my house.

23   Q    You're using them?

24   A    Oh, Yes.

25   Q    And, again, I don't want to ask you about the

1    substance of any communications given the objections that

2    your Counsel has raised.

3              But why did you understand that it was appropriate

4    for you to use those rugs?

5        A    Because they just came to my house.  They were

6    delivered to my house.

7        Q    Did anyone ever tell you you couldn't use those

8    rugs?

9        A    No.

10       Q    Did anyone ever tell you that you had to store the

11   rugs?

12       A    No.

13       Q    Do you know whether there's any insurance

14   maintained on those rugs?

15       A    Yes.  I have homeowner's insurance, and I have

16   included the rugs.

17       Q    Do you know whether any other insurance besides

18   your homeowner's policy covers those rugs?

19       A    No, I don't know.

20       Q    Do you have any understanding as to how much those

21   rugs are worth that are in your house?

22       A    That's a difficult one.  I've tried to find out.

23   But I don't know really for sure how much they're worth.  I

24   just don't.

25       Q    Did you have to provide valuation to your insurance

74

1    A    I don't believe so.  I don't recall that I did, but
2    I could go and look in my folder at home.
3    Q    Okay.  At any point did you have any understanding
4    that the rugs that are in your house are investments for the
5    Fahey Fund?
6    A    I have no understanding of that, No.
7    Q    And did anyone ever tell you that those were
8    investments for the Fahey Fund?
9    A    No.
10    Q    Did anyone ever tell you that you were holding
11    these rugs for the benefit of investors in the Fahey Fund?
12    A    No.
13    Q    All right.  So we also -- going back to the
14    original question, we also talked about some Geodes have come
15    into your possession?
16    A    Yes.
17    Q    Can you describe those for me?
18    A    There are four amethyst Geodes.  Two of them are
19    probably -- approximately four feet tall.  And two of them
20    are probably about five feet tall.  And then there's one
21    citrine Geode that's about five feet tall.
22    Q    All right.  So I'm going to talk about them in the
23    way that you just described them.  The two of them that are
24    four feet tall, where are those?
25    A    They're in my art studio.

1     had any other bank accounts?

2          A     Yes.

3          Q     What are those?

4          A     I have Placer Credit Union account.

5          Q     All right.

6          A     Bank account.  So Fidelity isn't -- I don't know if

7     you count that as a bank account. I believe that's all.

8                Did we discuss -- oh, we discussed my account at

9     Wells Fargo.  We discussed the joint account.   The Placer

10    Credit Union.  I believe that's all.

11         Q     And you had an account at B&P previous.

12         A     Oh, sorry, Yes, I did have that.  Maybe -- can I

13    have that book.  Because --

14         Q     We'll talk about those.  But can you, just off the

15    top of your head, can you think of any other bank accounts

16    you've had?

17         A     No.

18         Q     All right.  Well, let's look at the B&P account.

19    Do you speak French?

20         A     No.  And I can't read any of the statements.

21         Q     That's not going to be very helpful to me.

22         A     They send me letters, I throw them in the trash.

23         Q     Okay.  Let's turn to O'RILEY722.

24         A     Yes.

25         Q     All right.  So O'RILEY722 appears to reference a

1    bank account at B&P Paribus number ████9550/██.

2        A    Yes.

3        Q    Has the name of Mademoiselle Catherine O'Riley.

4        A    Yes.

5        Q    What is this bank account?

6        A    This bank account was set up for me by Mr. Trabulse

7    so that when we traveled to France, I could be using a French

8    account to go off and buy whatever my little heart desired,

9    and not have to bother him to use his card or whatever.

10            So that I could go shopping by myself.

11       Q    Who's idea was it to set up this bank account?

12       A    Mr. Trabulse.

13       Q    Who was authorized to take money out of this bank

14   account?

15       A    I was.

16       Q    Was anyone else?

17       A    No.

18       Q    So Mr. Trabulse couldn't take money out of your

19   account?

20       A    He never did.  I don't know if he could.  It was

21   under only my name.

22       Q    Okay.

23       A    But he never did.

24       Q    All right.  Did you have to get any approvals from

25   Mr. Trabulse before you could spend the money that was in

**REDACTED**

1   this bank account?

2        A    No.

3        Q    There weren't any limits on you whatsoever?

4        A    No.

5        Q    All right.  How -- how did money get into this

6   account?

7        A    Mr. Trabulse put it there.

8        Q    Did you ever make deposits into this account?

9        A    No.

10        Q    Did this account -- were deposits made into this

11   account from any source other than Mr. Trabulse?

12        A    Not that I know of.

13        Q    All right.  You said that Mr. Trabulse put money

14   into it.  Was there a regular funding mechanism?

15        A    No.  It was if we were going to take a trip to

16   France, he would be sure that there was enough money in there

17   so that I could go shopping.  And otherwise, it just sat

18   there.

19        Q    And can you give me a general sense of what types

20   of things you used this bank account to buy?

21        A    Clothes.

22        Q    Clothes in France?

23        A    Clothes in France.

24        Q    Anything else?

25        A    I may have -- Yes, I bought a few pieces of jewelry

1    that weren't outrageously expensive.  And I would use if I
2    went out to eat.  Just the usual type of things.  Usually
3    clothes, though.
4         Q    How long has this bank account been open?
5         A    Let's see.  Probably since 2002.  I don't see any
6    dates.  Yeah, here it is, March 2002.
7         Q    What document are you looking at?
8         A    I'm looking at 729.
9         Q    Okay.  So March of 2002.  Is it still open today?
10        A    Yes.
11        Q    Since you have split up, has Mr. Trabulse put money
12   into this account?
13        A    I would have to look at the paper work.  He may
14   have put a little bit of money in there when I was in France
15   after we split up.  Or there might have been enough to cover
16   it.  I'd have to go through these records.
17        Q    Do you have a sense of how much money you spent
18   from this bank account?
19        A    No.  I don't.
20        Q    Do you know what the highest balance in the bank
21   account was at any point?
22        A    It never was that high.  As I flip through here, I
23   see amounts like 11,000, 13,000.  Not that much money was
24   ever in this account at one time.
25        Q    Do you have any understanding that this account was

127

1          Exhibit 139 is a two-page document that appears to

2    be titled Bank of The West Full Transaction Report.  It has a

3    run date of April 24th, 2006.  And it appears to be for April

4    17th, 2006.

5          Now, Ms. O'Riley, there -- if you -- if you look to

6    the left-hand side of the first page of the document, it

7    says, "Fahey Hedge Fund, L.P."

8          Do you see that?

9                             (SEC Exhibit No. 139 was marked for

10                              identification.)

11    A    Yes.

12    Q    All right.  And then on the right-hand side of the

13    column, it says Catherine O'Riley.  Do you see that?

14    A    Yes.

15    Q    And if you look down on the credit payment message

16    text, it says $65,000.  Do you see that?

17    A    Yes.

18    Q    Do you have any understanding as to why the Fahey

19    Hedge Fund was transferring to you $65,000?

20    A    Yes, I think so.

21    Q    Do you recall being transferred $65,000?

22    A    Yes.

23    Q    What was that for?

24    A    It was to pay off my house.

25    Q    All right.  So we talked about this.  They pay-off

128

```
 1    of your mortgage that was part of the agreement that you came
 2    into with Mr. Trabulse.
 3              This appears to be dated April 17th, 2006.  Does
 4    that seem like this is the same transfer?
 5        A    I could tell you if I could look in my records.
 6        Q    Sure.
 7        A    That would be Bank of America.  We can find out
 8    right now.  I think it was in -- wow, look at all this stuff.
 9              So we had April -- April of 2006.  That looks like
10    that's the one.  Yes, it is.
11        Q    Can you read the Bates Numbers on the document that
12    you're pointing to right now?
13        A    Yes, this is my personal Bank of America account.
14    You want it -- I'm sorry --
15        Q    Can you read the number on the lower right-hand
16    corner.
17        A    I'm sorry, O'RILEY00466.
18        Q    Right.  So according to O'RILEY00466, $65,000 was
19    transferred into your account in April 2006?
20        A    Yes.
21        Q    All right.  Do you have any understanding as to why
22    that $65,000 came from the Fahey Hedge Fund?
23        A    I have no idea why it would have come from the
24    Fahey Hedge Fund.
25        Q    Did your statements from the Fahey Hedge Fund ever
```

1    reflect a $65,000 withdrawal?

2         A    Did -- No.

3         Q    Have your statements ever reflected any withdrawal?

4         A    No.

5         Q    Do you know who Kathleen Burke is?

6         A    Yes.

7         Q    Who's Kathleen Burke?

8         A    I've never met her.  My understanding is it's his

9    art teacher in Paris.

10        Q    Do you have an understanding as to whether

11   Mr. Trabulse has ever purchased art from Kathleen Burke?

12        A    I don't have any knowledge of that.

13        Q    Just sitting here today, is that the only thing you

14   know about Kathleen Burke that she's Mr. Trabulse's art

15   teacher?

16        A    That's how it was explained to me.

17        Q    In the apartment in Tempo Lodge, who's furnishings

18   are in that apartment?

19        A    It appears that they're a combination of the

20   furniture that was originally in the apartment, the Tempo

21   Lodge furniture, and other furniture that he purchased and

22   put in it.

23        Q    That Mr. Trabulse purchased?

24        A    Oh, I'm sorry, Mr. Trabulse, Yes.  That's what that

25   appears to me.

143

1  somewhere that was from the Fahey Fund saying there was an
2  accounting problem that was going to be fixed.  And that's
3  all I know.
4      Q    After you split with Mr. Trabulse, did you ever
5  have any conversations with him about the fact that -- or
6  where he said something like I'm not the best bookkeeper?
7  Anything like that?
8      A    He said he didn't like doing it.  He just liked to
9  trade.
10     Q    So sitting here today, you don't have any
11 understanding of what Mr. Trabulse was saying when he said
12 re-do the accounting again?
13     A    No, I have no idea.
14     Q    All right.  Did Mr. Trabulse pay for a home theater
15 system to install in your house?
16     A    No.  Yes.
17     Q    Can you tell me about that?
18     A    Mr. Trabulse, when we broke up, he wanted to bestow
19 money and gifts on me.  And so he said to me, Mr. Trabulse
20 said to me, you need a home entertainment system.
21          And I said, why.  I have a TV and stereo that are
22 just fine.  Oh, No, No.  You have to have a home
23 entertainment system.  And I said I don't want one.
24          And then he kept insisting, and so I thought, well,
25 why not.  It would be nice I suppose.  And so I said, okay.

144

1    And he said, here's your budget, go get one.  And so I did.

2         Q    Where did you get it from?

3         A    I got it at At Home Theater is the name of the

4    place in Grass Valley, California.

5         Q    And how much did you spend on the home theater

6    system?

7         A    I believe it was somewhere between $20 and $30

8    thousand probably.

9         Q    What did you get for $20 to $30 thousand?

10        A    An awesome system.  A giant television set.  Giant.

11   Two of the most awesome audio speakers I've ever had and I

12   love music.  Surround sound.  A really high-end turntable for

13   my vinyl collection.  I really love music.

14             And what else did I get.  Oh, a little component

15   part, you know, these little things, you know, certain parts

16   that drove those speakers.

17             You know, just a high end system.  Nothing like

18   I've ever seen in my life.  And it is awesome.

19        Q    The home theater system for the benefit of

20   investors in the Fahey Fund?

21        A    Oh, I'm going to cry.  No.

22        Q    Okay.  Did Mr. Trabulse put a -- put a limit on how

23   much you could spend on the stereo system?

24        A    Yes.

25        Q    What was the limit?

165

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE

I, <u>Toni Stratton</u>, reporter, hereby verify that the foregoing transcript of <u>164</u> pages is a complete, true and accurate transcript of the testimony indicated, held on <u>June 13, 2007,</u> at <u>44 Montgomery Street, San Francisco, California</u> in the matter of: <u>FAHEY FUND, L.P.</u>  I further testify that this proceeding was recorded by me, and that the foregoing transcript was prepared by <u>Elena Lara</u> under my direction.

Date: ___6/28/07_____

Official Reporter: ____Toni Stratton____

Diversified Reporting Services, Inc.

166

## PROOFREADER'S CERTIFICATION

In the Matter of:          Fahey Fund

Witness:                   Catherine M. O'Riley

File Number:               SF-3211-A

Date:                      June 13, 2007

Location:                  44 Montgomery Street

                           San Francisco, California


    This is to certify that, I, Elena Lara, do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been completed to the reporting or recording accomplished at the hearing.

_Elena Lara_                    _6/28/07_

# EXHIBIT 37

LAW OFFICES

# KEKER & VAN NEST
## LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

RECEIVED

JUN - 4 2007

SEC San Francisco

MICHAEL D. CELIO
MDC@KVN.COM

June 4, 2007

## FOIA CONFIDENTIAL TREATMENT REQUEST

**VIA HAND DELIVERY**

Erin E. Schneider
Office of Enforcement
U.S. Securities and Exchange Commission
44 Montgomery Street, Suite 2600
San Francisco, CA 94104-4613

**VIA FIRST CLASS MAIL**

Office of Freedom of Information and Privacy
Act Operations, SEC
Operations Center
6432 General Green Way
Alexandria, VA 22312-2413

Re:     In the Matter of Fahey Fund, L.P. (SF-3211)

Dear Ms. Schneider and To Whom It May Concern:

Enclosed with the copy of this letter sent to Ms. Schneider of the U.S. Securities and Exchange Commission is the production of documents in response to the subpoena to Lawrence Sanders dated April 20, 2007.

Pursuant to 17 C.F.R. § 200.83, I request confidential treatment under the Freedom of Information Act of the information submitted to the Commission by the subpoenaed parties. This request is being made in order to protect Mr. Sanders' personal privacy.

The documents Mr. Sanders has submitted have been Bates-stamped and marked "Confidential" as required by 17 C.F.R. § 200.83(c)(2). Confidential treatment is requested for each and every document submitted with this letter, i.e. Bates-stamped SANDERS-SEC-00001-00019.

Erin E. Schneider,
Office of Freedom of Information
and Privacy Act Operations, SEC
June 4, 2007
Page 2


If you have any questions about Mr. Sanders' production or his request for confidential treatment under the Freedom of Information Act, please do not hesitate to contact me at the address and telephone number listed above.

Very truly yours,

MICHAEL D. CELIO

MDC:wik
Enclosures:
(documents with letter sent to Ms. Schneider)
(self addressed stamped envelope with letter sent to Office of Freedom of Information)

396684.01

**The Fahey Financial Group, Inc.**
*A Nevada Corporation 800-880-6003*
~~1117 Desert Lane, Las Vegas, NV 89102-2305~~
*Statement as of Mar 31, 2007*



| LAWRENCE SANDERS | | | | | 2286 |
|---|---|---|---|---|---|

Lawrence Sanders (H) ████
(B) ████
(FAX)
San Leandro    CA    Cell: ████
94579    eMail: ████
Mail to:

TAX ID #

| Special Instruction | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**Share Liquidation Value Jan 1, 2007**        $    35,006.26

| Investment | Hedge fund and Special Investments Year Ending Dec. 31, 2007 | | | | | Deposits Withdrawals | Net Gain/Loss | Cumul. Acct Bal |
|---|---|---|---|---|---|---|---|---|
| | Gain/Loss | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | | | |
| **First Quarter TOTAL** | | | | | | | | 35,006.26 |
| | | | | | | | | |
| Comment: | No changes from Dec 31, 2006 | | | | | | | |
| **Second Quarter TOTAL** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Comment: | | | | | | | | |
| **Third Quarter TOTAL** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Comment: | | | | | | | | |
| **Fourth Quarter TOTAL** | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Comment: | | | | | | | | |
| Quarterly Subtotals, all trades | | | | | | | | |
| **TOTAL:** | **March 31, 2007** | | | | | | | 35,006.26 |

| NOTES: | |
|---|---|
| | |

SANDERS-SEC- 00008
FOIA CONFIDENTIAL
TREATMENT REQUSTED

*California Contact:Fahey Fund, 268 Bush Street, #4232   San Francisco, CA 94104 800-880-6003*



*The* FAHEY FUND/FAHEY FINANCIAL GROUP
268 Bush Street, Suite 4232
San Francisco, CA 94104
800-880-6003 bigcheese@faheyfund.com



Dear Investor:

Quarter Ending March 31, 2007

**Enclosed is your financial position for Q1 Jan-Mar, 2007.**

While there was a great deal of movement in the market, our particular positions just sat there! So there is nothing to report. Please not that your statements will be unchanged from the Dec. 31, 2006 final. That is, unless you had personal activity in your account, or changes, etc. The prospects for the coming several months are great. I anticipate strong moves in nearly all sectors as the great worldwide inflation roars onward!

## WHAT, REALLY, IS INFLATION?

These days, 'inflation' is called a general price rise. It is said to be linked to demand, or to shortages in particular sectors.

But 'said to be' by whom? Modern economists have, except for the Austrian school, forgotten that inflation was always defined as "a general increase in prices caused by excess monetary expansion over actual economic growth."

This means that the banking system puts more money into circulation than needed (by normal people). This 'excess' money looks for a place to increase itself. It buys perhaps, an investment, like stocks, gold, real estate. This extra money has the ability to pay more than the market rate, so it bids up prices. Other people, with no 'extra' money see the price rise, so a little boom ensues. And we have higher prices.

Of course the problem remains: to whom (very formal) does one sell after this price rise? Normal answer: the person who was FIRST to buy is often the first to sell as other people jump into the market! First in, first out – with a profit. That is what we have seen in our equities bubble, our real estate bubble, and on and on, including the present natural resource bubble, such as copper, zinc, precious metals, uranium, etc.
.p
## WE ARE IN THE MIDST OF A VERY LARGE, WORLDWIDE INFLATION

In the US, the Federal Reserve Bank no longer issues a little number called M3, which is the total of money in circulation. Odd – after 50 years, no? This is was THE inflation yardstick.

In every country which has a central bank , the money increases are running between 8% and as high as 20+% in Russia! China has a large increase in money AND demand. They are buying raw materials for their productive engine with all those American dollars (they have a reserve of one trillion – yes, you read that right: 1,000,000,000,000.00).

So, expecting of higher worldwide prices is reasonable. In addition, the dollar doesn't buy as much as it did five years ago both here and abroad. So it will take more dollars to buy something, simultaneously competing with Chinese.

## NOW YOU KNOW WHY THE $4.00 GASOLINE

So, what does this mean to us? It means that all valuable asset classes, including 1) quality real estate; 2) blue chips with strong international revenues; 3) commodities; 4) natural resources and their stocks; 5) gold and silver; 6) and grandpa's back teeth.

All will increase in price if not in value, in the fairly near future. It is inevitable. You know this is right because you feel it inside as well as every time you shop. You have to dig a little deeper at nearly everything. What ever happened to the $20 lunch? Ha! Even a Big Mac, fries and Coke are, what? $5.00?

## SO THE COMING 3 THROUGH 12 MONTHS WILL BE CHARACTERIZED BY VERY LARGE PRICE SWINGS TO THE UPSIDE, WITH ITS EVIL TWIN HAVING HEART-STOPPING THEATRICAL CORRECTIONS

The Feb. 600-point drop in the Dow was countered by a huge rally to new highs. Ditto in Shanghai, ditto everywhere. I don't predict the future, but this is as close as I come. Can you say: "double-digit percentages?"

## WHAT TO DO?

There are so many opportunities this year that it is going to be disappointing not to take advantage of all of them! Greedy me!

...legendary value investor Jeremy Grantham — the man Dick Cheney, plus a lot of other rich people, trusts with his money. Grantham, chairman of Boston firm Grantham Mayo Van Otterloo, has been a voice of caution for years. But he has upped his concerns in his latest letter to shareholders. Grantham says we are now seeing the first worldwide bubble in history covering all asset classes. Everything is in bubble territory, he says. Everything.

'The bursting of this bubble will be across all countries and all assets.' -- *Jeremy Grantham*

"From Indian antiquities to modern Chinese art," he wrote in a letter to clients this week following a six-week world tour, "from land in Panama to Mayfair; from forestry, infrastructure and the junkiest bonds to mundane blue chips; it's bubble time!"
-- *From www.thestreet.com*

Here are the coming hot spots: overseas stock markets, including Brazil, China, and Europe. Gas and Oil stocks, gas and oil equipment companies. Weather markets in wheat, corn (along with ethanol demand), soybeans, etc. Strong upside potential in gold, silver and the better quality mining stocks, including junior stocks and juniors with proven reserves. Strong blue chip dividend paying stocks, preferably with a large percentage of revenue earned in non-dollar currencies.

Fine art, prints, rare carpets, collectables, and objet d'art with solid provable value. Real estate, and fine quality real estate anywhere, especially commercially rated land, or lots in good locations.

I think we will do very well this year, and into 2008 too! Nothing is as easy as making predictions, (especially wrong ones!) but this is a multi-generational inflation and it is going to be a wild ride.

Sincerely,

Fund Manager

SANDERS-SEC- 00009
FOIA CONFIDENTIAL
TREATMENT REQUSTED

# EXHIBIT 38

**Pillsbury**
**Winthrop**
**Shaw**
**Pittman** LLP

50 Fremont Street
San Francisco, CA 94105
Tel 415.983.1000
Fax 415.983.1200

MAILING ADDRESS
P. O. Box 7880
San Francisco, CA 94120
www.pillsburylaw.com

RECEIVED

MAY 2 1 2007

SEC San Francisco

May 21, 2007

Marc H. Axelbaum
Phone: 415.983.1967
marc.axelbaum@pillsburylaw.com

## FOIA CONFIDENTIAL TREATMENT REQUESTED

*HAND DELIVERED*

Erin E. Schneider, Esq.
Staff Attorney, Division of Enforcement
United States Securities and Exchange Commission
44 Montgomery Street
Suite 2600
San Francisco, CA  94104-4613

      Re:    <u>In the Matter of Fahey Fund, SF-3211</u>

Dear Ms. Schneider:

Enclosed are additional recent documents numbered FF-KR 0638 to FF-KR 0643, which are responsive to the SEC's subpoena for documents dated April 11, 2007 to Kathleen Ranz.

We consider this letter (together with enclosures) to remain the property of Ms. Ranz for purposes of the Freedom of Information Act, 5 U.S.C. § 552, as amended ("FOIA"). In the event that this letter, or any part of it, is determined to be an agency record within the meaning of FOIA, we request confidential treatment pursuant to FOIA and the applicable rules of the Commission, including but not limited to Rule 83 of the Commission's Rules on Information and Requests, 17 C.F.R. § 200.83. In this regard, please be advised that we have submitted to the Commission a request for confidential treatment under FOIA. A copy of our FOIA letter request is enclosed.

This letter is not intended to, and does not, waive any applicable privilege or other legal basis under which information may not be subject to production. Our production of any material subject to any applicable privilege or other legal basis under which information may not be subject to production is inadvertent.

Erin E. Schneider, Esq.
May 21, 2007
Page 2

Please call me at 415-983-1967 if you have any questions.

Sincerely,

Marc H. Axelbaum

Enclosures

cc:      FOIA and Privacy Act Office (w/o enclosures)



*The* FAHEY FUND/FAHEY FINANCIAL GROUP
268 Bush Street, Suite 4232
San Francisco, CA 94104
800-880-6003 bigcheese@faheyfund.com



Dear Investor:

Quarter Ending March 31, 2007

---

**Enclosed is your financial position for Q1 Jan-Mar, 2007.**
While there was a great deal of movement in the market, our particular positions just sat there! So there is nothing to report. Please not that your statements will be unchanged from the Dec. 31, 2006 final. That is, unless you had personal activity in your account, or changes, etc. The prospects for the coming several months are great. I anticipate strong moves in nearly all sectors as the great worldwide inflation roars onward!

---

## WHAT, REALLY, IS INFLATION?

These days, 'inflation' is called a general price rise. It is said to be linked to demand, or to shortages in particular sectors.

But 'said to be' by whom? Modern economists have, except for the Austrian school, forgotten that inflation was always defined as "a general increase in prices caused by excess monetary expansion over actual economic growth."

This means that the banking system puts more money into circulation than needed (by normal people). This 'excess' money looks for a place to increase itself. It buys perhaps, an investment, like stocks, gold, real estate. This extra money has the ability to pay more than the market rate, so it bids up prices. Other people, with no 'extra' money see the price rise, so a little boom ensues. And we have higher prices.

Of course the problem remains: to whom (very formal) does one sell after this price rise? Normal answer: the person who was FIRST to buy is often the first to sell as other people jump into the market! First in, first out – with a profit. That is what we have seen in our equities bubble, our real estate bubble, and on and on, including the present natural resource bubble, such as copper, zinc, precious metals, uranium, etc.
p

## WE ARE IN THE MIDST OF A VERY LARGE, WORLDWIDE INFLATION

In the US, the Federal Reserve Bank no longer issues a little number called M3, which is the total of money in circulation. Odd – after 50 years, no? This is-was-THE inflation yardstick.

In every country which has a central bank , the money increases are running between 8% and as high as 20+% in Russia! China has a large increase in money AND demand. They are buying raw materials for their productive engine with all those American dollars (they have a reserve of one trillion – yes, you read that right: 1,000,000,000,000.00).

So, expecting of higher worldwide prices is reasonable. In addition, the dollar doesn't buy as much as it did five years ago both here and abroad. So it will take more dollars to buy something, simultaneously competing with Chinese.

## NOW YOU KNOW WHY THE $4.00 GASOLINE

So, what does this mean to us? It means that all valuable asset classes, including 1) quality real estate; 2) blue chips with strong international revenues; 3) commodities; 4) natural resources and their stocks; 5) gold and silver; 6) and grandpa's back teeth.

All will increase in price if not in value, in the fairly near future. It is inevitable. You know this is right because you feel it inside as well as every time you shop. You have to dig a little deeper at nearly everything. What ever happened to the $20 lunch? Ha! Even a Big Mac, fries and Coke are, what? $5.00?

SO THE COMING 3 THROUGH 12 MONTHS WILL BE CHARACTERIZED BY VERY LARGE PRICE SWINGS TO THE UPSIDE, WITH ITS EVIL TWIN HAVING HEART-STOPPING THEATRICAL CORRECTIONS

The Feb. 600-point drop in the Dow was countered by a huge rally to new highs. Ditto in Shanghai, ditto everywhere. I don't predict the future, but this is as close as I come. Can you say: "double-digit percentages?"

## WHAT TO DO?

There are so many opportunities this year that it is going to be disappointing not to take advantage of all of them! Greedy me!

---

...legendary value investor Jeremy Grantham -- the man Dick Cheney, plus a lot of other rich people, trusts with his money. Grantham, chairman of Boston firm Grantham Mayo Van Otterloo, has been a voice of caution for years. But he has upped his concerns in his latest letter to shareholders. Grantham says we are now seeing the first worldwide bubble in history covering all asset classes. Everything is in bubble territory, he says. Everything.

"The bursting of this bubble will be across all countries and all assets." -- *Jeremy Grantham*

"From Indian antiquities to modern Chinese art," he wrote in a letter to clients this week following a six-week world tour, "from land in Panama to Mayfair, from forestry, infrastructure and the junkiest bonds to mundane blue chips; it's bubble time!"
-- *From www.thestreet.com*

---

Here are the coming hot spots: oversees stock markets, including Brazil, China, and Europe. Gas and Oil stocks, gas and oil equipment companies. Weather markets in wheat, corn (along with ethanol demand), soybeans, etc. Strong upside potential in gold, silver and the better quality mining stocks, including junior stocks and juniors with proven reserves. Strong blue chip dividend paying stocks, preferably with a large percentage of revenue earned in non-dollar currencies.

Fine art, prints, rare carpets, collectables, and objet d'art with solid provable value. Real estate, and fine quality real estate anywhere, especially commercially rated land, or lots in good locations.

I think we will do very well this year, and into 2008 too! Nothing is as easy as making predictions, (especially wrong ones!) but this is a multi-generational inflation and it is going to be a wild ride.

Sincerely,

Fund Manager

---

FOIA CONFIDENTIAL
TREATMENT REQUESTED

FF-KR 0638

**The Fahey Financial Group,** *Inc.*
*A Nevada Corporation 800-880-6003*
1117 Desert Lane, Las Vegas, NV 89102-2905
*Statement as of Mar 31, 2007*



| KATHY RANZ | | | | | | 2277 |
|---|---|---|---|---|---|---|

Kathleen Ranz
████████████  (H) ████████
(B) ████████
(FAX)
Valpariaso    IN    Cell: ████████
46385-5385    eMail ████████

*Mail to:*

324 E. Wisconsin Ave.    Chicago
Il    60606

TAX ID #
Bank of West-Bush St    ████0347

| Special Instruction | | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**Share Liquidation Value Jan 1, 2007**    **$    91,408.48**

| Investment | Hedge fund and Special Investments Year Ending Dec. 31, 2007 | | | | | Deposits Withdrawals | Net Gain/Loss | Cumul. Acct Bal. |
|---|---|---|---|---|---|---|---|---|
| | Gain/Loss | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | | | |
| First Quarter TOTAL | | | | | | | | 91,408.48 |
| | | | | | | | | |
| Comment: | No changes from Dec 31, 2006 | | | | | | | |
| Second Quarter TOTAL | | | | | | | | |
| | | | | | | | | |
| Comment: | | | | | | | | |
| Third Quarter TOTAL | | | | | | | | |
| | | | | | | | | |
| Comment: | | | | | | | | |
| Fourth Quarter TOTAL | | | | | | | | |
| | | | | | | | | |
| Comment: | | | | | | | | |
| Quarterly Subtotals, all trades | | | | | | | | |
| **TOTAL:** | March 31, 2007 | | | | | | | 91,408.48 |

| NOTES: |
|---|
| |

*California Contact:Fahey Fund, 268 Bush Street, #4232   San Francisco, CA 94104 800-880-6003*

**FOIA CONFIDENTIAL**
**TREATMENT REQUESTED**

**FF-KR 0639**



**The FAHEY FUND/FAHEY FINANCIAL GROUP**
268 Bush Street, Suite 4232
San Francisco, CA 94104
800-880-6003 bigcheese@faheyfund.com



Dear Investor:                                                    Quarter Ending March 31, 2007

---

**Enclosed is your financial position for Q1 Jan-Mar, 2007.**
While there was a great deal of movement in the market, our particular positions just sat there! So there is nothing to report. Please note that your statements will be unchanged from the Dec. 31, 2006 final. That is, unless you had personal activity in your account, or changes, etc. The prospects for the coming several months are great. I anticipate strong moves in nearly all sectors as the great worldwide inflation roars onward!

---

## WHAT, REALLY, IS INFLATION?

These days, 'inflation' is called a general price rise. It is said to be linked to demand, or to shortages in particular sectors.

But 'said to be' by whom? Modern economists have, except for the Austrian school, forgotten that inflation was always defined as "a general increase in prices caused by excess monetary expansion over actual economic growth."

This means that the banking system puts more money into circulation than needed (by normal people). This 'excess' money looks for a place to increase itself. It buys perhaps, an investment, like stocks, gold, real estate. This extra money has the ability to pay more than the market rate, so it bids up prices. Other people, with no 'extra' money see the price rise, so a little boom ensues. And we have higher prices.

Of course the problem remains: to whom (very formal) does one sell after this price rise? Normal answer: the person who was FIRST to buy is often the first to sell as other people jump into the market! First in, first out – with a profit. That is what we have seen in our equities bubble, our real estate bubble, and on and on, including the present natural resource bubble, such as copper, zinc, precious metals, uranium, etc.

## WE ARE IN THE MIDST OF A VERY LARGE, WORLDWIDE INFLATION

In the US, the Federal Reserve Bank no longer issues a little number called M3, which is the total of money in circulation. Odd – after 50 years, no? This is-was-THE inflation yardstick.

In every country which has a central bank , the money increases are running between 8% and as high as 20+% in Russia! China has a large increase in money AND demand. They are buying raw materials for their productive engine with all those American dollars (they have a reserve of one trillion – yes, you read that right: 1,000,000,000,000.00).

So, expecting of higher worldwide prices is reasonable. In addition, the dollar doesn't buy as much as it did five years ago both here and abroad. So it will take more dollars to buy something, simultaneously competing with Chinese.

## NOW YOU KNOW WHY THE $4.00 GASOLINE

So, what does this mean to us? It means that all valuable asset classes, including 1) quality real estate; 2) blue chips with strong international revenues; 3) commodities; 4) natural resources and their stocks; 5) gold and silver; 6) and grandpa's back teeth.

All will increase in price if not in value, in the fairly near future. It is inevitable. You know this is right because you feel it inside as well as every time you shop. You have to dig a little deeper at nearly everything. What ever happened to the $20 lunch? Ha! Even a Big Mac, fries and Coke are, what? $5.00?

## SO THE COMING 3 THROUGH 12 MONTHS WILL BE CHARACTERIZED BY VERY LARGE PRICE SWINGS TO THE UPSIDE, WITH ITS EVIL TWIN HAVING HEART-STOPPING THEATRICAL CORRECTIONS

The Feb. 600-point drop in the Dow was countered by a huge rally to new highs. Ditto in Shanghai, ditto everywhere. I don't predict the future, but this is as close as I come. Can you say: "double-digit percentages?"

## WHAT TO DO?

There are so many opportunities this year that it is going to be disappointing not to take advantage of all of them! Greedy me!

---

...legendary value investor Jeremy Grantham – the man Dick Cheney, plus a lot of other rich people, trusts with his money. Grantham, chairman of Boston firm Grantham Mayo Van Otterloo, has for years, been a voice of caution for years. But he has upped his concerns in his latest letter to shareholders. Grantham says we are now seeing the first worldwide bubble in history covering all asset classes. Everything is in bubble territory, he says. Everything.

'The bursting of this bubble will be across all countries and all assets.' – *Jeremy Grantham*

"From Indian antiquities to modern Chinese art," he wrote in a letter to clients this week following a six-week world tour, "from land in Panama to Mayfair; from forestry, infrastructure and the junkiest bonds to mundane blue chips; it's bubble time!"
– *From www.thestreet.com*

---

Here are the coming hot spots: oversees stock markets, including Brazil, China, and Europe. Gas and Oil stocks, gas and oil equipment companies. Weather markets in wheat, corn (along with ethanol demand), soybeans, etc. Strong upside potential in gold, silver and the better quality mining stocks, including junior stocks and juniors with proven reserves. Strong blue chip dividend paying stocks, preferably with a large percentage of revenue earned in non-dollar currencies.

Fine art, prints, rare carpets, collectables, and objet d'art with solid provable value. Real estate, and fine quality real estate anywhere, especially commercially rated land, or lots in good locations.

I think we will do very well this year, and into 2008 too! Nothing is as easy as making predictions, (especially wrong ones!) but this is a multi-generational inflation and it is going to be a wild ride.

Sincerely,

*[signature]*

Fund Manager

FOIA CONFIDENTIAL
TREATMENT REQUESTED

**The Fahey Fund, l.p.**
268 Bush St., Suite 4232
San Francisco, CA 94104
*Partnership Documentation - Mar. 31 2007*



| Kathy Ranz / IRA | | | | | | | | 1095 |
|---|---|---|---|---|---|---|---|---|

| Kathy Ranz | | (H) | ▓▓▓▓ | Sterling Trust Co. | | |
|---|---|---|---|---|---|---|
| ▓▓▓▓▓▓▓▓ | | (B) | ▓▓▓▓ | IRA Account | | |
| | | (FAX) | ▓▓▓▓ | UNITS | Date | Total |
| Valparaiso | IN | Cell: | ▓▓▓▓ | | | |
| | 46385-5385 | eMail | ▓▓▓▓ | | | |
| Mail to: | | | | | | |

TAX ID # ▓▓▓▓▓3879
Bank of West-Bush St.

| | | | Opening Balance, Jan 1, 2007 | $ 490,779.28 |
|---|---|---|---|---|

| Trade Description | Gain/Loss | For the Year Ending Dec. 31, 2007 | | | | Deposits Withdrawals | Net Gain/Loss | Cumul. Acct Bal. |
|---|---|---|---|---|---|---|---|---|
| | | Qtr 1 | Qtr 2 | Qtr 3 | Qtr 4 | | | |
| First Quarter TOTAL | | | | | | | | 490,779.28 |
| | | | | | | | | |
| Comment: | *No changes from Dec 31, 2006* | | | | | | | |
| Second Quarter TOTAL | | | | | | | | |
| | | | | | | | | |
| Comments: | | | | | | | | |
| Third Quarter TOTAL | | | | | | | | |
| | | | | | | | | |
| Comments: | | | | | | | | |
| Fourth Quarter TOTAL | | | | | | | | |
| | | | | | | | | |
| Comments: | | | | | | | | |
| Quarterly Subtotals, all trades | | | | | | | | |
| **TOTAL:** | **Mar 31, 2007** | | | | | | | **490,779.28** |

| NOTES: | |
|---|---|
| | |

*A CALIFORNIA Limited Partnership*

FOIA CONFIDENTIAL
TREATMENT REQUESTED

# EXHIBIT 39

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:          )

4                              )   File No. SF-3211-A

5    FAHEY FUND, L.P.           )

6

7

8

9    WITNESS:   Cortney Allan Robinson

10   PAGES:     1 through 53

11   PLACE:     Securities and Exchange Commission

12              44 Montgomery Street, Suite 2600

13              San Francisco, California   94104

14   DATE:      Friday, June 8, 2007

15

16        The above-entitled matter came on for hearing, pursuant

17   to notice, at 1:15 p.m.

18

19

20

21

22                         COPY

23

24              Diversified Reporting Services, Inc.

25                       (202) 467-9200

2

```
 1   APPEARANCES:

 2   On behalf of the Securities and Exchange Commission:

 3        ERIN E. SCHNEIDER, ESQ.

 4        Office of Enforcement

 5        United States Securities and Exchange Commission

 6        44 Montgomery Street, Suite 2600

 7        San Francisco, California  94104

 8        (415) 293-0337

 9   On behalf of the Witness:

10        MARC H. AXELBAUM, ESQ.

11        NATHAN CARDOZO, LAW CLERK

12        Pillsbury, Winthrop, Shaw, Pittman, LLP

13        50 Fremont Street

14        San Francisco, California  94105

15        (415) 983-1000

16

17

18

19

20

21

22

23

24

25
```

1   performance for the agency.

2        Q     What are your typical duties during a day?   What

3   are your job responsibilities?

4        A     Reviews of business plans for different

5   organizations within the agency.   Preparing budget

6   submissions throughout the year for the Office of the

7   Secretary for OMB, the President and the Congressional

8   Justification.

9        Q     And you're still -- you're still employed at that

10  position today?

11       A     Yes.

12       Q     Those are still your job responsibilities?

13       A     Yes.

14       Q     Do you know what Fahey Fund is?

15       A     A hedge fund.

16       Q     Well, how did you -- you invested in the Fahey

17  Fund; right?

18       A     Yes.

19       Q     How did that happen?

20       A     I heard mention of it by someone I know.   And asked

21  for information on it.   That was about it.

22       Q     Who did you hear about it from?

23       A     Father Dunn.

24       Q     Who is Father Dunn?

25       A     He is a priest who I met in seminary.

16

1    Q    When you say you met him in seminary, was he also

2    involved in the seminary program?

3    A    No.

4    Q    How did you meet him in seminary?

5    A    He just came.  He was a guest.  He was there for a

6    few days.

7    Q    What did Father Dunn say about the Fahey Fund?

8    A    He just mentioned that it was -- he had made a

9    profit.

10    Q    Do you recall anything else Father Dunn said about

11    the Fahey Fund?

12    A    Beside that, you know, it had been profitable and

13    he knew the fund manager.  That's all -- that's all he said.

14    Q    How many times did you speak with Father Dunn about

15    the Fahey Fund?

16    A    Maybe three or four times.

17    Q    So you said you met him in seminary.  Did you have

18    a conversation, a face-to-face conversation with Father Dunn

19    about the Fahey Fund at that time?

20    A    Yes.

21    Q    How did it initially come up?

22    A    I had been discussing some of my experience with

23    investing.  And so he shared his.

24    Q    What were you telling Father Dunn about your

25    experience with investing?

18

1    Q    By wrong direction, do you mean your investment was

2    decreasing in value?

3    A    Yes.

4    Q    All right.  So you said Father Dunn said that, or

5    mentioned that he had made a profit.  What was your

6    understanding of what sort of a profit Father Dunn had made?

7    A    Well, it had been -- I mean, he was making a

8    profit.  He put in money, and it increased in value.

9    Q    Father Dunn said that to you?

10   A    Yes.

11   Q    Did he give you any sense of how much it had

12   increased in value?

13   A    Twenty percent.

14   Q    You recall Father Dunn specifically saying twenty

15   percent?

16   A    Yes.

17   Q    During this time that you were speaking with Father

18   Dunn, did you have an understanding of how long he had been

19   invested in the fund?

20   A    No, not how long.

21   Q    Did you ever see any documents related to the fund?

22   A    No.

23   Q    So you never looked at Father Dunn's statements?

24   A    No.

25   Q    And then you also said that Father Dunn said he

52

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

REPORTER'S CERTIFICATE

I, <u>Richard Friant</u>, reporter, hereby verify that the
foregoing transcript of <u>51</u> pages is a complete, true and
accurate transcript of the testimony indicated, held on <u>June</u>
<u>8, 2007,</u> at <u>44 Montgomery Street, San Francisco, California</u>
in the matter of: <u>FAHEY FUND, L.P.</u>  I further testify that
this proceeding was recorded by me, and that the foregoing
transcript was prepared by <u>Elena Lara</u> under my direction.

Date: _____6/18/07_____

Official Reporter:_____

Diversified Reporting Services, Inc.

53

## PROOFREADER'S CERTIFICATION

In the Matter of:        Fahey Fund

Witness:                 Cortney Allan Robinson

File Number:             SF-3211-A

Date:                    June 8, 2007

Location:                44 Montgomery Street

                         San Francisco, California


This is to certify that, I, Elena Lara, do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been completed to the reporting or recording accomplished at the hearing.

Elena Lara                     6/18/07

# EXHIBIT 40

# REDACTED

| | | | | |
|---|---|---|---|---|
| Amount: | $206,885.00 | | Sequence Number: | 4692483326 |
| Account: | ▮▮▮5114 | | Capture Date: | 03/06/2007 |
| Bank Number: | 12240072 | | Check Number: | 651 |

**FAHEY FINANCIAL GROUP INC.**    02-01    **651**
1117 DESERT LN. STE 728
LAS VEGAS, NV 89102
800-880-6003

Date    Mar 1  07    94-72/1224 NV
6984

Pay to the
Order of    Suzanne Greg    | $ 206,885 ᵒᵒ

Two Hundred Six Thousand Eight Hundred Eighty Five    Dollars

**Bank of America**

ACH R/T 122400724

For Fwor Distribution    G-Dm Lee

⑆122400724⑆ ▮▮▮▮▮▮5114⑈0651    ⑆0020688500⑈





Electronic Endorsements
| Date | Sequence | | Bank # | BOFD | Bank Name | |
|---|---|---|---|---|---|---|
| 03/06/2007 | 00860905343 | | 121000358 | Y | BANK OF AMERICA, NA | |
| 03/06/2007 | 004692483326 | | 121103886 | N | BANK OF AMERICA, NA | |