MARC J. FAGEL (Cal. Bar No. 154425)
MARK P. FICKES (Cal. Bar No. 178570)
 (fickesm@sec.gov)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
 (schneidere@sec.gov)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> ALEXANDER JAMES TRABULSE, <br><br> Defendant, <br><br> and <br><br> FAHEY FUND, L.P., FAHEY FINANCIAL GROUP, INC., INTERNATIONAL TRADE & DATA, and ITD TRADING, <br><br> Relief Defendants. | Case No. C 07-4975 WHA <br><br> PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION <br><br> DATE: December 6, 2007 <br> TIME: 8:00 a.m. <br> PLACE: Courtroom 9, 19th Floor |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................. 1

    A.    Where the SEC Makes a Substantial Showing of Likely Success as to Current and Future Violations, a Preliminary Injunction Should Issue. ................................................................................. 2

    B.    Defendant Made Material Misrepresentations and Omissions, and Misappropriated Fund Assets in Breach of His Fiduciary Duty. ............................................................................................................... 3

        1.    The Evidence Demonstrates Trabulse's Violations of the Antifraud Provisions of the Securities Act and the Exchange Act. ............................................................................ 4

        2.    Trabulse Breached His Fiduciary Duty in Violation of the Investment Advisers Act. ...................................................... 7

        3.    The Evidence Demonstrates that Trabulse Likely Will Continue to Violate the Securities Laws Unless Enjoined. ................................................................................. 9

    C.    Defendant Offers No Basis for Permitting Him to Withdraw Further Fund Assets to Pay His Personal Expenses. ........................... 10

    D.    The Court Should Order Trabulse to Provide an Immediate Accounting. .............................................................................................. 12

    E.    This Court Should Order Expedited Discovery. ........................................ 13

    F.    This Court Should Appoint a Monitor. ....................................................... 14

CONCLUSION ..................................................................................................................... 14

## **TABLE OF AUTHORITIES**

Page

CASES

*Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.,*
  67 F.3d 766, 775 (9th Cir. 1995) .......................................................................... 11

*Federal Sav. & Loan Ins. Co. v. Dixon,*
  835 F.2d 554, 564-65 (5th Cir. 1987) .................................................................. 12

*Federal Trade Comm'n v. World Wide Factors, Ltd.,*
  882 F.2d 344, 347-48 (9th Cir. 1989) .................................................................. 11

*Koehler v. Pulvers,*
  614 F. Supp. 829 (S.D. Cal. 1985) ......................................................................... 3

*Laird v. Integrated Resources, Inc.,*
  897 F.2d 826, 835 (5th Cir. 1990) ......................................................................... 8

*Orr v. Bank of America, NT & SA,*
  285 F.3d 764, 773-74 (9th Cir. 2002) .................................................................... 6

*SEC v. Berger,*
  244 F. Supp.2d 180 (S.D.N.Y. 2001), *aff'd*, 322 F.3d 187 (2d Cir. 2002) ............ 3

*SEC v. Capital Gains Research Bureau, Inc.,*
  375 U.S. 180 (1963) ............................................................................................... 4

*SEC v. Cavanagh,*
  155 F.3d 129, 132 (2d Cir. 1998) ........................................................................... 2

*SEC v. International Swiss Investments Corp.,*
  895 F.2d 1272, 1276 (9th Cir. 1990) .................................................................... 12

*SEC v. Quinn,*
  997 F.2d 287, 289 (7th Cir. 1993) ........................................................................ 11

*SEC v. Unifund SAL,*
  910 F.2d 1028 (2d Cir.1990) .................................................................................. 3

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) ............................................................................................... 3

*U.S. v. Payment Processing Ctr., LLC,*
  439 F. Supp.2d 435, 440 (E.D. Pa. 2006) ............................................................. 12

*Vernazza v. SEC,*
  327 F.3d 851, 859 (9th Cir. 2003) .......................................................................... 4

**TABLE OF AUTHORITIES, cont.**

Page

STATUTES

15 U.S.C. § 78j(b) .................................................................................................................. 3

OTHER AUTHORITIES

T. FRANKEL, THE REGULATION OF MONEY MANAGERS § 13.02[A] (2d ed. 2001) .................... 4, 8

RULES

17 C.F.R. § 240.10b-5 ............................................................................................................. 3

## INTRODUCTION

As the Commission's moving papers establish, defendant Alexander J. Trabulse defrauded his hedge fund investors, and the hedge fund he manages, by sending false account statements, treating the hedge fund's assets as his own personal piggy bank, and making misrepresentations and omissions of material fact to lure investments into his fund. The Commission established these violations of the securities laws through the documentary evidence of the fund's bank and brokerage accounts showing the contrast between those records and Trabulse's representations to investors in quarterly statements; through the testimony of investors confirming that they were not told that Trabulse was purchasing rugs, jewelry, and making other purchases of consumption items for himself and his family and friends; and through an expert declaration describing how the account statements provided to investors simply do not add up.

Trabulse does not rebut any of these facts with any evidence.[1] Instead, he dances around the obvious to make the twin, strained arguments: first, that the Commission has not added up the purported "value" of various "assets that are not held in brokerage accounts" or bank accounts, and second, that the Commission has not shown how much money the fund made or how much he withdrew. Opp. at 5, 7. From these assertions he concludes that the Commission cannot establish his violations of the antifraud provisions and his fraudulent breach of his fiduciary duty. Of course, to get to this point, Trabulse requires the Court to ignore the fact that the value of the fund reported to investors was vastly higher than the value of the assets in the funds' brokerage and bank accounts. And, Trabulse does not point to the existence of even a single "asset" that would account for that difference. Similarly, Trabulse ignores the fact that returns he reported to investors were grossly inflated in comparison to the returns the funds actually earned on investments made in brokerage accounts. Moreover, the false investor account statements report supposed gains only from stocks, derivatives, and foreign currency and do not suggest that any of the reported value is attributable to rugs or jewelry, or any of the other items that Trabulse purchased with investor money. These

---

[1] Trabulse does purport to submit a single document that he calls a "partnership agreement," which has not been authenticated and whose veracity and relevance is contradicted by the unrebutted evidence.

unrebutted facts do not simply disappear when countered only with the argument that the Commission has not assigned "value" to unspecified and undisclosed "assets," such as rugs sitting on the floor of defendant's ex-wife's home. Rather, these facts establish defendant's serious securities law violations. And these facts further establish the likelihood of his repeating the fraud and misappropriation even as this litigation continues.

Beyond contesting the entry of a preliminary injunction, defendant also objects to his being prohibited from withdrawing more investor funds for his own purposes while maintaining that he should not be ordered to account for the transactions to date. Trabulse would prefer that the Court permit him to continue to squander fund (and investor) assets, without oversight by any disinterested person, while taking his time in determining how much he has already taken from investors. He, of course, sees no urgency in completing this task, and further balks at the Commission's request for expedited discovery, as such discovery might provide another venue for sorting out the mess he has created. While arguing that he might have been entitled to a share of "profits" under the fund's partnership agreement, Trabulse offers the Court no evidence to suggest that the large amounts of money he took for himself or his family and friends on a continual, ad hoc basis bear any relationship to the portion of profits he might have been entitled to. In contrast, the Commission's unrebutted evidence gives the lie to the notion that there were any profits during specific periods when he was removing investor funds for his own use. Yet, Trabulse asks this Court to approve of his continued withdrawal of money from the fund, when he has no basis for determining whether he is entitled to *any* funds.

As described in our moving papers, and addressed below, Trabulse should be preliminarily enjoined and the Court should order the ancillary relief set forth in the Commission's proposed order, including an accounting, expedited discovery and the appointment of a monitor.

### A. Where the SEC Makes a Substantial Showing of Likely Success as to Current and Future Violations, a Preliminary Injunction Should Issue.

"A preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998). Contrary to defendant's

unsupported assertions, the Commission is not held to a "heightened evidentiary standard" simply because the Commission seeks a preliminary injunction against his continued violations of the securities laws. As the Court in *SEC v. Unifund SAL* – the very case defendant cites for this proposition – held: "Like any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks. In some cases a preliminary injunction can have very serious consequences [citations omitted], yet in other cases may be fairly described as only a 'mild prophylactic' [citations omitted]." 910 F.2d 1028, 1039 (2d Cir. 1990). Notably, the Second Circuit did not hold in *Unifund*, as defendant asserts, that prohibitions against further violations of the securities laws are always so "grave" as to require a "more substantial showing of the likelihood of success, both as to violation and risk of recurrence." Opp. at 4. Defendant has offered the Court no reason whatsoever to assume that the consequences from such an injunction against him are "very serious." To the contrary, defendant declares at the outset of his brief that he has already been so limited by the parties' Stipulation that the Commission's request for an injunction is "moot." Opp. at 1.

As discussed below, regardless of which standard is applied to the evidence in this case, defendant should be preliminarily enjoined from violations of the antifraud statutes. His repeated and ongoing violations should not be permitted to remain unaddressed while he maintains control over investors' funds.

**B.    Defendant Made Material Misrepresentations and Omissions, and Misappropriated Fund Assets in Breach of His Fiduciary Duty.**

Material misrepresentations to investors about the value of their securities violate the antifraud statutes under the securities laws, including Section 10(b) of the Exchange Act and Rule 10b-5 (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5). *SEC v. Berger*, 244 F. Supp.2d 180 (S.D.N.Y. 2001), *aff'd*, 322 F.3d 187 (2d Cir. 2002). *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (a fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision); *Koehler v. Pulvers*, 614 F. Supp. 829, 842 (S.D. Cal. 1985) (material information includes, at a minimum, "accurate information on the use of investor funds"). Furthermore, misappropriation, and commingling of a fund's assets with those of

the adviser each constitute the breach of the adviser's fiduciary duty to act with the "utmost good faith" in the management of the client's money. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92, 194, 196-97, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (advisers owe fiduciary duty to deal with their clients in utmost good faith and with complete candor); *Vernazza v. SEC*, 327 F.3d 851, 859 (9th Cir. 2003) (misappropriation constitutes a breach of that duty); T. FRANKEL, THE REGULATION OF MONEY MANAGERS § 13.02[A] at 13-46 to 13-47 (Aspen Publishers 2d ed. Supp. 2006) ("[F]iduciaries must segregate their own assets from those of the entrustors. This rule protects entrustors' property from the claims of the fiduciary's creditors. It also provides a constant reminder to the fiduciary that the entrustor's assets are labeled as such and that they are not the fiduciary's own"). The unrebutted evidence, set forth in our moving papers and discussed below, establish defendant's ongoing violations of the antifraud provisions and his continual breach of his fiduciary duties.

        1.    **The Evidence Demonstrates Trabulse's Violations of the Antifraud Provisions of the Securities Act and the Exchange Act.**

The Commission's uncontradicted evidence squarely demonstrates that Trabulse sent to investors account statements that were false and misleading because they overstated the amount of profits the fund earned and the value of the fund. For instance, as of December 31, 2006, Trabulse reported to investors net assets purportedly comprised of investor contributions plus gains on investments in stocks, futures, derivatives, and foreign currency, totaling approximately $50 million. (Schneider Decl., ¶¶ 23-24, Exh. 17.) In contrast, the fund's brokerage account records and bank statements – the only records of investor contributions and transactions in stocks, futures, derivatives, and foreign currency – reveal that the actual value of the funds' assets was only approximately $10 million ($6.95 million in brokerage accounts and $3.05 million in bank accounts). (Schneider Decl., ¶¶ 8-22, Exhs. 7-16.) Trabulse also failed to disclose purchase of rugs, real estate, and jewelry to investors. (Schneider Decl. ¶¶ 33, 37, 41, 43, Exhs. 26, 30, 34, 35.)

Trabulse has offered no facts that call into question the Commission's evidence, nor any evidence to explain this approximately five-fold discrepancy in the account statements sent to investors. Instead, Trabulse argues that the Commission has not accounted for the fund's supposed

other, unspecified investments, which would have to comprise approximately 80 percent of the value of the fund. Importantly, the investor account statements specify the investments that do supposedly comprise the funds assets and they do not mention any other investments. (Schneider Decl. ¶ 23, Exh. 17). They reflect gains in stocks, derivatives, and foreign currency – transactions that were made through and posted in the fund's brokerage accounts. (*Id.*) Consequently, even if it were true that the fund "invested" in other assets that retained value, the investor statements would still be false and misleading for failing to disclose such assets in the gain and ending balance calculations.[2] When the Commission asked Trabulse how he valued the fund's assets, Trabulse refused to answer the staff's questions citing his Fifth Amendment right against self-incrimination. (Schneider Decl., ¶ 25.)

Ignoring entirely the specific representations he made in the statements he sent to investors, Trabulse argues that he nevertheless did disclose to investors "other" investments, in a purported "partnership agreement" he attaches as Exhibit A to the declaration of his counsel, Clement S. Roberts. Contrary to Mr. Roberts' assertion in his declaration that he has "personal knowledge of the facts set forth herein," Mr. Roberts provides no basis for asserting that the exhibit is a "true and correct copy of the Fahey Fund (Limited) Partnership Agreement, dated January 2002"; he does not disclose whether the unsigned document is a draft, or final; he does not state whether the document was ever the shown to, let alone entered into, with any investors; and, he does not have any basis for making any claims about a document purportedly dated January 2002, when Mr. Roberts was not affiliated with the Fahey Fund. Importantly, the purported agreement conflicts in key respects with the unchallenged, and unrebutted evidence properly before the Court. *See* Schneider Decl. ¶¶ 30-31, Exhs. 23-24 (partnership agreement provided to investor James Wojack states that the purpose of the partnership was to use listed stock, futures, options, and index opportunities to gain consistent compound rates of return (FF-JMW-43) and that the fund would trade stocks, indexes, warrants,

---

[2] Contrary to Trabulse's claims, the Commission has not alleged that Trabulse "invested" a significant portion of the fund's capital in assets that are not held in brokerage accounts. Def's Opp. at 5. Rather, the Commission has alleged that Trabulse misused investors' money to purchase numerous items that were not disclosed to them – including gifts to his family members. Complaint, ¶ 28.

stock options, futures, forwards, commodities, and similar financial instruments (FF-JMW-43). In short, Mr. Roberts' declaration, and the document attached, should be stricken.[3]

Furthermore, the arguments defendant makes based on his Exhibit A are specious. In particular, defendant points to two paragraphs (that provide information different from the actual Partnership Agreement), which he says "clearly state[] that 'capital may be invested in other businesses' and that the Fund's mission will be to invest in 'publicly listed opportunities, natural resources, **and any other investment of a unique long-term character**.'" Def's Opp. at 5 (emphasis in original). However, none of the investor account statements suggest that the fund actually invested in any of these "other" assets. (Schneider Decl. ¶ 23, Exh. 17.) Nor did Trabulse discuss these purported investments with investors before they decided to put money into the fund.[4] (Schneider Decl. ¶ 33, 37, 41, 43, Exhs. 26, 30, 34, 35.) Trabulse simply ignores the clear testimony

---

[3] Lacking personal knowledge, Mr. Roberts cannot authenticate Exhibit A by simply asserting that he is attaching a true and correct copy. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773-74 (9th Cir. 2002). *See* Local Rule 7-5 (providing that "evidentiary matters must be appropriately authenticated by an affidavit or declaration," and that declarations must contain facts, not conclusions, conform to Rule 56(e), or be stricken). The unsigned document is not self-authenticating. In contrast, the Court has before it Exhibits 23 and 24 to the Declaration of Erin E. Schneider. Those documents present evidence that a contemporaneously created Partnership Agreement (Ex. 24) was provided to an investor, Mr. Wojack, as the investor testified (Ex. 23). The true Partnership Agreement is dated "Rev Jan 2003," and does not include the vague statements to which Trabulse cites in his motion as the source of his "disclosure." (Ex. 24 at FF-JMW 0042, 0043.) Even if it were true that the document attached to Mr. Roberts' declaration was in effect in "Jan 2002" (and there is no evidence in support of that proposition), it would have been superseded by the "Jan 2003" agreement that is properly before the Court. Finally, Mr. Roberts' declaration fails to satisfy the requirements of an "affidavit" or "declaration," as it is neither sworn, nor made under penalty of perjury pursuant to 28 U.S.C. § 1746.

[4] Incredibly, Trabulse cites to the testimony of two investors, Urbano Maffei and Suzanne Gregg, each of whom provide testimony in decided contradiction to his theory of disclosure. Maffei invested in approximately 2000, but he testified in April 2007 that Trabulse did not tell him that the fund invested in pearls until sometime in 2007. (Schneider Decl. ¶ 33, Exh. 26, p. 112:10-22.) Moreover, the pearl "investment" does not show up on any of the investor account statements. (Schneider Decl. ¶ 23, Exh. 17.) Similarly, Gregg actually testified that, while she was aware Trabulse was interested in Panama, "it was never discussed that the fund was going to invest . . . in property down there." (Schneider Decl. ¶ 41, Exh. 34, p. 81:2-11.) Gregg also testified that it was not her intention to invest in a fund that invested in real estate and that the concept of the fund investing in real estate "was just never discussed." (*Id.*, p. 80:20-81:1.)

from investors Maffei, Hillemann, Gregg, and Banister that Trabulse never discussed these types of investments with them before they invested. (*Id.*)

Trabulse also argues that his lack of disclosure is immaterial. *See* Def's Opp. at 6 (quoting investor Maffei as saying "But, again, it's not going to change my mind or wouldn't have changed my mind at the time of the initial investment.") The standard for materiality, however, does not depend on whether a particular investor would have changed his or her mind, but whether a "reasonable" investor would have considered it important in making an investment decision. *TSC Indus.*, 426 U.S. at 449. Nevertheless, when asked whether he would have liked to have known that the fund was going to invest in crystals before he invested, Maffei responded: "Yeah. I think – I think I would like to know whatever information he may have on his investments . . . . I mean, not that the 10,000 is a big number to be concerned with. But I'd still like to know the type of investments he's making." (Schneider Decl. ¶ 33, Exh. 26, p. 113:13-25; s*ee id.* 26 at 109:8-23; 114:20-115:13 (testifying that he would have liked to have known before investing about Persian rugs, and providing capital to a start-up golf company, if they were to be investments)). Similarly, the reaction of another investor gives the lie to his materiality argument, as she testified in response to whether she expected the fund might invest in a pearl necklace: "No. . . . That's – even the question sounds bizarre to me, frankly. . . . It just doesn't seem like he acted in good faith. I mean, that's – that's an investment? I don't know." (Schneider Decl. ¶ 41, Exh. 34, p. 83:9-25.)

### 2. Trabulse Breached His Fiduciary Duty in Violation of the Investment Advisers Act.

Under the fund's Partnership Agreement, Trabulse was not entitled to any money from the fund until he properly calculated what the fund's profits were. However, Trabulse merely withdrew money from the fund's bank accounts as he felt like it. (Schneider Decl., ¶ 26, Exh. 19.) He also allowed his daughter to use a debit card linked to one of the fund's bank accounts, which she used as she pleased. (Schneider Decl., ¶ 51, Exh. 43.) Trabulse has offered no evidence to rebut the Commission's evidence that he failed to properly account for the fund's activities and profits in the statements he sent to investors. (Fong Decl., ¶¶ 11-12, Exhs. 2-3.) Nor has he offered any evidence to rebut the Commission's calculation of the fund's return or value.

Under the terms of the fund's limited partnership agreement, Trabulse was required to "close[] and balance[]" the books of the fund at the end of each calendar year and deliver the resulting statement to each investor. (Schneider Decl., ¶ 31, Exh. 24, Section 5.15.) Even though the fund required him to keep accurate books and records and calculate profits in accordance with generally accepted accounting principles, Trabulse flatly disregarded these provisions. Given his abysmal record-keeping and accounting procedures, it is not clear that Trabulse had any mechanism to determine whether or not the fund was profitable in a given period, let alone what his share of those profits would amount to.[5]

Moreover, Trabulse routinely commingled his own assets with those of the fund. (Schneider Decl., ¶ 26, Exh. 19.) He on numerous occasions transferred money between bank accounts held in his name and bank accounts belonging to the fund and authorized the withdrawal of money from all accounts for personal use. (Schneider Decl., ¶¶ 26, 44, 51-57, 60, Exh. 19, 36, 43-48.) This, in and of itself, is a violation of Trabulse's fiduciary duty to the fund. T. FRANKEL, THE REGULATION OF MONEY MANAGERS § 13.02[A] at 13-46 to 13-47.[6]

Contrary to Trabulse's assertions, nothing in the partnership agreement gave Trabulse the green light to commingle his assets with those of the fund, or to treat the fund as his own piggy bank. With respect to Trabulse's share of the profits, the partnership agreement provides that, for those investors with more than $50,000, "25% of the net profit . . . shall be payable and distributable to the General Partner" (Schneider Decl. ¶ 31, Exh. 24, Section 5.14) and that "the General Partner shall receive the right to draw expenses consistent with prudent and sound management of the trading

---

[5] In particular, Trabulse failed to "mark to market" the fund's holdings and did not accurately account for the fund's trading activities and cash flows. (Fong Decl., ¶¶ 2, 4-7, 10, 11, 12, 15, Exhs. 2-3, 5-6.)

[6] Similarly, he failed to record in investor statements all contributions and withdrawals, which resulted in an over or understatement of investors profits and balances (Fong Decl., ¶¶ 10, 17-18, Exhs. 9-10.) He allocated to certain investors more profits than they were entitled to. (Fong Decl., ¶¶ 6, 10, 16, Exhs.7-8.) Moreover, for purposes of Exchange Act Section 10(b), an investment adviser is a fiduciary and therefore has an affirmative duty of utmost good faith to avoid misleading clients, including the disclosure of all material facts and all possible conflicts of interest. *Laird v. Integrated Resources, Inc.*, 897 F.2d 826, 835 (5th Cir. 1990).

activities, such expenses being charged against his share" (Schneider Decl., ¶ 31, Exh. 24, Section 6.06). As defendant concedes, this means that Trabulse must pay for the fund's expenses out of his own pocket. Opp. at 8:2-3. It certainly does not mean he has to use the fund's bank accounts as a personal bank account, as Trabulse suggests (*id.* at 8:18-19), thus placing the fund's capital at risk from his personal creditors.

Defendant further argues that the Commission is simply quibbling with how he spent his money in pointing to his purchases of rugs, jewelry, and an ATM card attached to a fund account that his daughter had access to. Opp. at 7-8. Nevertheless, these rugs and jewelry are among the same purported "assets" that defendant complains the Commission has not given full value to in calculating the tremendous shortfall between the profits and assets he reported to investors versus those appearing in the funds' brokerage and bank statements. Defendant cannot have it both ways: if he purchased the rugs, jewelry, etc. with funds to which he was entitled as his profit share, then those goods he purchased cannot be part of any measurement of the fund's asset value or its profitability. The reality is defendant simply used the fund's accounts to pay for his lifestyle.

### 3. The Evidence Demonstrates that Trabulse Likely Will Continue to Violate the Securities Laws Unless Enjoined.

Trabulse's violations to date of the antifraud provisions of the securities laws, and his repeated and ongoing breach of his fiduciary duty, strongly suggest that a preliminary injunction enjoining him from further violations of Section 10(b) of the Exchange Act and Rule 10b-5, Section 206 of the Advisers Act, and Section 17(a) of the Securities Act is appropriate. The fraud perpetrated against investors and the fund by Trabulse is ongoing: the Fahey Fund investors are currently invested in a fund that has substantially less assets (and lower returns) than they have been told, and Trabulse has not fulfilled his duty to the fund to account for its assets. Moreover, it is an utter fiction, based on a misinterpretation of the law, that defendant is somehow prevented from committing further fraud against investors by the parties' Stipulation, entered by the Court on October 29, 2007, simply because defendant is prohibited from taking on new investor money or making distributions to investors. Defendant thus poses the fallacious argument that because "he has agreed not to offer or sell securities at all," he somehow cannot perpetrate any further fraud. Opp. at 9. Importantly,

nothing in the parties' agreement addresses the defendant's provision of account statements to investors – to date, those have been false, and all the record evidence suggests that the defendant will continue to lie to the extent he provides such information to fund investors. Moreover, failure to provide accurate information to investors violates defendant's fiduciary duty.

Importantly, investors currently cannot withdraw from the fund, under the Stipulation, which prohibits distributions until further order of the Court. Defendant, meanwhile, remains in control of the fund without any objective check (such as the monitor the Commission has proposed) over his use of fund assets. Indeed, defendant's own list of the fund's purported "expenses" withdrawn from accounts by defendant during October 2007, includes: "$4,500.00 Personal," "$1,000.00 Charity," and "Housekeeping $400.00." (Exh. 1 to Second Declaration of Erin E. Schneider, dated November 21, 2007.) Obviously, such expenditures – comprising more than one-third of the $25,000 – are on behalf of defendant Trabulse, not any of the fund entities. Defendant is thus continuing to misuse the fund's assets to support his lifestyle, even in the face of this ongoing litigation.

Accordingly, a preliminary injunction against his further violations of the antifraud and fiduciary duty provisions is both necessary and appropriate.

C. **Defendant Offers No Basis for Permitting Him to Withdraw Further Fund Assets to Pay His Personal Expenses.**

Trabulse requests that the Court allow him to spend $25,000 per month from the fund's bank accounts to pay both for fund expenses, and his own personal living expenses. Opp. at 16. On top of this, defendant wants to be free to spend as much of the fund's assets as he sees fit to pay for lawyers. Based on his presentation to the Court to date, defendant's proposal should be rejected.

The Commission already has agreed that the fund can pay legitimate and reasonable expenses incurred in the ordinary operation of the fund. Stipulation, ¶ VIII. Importantly, the Court has not ordered that Trabulse's assets be frozen. Yet, as described above, defendant has used the expense provision in the Stipulation to pay for his own personal expenses, to the tune of at least one-third of the $25,000. Defendant's proposal entirely reverses the fair expectations of investors who entrusted their money to Trabulse. The Partnership Agreement with investors provides that the fund's expenses are to be borne by Trabulse – not that the fund's assets should pay for his lifestyle or legal

expenses. *See* Schneider Decl., ¶31, Exh. 24, Section 6.06 ("No partner shall be entitled to any salary, but the General Partner shall receive the right to draw expenses consistent with prudent and sound management of the trading activities, such expenses being charged against his share.").

Similarly, defendant has offered this Court no reason to permit him to drain the fund's bank accounts to pay for his own legal defense while investors cannot withdraw their funds. "Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victim's assets to hire counsel who will help him retain the gleanings of the crime." *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) (collecting authority). Ninth Circuit law recognizes that "[c]ourts regularly have frozen assets and denied attorney fees or limited the amount for attorney fees." *Federal Trade Comm'n v. World Wide Factors, Ltd.*, 882 F.2d 344, 347-48 (9th Cir. 1989); *see Commodity Futures Trading Comm'n v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (affirming order denying payment of attorney's fees from frozen assets).

All along, Trabulse has failed to distinguish between his own interests and those of the fund, and he perpetuates this failure in his opposition. He thus asks the Court not to "prevent the fund from defending itself." Opp. at 10. (And, in his list of expenses he merely lists "Professional services, including legal $5,000.00," without distinguishing whether the purpose of such expenditures was Trabulse's own defense or other "services" provided to the funds rather than to him.) Yet, the instant motion is directed at Trabulse, not any of the funds who are named as relief defendants. Nevertheless, Trabulse's response purports to be made on behalf of all defendants. The interests of Trabulse and the fund are very different. The Commission has alleged that Trabulse prepared false account statements and misappropriated money; the fund, of course, has an interest in identifying and recovering any funds Trabulse may have misappropriated from the fund, and thus, from investors.

Finally, Trabulse argues that the Court's "central concern should be the fairness of the proceedings." Opp. at 11. Trabulse served as a fiduciary to the fund. Investors trusted him to invest their money as he told them he would and to provide them with accurate account statements. It is not fair to now allow Trabulse to continue taking money from the fund (and from investors), while investors are prohibited from redeeming their shares. It is especially unfair under the circumstances, since most of the knowledge of the fund's operations resides exclusively with Trabulse and he has

refused to answer questions about the fund, thereby drawing out this litigation. Finally, Trabulse has made no showing that he could not pay for the legal expenses of his counsel without dipping into the fund's coffers.[7] His request, unsubstantiated by any evidence, should therefore be rejected.

### D. The Court Should Order Trabulse to Provide an Immediate Accounting.

The Court has the power to order an accounting to, among other things, aid in the determination of the appropriate amount of disgorgement. *SEC v. International Swiss Investments Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990). Trabulse also agreed to provide such an accounting. The fund's limited partnership agreement provides that the fund's net profits are to be calculated in accordance with generally accepted accounting principles. (Schneider Decl. ¶ 31, Exh. 24, Section 5.16). It also provides that the fund's books "shall be closed and balanced at the end of each calendar year. Statements will be delivered to each partner within forty-five (45) days after the expiration of said fiscal year. . . . quarterly statements will be issued to each partner within 30 (thirty) days following the end of the quarter, showing changes in each account." (Schneider Decl. ¶ 31, Exh. 24, Section 5.15.) Accordingly, the fund's governing documents *require* that Trabulse provide to investors accurate and timely investor account statements.

Trabulse argues that the defendant should not be required to prepare an expert report for the plaintiff's use at the outset of the discovery process. Opp. at 13. As defendant is aware, an accounting is not an "expert report." The Commission's proposed order simply asks that Trabulse prepare an accounting of the fund's activities – something he has been required to do since the inception of the fund. Ordering an immediate accounting would ensure that Trabulse is complying with his duties to the fund and the fund's investors.

---

[7] While defendant cites cases allow for the use of money for a legal defense that otherwise is likely to be subject to restitution, forfeiture or some other remedy, that result follows when a defendant is unable to otherwise obtain counsel, such as when an asset freeze is in place. *E.g., Federal Sav. & Loan Ins. Co. v. Dixon*, 835 F.2d 554, 564-65 (5th Cir. 1987) (in upholding preliminary injunction, requesting district court to modify *asset freeze* to "allow each defendant's reasonable request for a release of assets that are necessary to pay attorneys unless FSLIC can carry the burden of demonstrating a likelihood of impropriety on the part of the defendant."); *U.S. v. Payment Processing Ctr., LLC*, 439 F. Supp.2d 435, 440 (E.D. Pa. 2006) (releasing *restrained* funds for defense fees). Defendant's assets have not been frozen here. Moreover, Trabulse has submitted no evidence showing that he would be unable to obtain counsel were he not allowed to use the fund's money.

An accounting is critical in this case. Without it, investors who are contractually entitled to such an accounting, and who cannot redeem their shares until the accounting mess he has created is corrected, remain in limbo. Defendant disregards entirely their interests in favor of a protracted, unchecked situation in which he is free to continually withdraw their money until he is ready to reveal how much is left. His proposal is untenable. Accordingly, an immediate accounting should be ordered.

### E. This Court Should Order Expedited Discovery.

Trabulse incorrectly implies, without citing any law for the proposition, that the Commission's request for expedited discovery must meet the standards for entry of a mandatory injunction. Opp. at 12. He also asserts that it is not necessary. *Id.* at 14. (He nevertheless complains that he has not been provided with documents the Commission collected and has "not had a chance to depose the witnesses." *Id.* at 6.) Moreover, Trabulse asserts that the Commission already has "thousand upon thousands of pages" of documents relating to the fund, and he inaccurately declares that the Commission has taken testimony from "more than 30 witnesses."[8] *Id.* at 14. The jumble of documents produced to the Commission, purportedly on behalf of Trabulse and the various fund entities jointly, demands explanation. Yet, Trabulse refused to explain any of the documents he produced, asserting his Fifth Amendment right against self-incrimination. As Trabulse himself admitted, he ran the fund almost entirely by himself. (Schneider Decl., ¶ 26, Exh. 19, p. 4.) His daughter had few responsibilities and his assistant performs only ministerial tasks, such as checking the mail and stuffing envelopes. (*Id.*) Trabulse is the only person who knows how the fund operates – and he has refused to share that information. Consequently, the Commission is left with attempting to piece together the broken egg by whatever means it can find available, and is therefore in need of immediate discovery to aid in this process.

---

[8] Trabulse's counsel's claim – in defendant's Opposition (at 14) and in the Roberts Declaration (¶ 8) – that the Commission has taken testimony from more than 30 individuals is flatly wrong. As is true of counsel's claims with respect to the document he attached as Exhibit A, he has no personal knowledge of the facts he asserts to be true. His so-called declaration should be stricken.

### F. This Court Should Appoint A Monitor.

The Commission's proposed order would provide for a monitor – an objective third party – to review the transactions entered into by Trabulse and to report questionable activity. Trabulse expects the Court to perform this work. Opp. at 15. This function is necessitated by Trabulse's failure to abide by his promise to investors to accurately account for the fund's assets, and his fiduciary duties to them to keep their assets separate and apart from his own. It is also clear from Trabulse's own list of expenditures that the after-the-fact reporting of expenses that should only be those of the fund appears not to have inhibited him in the least from using fund assets for his own personal expenses. Accordingly, the Court should appoint a monitor with the duties delineated in the Commission's proposed order.[9]

### CONCLUSION

For the reasons set forth in the Commission's moving papers and discussed above, the Commission requests that the Court order a preliminary injunction and the ancillary relief requested in the proposed order.

Dated: November 21, 2007           Respectfully submitted,

/s/ Erin E. Schneider
Mark P. Fickes
Erin E. Schneider
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

---

[9] In the Roberts Declaration, ¶ 6, counsel asserts that he was informed that the Commission will not seek "during this litigation" any other relief that would remove Trabulse from managing the funds. Counsel's unsupported assertion does not square with the Commission's counsel record and recollection of the communications. Indeed, the Commission has asked in its complaint for any other relief the Court may deem appropriate. If, even after appointment of a monitor, the evidence suggests that Trabulse should not remain affiliated with the fund, the Commission would seek appropriate relief.