IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>  v.<br><br>ALEXANDER J. TRABULSE,<br><br>    Defendant,<br><br>and<br><br>FAHEY FUND, L.P., FAHEY FINANCIAL GROUP, INC., INTERNATIONAL TRADE & DATA, and ITD TRADING,<br><br>    Relief Defendants.<br>                                                        / | No. C 07-04975 WHA<br><br>**PRELIMINARY INJUNCTION ORDER AND OTHER ANCILLARY RELIEF** |

**INTRODUCTION**

In this enforcement action, the Securities and Exchange Commission charges defendant Alexander James Trabulse, a San Francisco hedge fund manager, with defrauding investors by misrepresenting the fund's profitability and misusing fund assets. Fahey Fund, L.P., Fahey Financial Group, Inc., International Trade & Data, and ITD Trading are named as the relief defendants. The SEC moves for an order enjoining Trabulse from violating the securities laws and making distributions to himself pending further order. The SEC also moves for the following ancillary relief: (i) appointing a monitor to oversee the operations of defendant and relief defendants; (ii) requiring a verified accounting; (iii) preventing destruction of documents;

and (iv) permitting expedited discovery.  For the reasons stated below, plaintiff's motion for a preliminary injunction and other ancillary relief is largely **GRANTED**.

## STATEMENT

Defendant Alexander Trabulse operates the hedge funds at issue.  He formed Fahey Fund, L.P. in 1997 to invest in securities and other financial instruments.  He remains its general partner.  Fahey Financial Group is a Nevada corporation formed in 1999.  Trabulse serves as its president and chief financial officer.  He and another individual formed International Trade & Data in March 1985 to conduct general securities business.  For some time, however, Trabulse has been its sole partner.  ITD Trading is a California general partnership that Trabulse and another individual formed in 2002 for the purpose of trading commodities.  Defendant has operated all relief defendants as a single hedge fund.

Fahey Fund is governed by a partnership agreement, but which one is disputed. The SEC asserts that the operative version is the one provided by investor James Wojack and dated "Rev Jan 2003."  According to it, the fund's "primary purpose shall be to use limited stock, futures, options and index opportunities to gain consistent compound rates of return" (Schneider Decl. Exh. 24 at § 2.01).  The version set forth by defendant is dated "Rev Jan 2002."  According to this version, the fund's "primary purpose shall be to use publicly listed opportunities, natural resources, and any other investment of a unique long-term character, to gain consistent compound rates of return" (Roberts Decl. Exh. A at § 2.01).  This version has *not* been properly authenticated.[1]

Both versions provided that the profits "will be allocated as to the ratio of each partner's capital account to the Fund's total capital.  Thereafter, 25% of the net profit of each limited partner shall be payable and distributable to the General Partner . . . <u>Losses shall be charged</u>

---

[1] The SEC objects to the use of the 2002 partnership agreement because the declarant, defense counsel Clement Roberts, lacks personal knowledge.  Due to the urgency of obtaining a preliminary injunction, however, the Court has discretion to accept hearsay and other evidence that might be inadmissible at trial. According to *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1393 (9th Cir. 1984), "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits for persons who would be competent to testify at trial.  The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."  Here, however, Trabulse himself would be competent to tell us, if he would, which version is the operative version.  That he has elected to plead the Fifth Amendment is his own choice.  The objection is sustained.

2

1  <u>against the General Partner up to his share of the profits from the beginning of the three fiscal</u>
2  <u>years before the partners [sic] losses are calculated</u>" (*id.* at § 5.14) (underlining in original).
3  Both also stated that "the General Partner [Trabulse] shall receive the right to draw expenses
4  consistent with prudent and sound management of the trading activities, such expenses being
5  charged against his share" (*id.* at § 6.06).

6  Trabulse described the fund to investors as "conservative." He described it as investing
7  in financial instruments such as commodities, futures, interest-rate plays, options, stocks.
8  He promoted it emphasizing the fund's consistent and stable profitability. Trabulse prepared
9  and distributed to investors quarterly account statements and newsletters. They identified
10 investors' beginning and ending balances, and gains and/or losses during the statement period.
11 The account statements were supposed to include a description of the investments in which
12 gains were earned. Trabulse himself received bank statements and daily and monthly
13 statements for the fund's brokerage accounts.[2]

14 A powerful fact militating in favor of preliminary relief is the fact that Trabulse
15 audaciously overstated the fund's net assets in the quarterly investor account statements. As of
16 December 31, 2006, he reported to investors that the value of the fund itself totaled
17 *approximately $50 million* (Schneider Decl. at ¶¶ 23–24 and Exh. 17). The fund's
18 brokerage-account records and bank statements, on the other hand, now show that the fund's
19 value was only approximately $10 million — $6.95 million in brokerage accounts and $3.05
20 million in bank accounts (*id.* at ¶¶ 8–22 and Exhs. 7–16).

21 The $40 million difference between the claimed value and the actual value has not been
22 explained by Trabulse. His counsel argue he has no duty to do so and that the SEC has the

---

[2] The account statements Trabulse sent to investors, clearly, did not always reflect the fund's actual performance during a particular quarter. For example, for the quarter ending on March 31, 2007, Trabulse distributed account statements to investors that claimed that there were "no changes" from December 31, 2006. In his accompanying newsletter, Trabulse stated, "While there was a great deal of movement in the market, our particular positions just sat there! So, there is nothing to report. Please not[e] that <u>your statements will be unchanged from the Dec. 31, 2006 final</u>" (Schneider Decl. ¶¶ 45–46 and Exhs. 37–38) (underlining in original). In reality, two of the fund's three brokerage accounts suffered trading losses of $5,267,219, and the combined return on those accounts was -2.6%. Although the gross value of the accounts is in dispute, the five million dollar losses would have been material measured against any of the totals in contention. Note that the balance in the third brokerage account at December 31, 2006, was approximately $75,000. The SEC argues that it was unlikely that gains earned at the third brokerage account had a significant impact.

3

burden to prove that the $40 million is missing. His counsel argue that the difference may possibly be accounted for by diamonds, pearls, rugs, and other commodities Trabulse has acquired. *The problem is that Trabulse ought to know and have ready records to show how he calculated the $50 million figure touted to investors. None exists.* The number seems to have been pulled from his imagination. The hard records pored over by the SEC show only ten million. It is extremely hard to believe that Trabulse has $40 million in diamonds, pearls, rugs, and commodities. He and his counsel have no explanation for the chasm between the claimed and the actual amounts.

Worse, since the $50 million claim was circulated for 2006, the fund's largest brokerage account has declined from $6,224,122.68 (at that time) to $1,416,728.24 as of August 31, 2007. Matters appear to be going south.

Moreover, Trabulse used Fahey Fund bank accounts to pay for personal and unauthorized expenses. He commingled funds, even though standard industry practice was to segregate fund assets from personal assets. The SEC provides examples. On October 4, 2004, and on August 15, 2005, Trabulse transferred approximately $20,000 to his wife's overseas bank account. The August 15 transfer was described in the fund's records as a transfer for "Paris Business Expenses." The money, however, was actually transferred so his wife could go shopping in France while they vacationed there. On April 17, 2006, Trabulse transferred $65,000 to one of his wife's domestic bank accounts for her home-mortgage payments after they separated. On June 14, 2006, and July 28, 2006, he used these funds to purchase his wife a home-theater system that cost over $25,000. Fahey funds were also used to buy several rugs for Trabulse's wife to use in her home. Between January 2003 and October 2006, he transferred over $500,000 overseas to a bank account maintained in his personal name in Paris. Although the amount was described in the fund's records as a transfer for "Paris Business Expenses," it was actually used to pay for personal consumption items in the United States, such as groceries and outdoor gear. Trabulse authorized his daughter to use a debit card linked to the Fahey Fund's bank accounts. His daughter used the card to buy furniture, airline tickets, and her 2007 honeymoon to Panama. In addition to the debit card, Trabulse gave his daughter

4

jewelry and rugs — all from the fund's bank accounts.[3]

Trabulse did not inform investors that these funds were being used for jewelry, real property, or rugs. Nor did he identify these purchases or report gains or balances in account statements or other materials submitted to investors. For example, for the quarter ending on March 31, 2007, he transferred money out of the fund's bank accounts for an "artistic" investment, a "property" investment, and an "auto" investment. But the account statements sent to investors did not disclose these investments.

Shortly after this action was commenced, both sides entered into a stipulation. Trabulse agreed to the following terms, among others (Dkt. 10):

> (i) Trabulse was "prohibited from making a payment, transfer, or distribution, to any people who have invested in and/or purchased securities from Fahey Fund, L.P. . . . or Fahey Financial Group, Inc. . . . or from authorizing the payment, transfer, or distribution of, any funds or assets to any current Investor," except "to pay legitimate and reasonable expenses incurred in the ordinary operation of the Relief Defendants" (at §§ II and VIII);
>
> (ii) Trabulse was "prohibited from accepting any investments from any current or prospective Investors" (at § III);
>
> (iii) Trabulse had to limit future investments "solely to investments in securities, derivatives, commodities contracts, foreign currency or other exchange-traded investments" (at § IV);
>
> (iv) Trabulse could not transfer or convey any of the fund's assets other than to sell them to a bona fide purchaser for value (at § V);
>
> (v) Trabulse had to provide the SEC with monthly accountings of all funds or assets transferred out of any bank or brokerage account (at § VI); and
>
> (vi) Trabulse could not transfer any funds or assets located in the United States to jurisdictions located outside the United States (at § VII).

Other than this stipulation, the SEC sought no relief until the instant motion to enjoin Trabulse from violating securities laws and from making distributions to himself.

---

[3] It is unclear from the record whether or not Trabulse was married to his wife at the time. They are currently divorced.

5

**ANALYSIS**

"A preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition . . . Unlike a private litigant, the SEC need not show risk of irreparable injury." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998).[4]

Defendant argues that there is a heightened evidentiary standard in this case. He cites *SEC v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990), which held that "a district court, exercising its equitable discretion, should bear in mind the nature of the preliminary relief the Commission is seeking, and should require a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo." In *Unifund*, the Second Circuit emphasized that the SEC was obliged to make a more persuasive showing that "the more onerous are the burdens of the injunction it seeks." *Ibid*. Defendant claims that the preliminary relief sought goes beyond preserving the status quo; it seeks to "prevent the Fund from litigating the case, to enhance the SEC's discovery position, and to generally enjoin the defendant from 'violating the securities laws'" (Opp. Br. 4).

The parties have already stipulated to some preliminary injunctive relief. An immediate point of contention is whether Trabulse should be permitted to withdraw money from the funds. The SEC fears that defendant will "misuse the fund assets to support his lifestyle, even in the face of this ongoing litigation" (Reply Br. 10). Assuming for argument's sake that the heightened evidentiary standard applies, this order finds that the SEC has met its burden to justify a preliminary injunction.

**1. LIKELIHOOD OF SUCCESS.**

In its complaint, the SEC alleged four claims against Trabulse: (i) violations of Section 17(a) of the 1933 Securities Act; (ii) violations of Section 10(b) of the 1934 Exchange Act; (iii) violations of Sections 206(1) and 206(2) of the 1940 Investment

---

[4] Unless otherwise indicated, all internal citations are omitted from cites.

6

Advisers Act; and (iv) violations of Sections 5(a) and 5(c) of the 1933 Securities Act. The SEC briefs neglect the fourth claim, which deals with offering to sell securities when no registration has been filed. *See* 15 U.S.C. 77e(a) and 77(e)(c). This order assumes that the SEC is not now seeking relief related to that claim.

Section 17(a) of the 1933 Securities Act prohibits misrepresentations, omissions of material fact, or the use of fraudulent devices in the offer or sale of any securities. 15 U.S.C. 77q(a). Section 10(b) of the 1934 Exchange Act and Rule 10b-5 prohibit the same conduct as described in Section 17(a), but they concern conduct in connection with the purchase or sale of securities. 15 U.S.C. 80j(b), 17 C.F.R. 240.10b-5. The SEC also alleges a violation of Sections 206(1) and 206(2) of the 1940 Investment Advisers Act. These sections prohibit an "investment adviser" from (i) employing "any device, scheme, or artifice to defraud any client or prospective client"; or (ii) engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. 80b-6(1), (2).

Violations of the antifraud provisions require that the deception, misrepresentations, or omissions be "material." The Supreme Court held that to fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

The SEC is not yet arguing that investors have lost their principal; rather it is arguing that Trabulse has misrepresented the value of the fund as being worth $50 million when, in truth, it seems to have been worth $10 million. The massive discrepancy has not been accounted for. Trabulse also failed to keep investors informed as to the types of investments he made. Investors were generally kept in the dark as to Trabulse's "investments" in real property, jewelry, and rugs, and diversions of assets to family members. This order finds that there was a substantial likelihood that a reasonable investor would have considered all of this information important in making an investment decision.

In addition to materiality, there must also be the requisite scienter in actions under Section 10(b) and Rule 10b-5, Section 17(a)(1), or Section 206(1), even when the SEC is the

7

plaintiff. *See Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 695 (1980). When scienter is an element of the substantive violation of federal securities laws that is sought to be enjoined, scienter must be proven before an injunction may issue. *Id.* at 700-01. Recklessness satisfies the scienter requirement of a securities-fraud action. It requires highly unreasonable conduct that amounts to an extreme departure from standards of ordinary care. *Hollinger v. Titan Capital Corp*, 914 F.2d 1564, 1568–70 (9th Cir. 1990). This order finds that defendant had the requisite scienter. Trabulse received bank statements and daily and monthly statements from the fund's brokerage accounts. He was surely aware of the fund's financial status. Yet he misstated the value of fund assets and the performance of the fund. The obvious reasons that he would have exaggerated the value of the fund were to serve as cover for large withdrawals for himself, to attract new investors, to increase the buy-in price, and to induce existing investors to contribute more funds and to stay with the program.[5]

Under Section 10(b) of the Exchange Act and Rule 10b-5, the fraud must be made "in connection" with the purchase or sale of a security. The Ninth Circuit has said that the "'in connection with' requirement is met if the fraud alleged 'somehow touched upon' or has 'some nexus' with 'any securities transaction.'" *SEC v. Rana Research*, 8 F.3d 1358, 1362 (9th Cir. 1993). "Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus or *other such document on which an investor would presumably rely*, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Ibid*. (emphasis added).

Trabulse prepared and sent to investors account statements and newsletters summarizing changes in account balances, the fund's performance, current market conditions, and what he expected markets to do in upcoming quarters. This material, however, falsely reported what Trabule invested in and the actual value of the fund. Investors relied upon the account

---

[5] Scienter, however, is not an element of violations of Section 206(2) of the Investment Advisers Act or Sections 17(a)(2) and (3) of the Securities Act. *Vernazza v. SEC*, 327 F.3d 851, 859–60 (9th Cir. 2003).

8

statements to recruit other investors or to make further investments. These false statements were plainly "in connection with" a deceptive securities scheme.[6]

Defendant challenges the SEC's math. The $50-million-versus-$10 million discrepancy is an apples-versus-oranges comparison, it is said. This is because the $10 million is based only on brokerage accounts and thus ignores defendant's other investments. "It is as if Mr. Trabulse told investors that his car had four people in it, and the SEC were trying to claim a likelihood of success based on evidence that only two people were in the front seat" (Opp. Br. 5). Defendant argues that it made sense for a portion of the fund to be valued at $10 million while the entire fund was valued at $50 million; the remaining value belonged to other types of assets (such as investment-quality pearls and real estate) not mentioned in brokerage account records. According to the (inadmissible) 2002 partnership agreement (but not the 2003 one), the fund's main purpose was "to use listed opportunities, natural resources, and *any other investment of a unique long-term character*, to gain consistent compound rates of return" (emphasis added). Investments in jewelry, real property, or rugs, defendant argues, were included in this provision and Trabulse could not be considered to have concealed this information from investors. Furthermore, Trabulse claims that he *did* discuss his "investments" with investors. This order disagrees.[7]

---

[6] Section 206 of the Investment Advisers Act also requires another element — that the illicit conduct be carried out by an investment adviser towards a client or prospective client. 15 U.S.C. 80b-6. An "investment adviser" is anyone who, "for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. 80b-2(a)(11). Trabulse should be deemed an investment adviser because he advised and encouraged others with respect to investments. *See Abrahamson v. Fleschner*, 568 F.2d 862, 870 (2d Cir. 1977) ("we believe that the general partners as persons who managed the funds of others for compensation are 'investment advisers' within the meaning of the statute").

[7] When the SEC asked investor Ubrano Maffei whether Trabulse had ever mentioned investing in pearls, Maffei answered, "[Trabulse] brought up that he was investing in investment quality pearls. And I said, oh, that's fine as long as they're making money for us. That's okay" (Schneider Decl. Exh. 26 at 112). Investor Suzanne Gregg told the SEC that she "knew that [Trabulse] was interested in Panama" and that he had a "general interest for a real estate deal there" and for "[t]he potential growth" (Schneider Decl. Exh. 34 at 81–82). Moreover, some of the investors did not consider the information material. When asked whether he would have liked to have known about the "investments" in these types of items, investor Maffei answered, "[S]o, yeah, I think I'd like to know. But, again, it's not going to change my mind or wouldn't have changed my mind at the time of the initial investment" (Schneider Decl. Exh. 26 at 112).

9

*First*, Trabulse did in fact materially overstate the value of the fund. What Trabulse reported to investors as of December 31, 2006, were net assets comprised of investor contributions and gains on investments in stocks, options, futures, derivatives, or foreign currency — none of which described investments in real estate, jewelry, or rugs. The net assets purportedly totaled $50 million. In reality, the *only* records of investor contributions and transactions in stocks, futures, derivatives, or foreign currency were the fund's brokerage-account records and bank statements, which revealed the fund's value at about $10 million, a figure substantially less than what he reported.

*Second*, even assuming arguendo that the brokerage-account records and bank statements only represented twenty percent of the total "real" fund value, defendant has stubbornly provided no other evidence as to how he came up with the $50 million number in the first place. This is the information that he should have at his fingertips. Where are the work papers he used to generate the $50 million number? Their absence speaks volumes.

*Third*, even if all the diamonds, pearls, and other commodities are fully credited to the fund rather than treated as the personal diversions they seem to have been, a serious question exists by what authority he invested the fund in such speculative items. The partnership agreement did not allow for such investments. Defendant claims that these other "investments" were disclosed to other investors through various conversations and through the inadmissible 2002 partnership agreement (which stated that the fund would invest in "any other investment of a unique long-term character"). Again, this argument is misleading. The 2002 version has not been shown to be admissible. Even if it were admitted, the phrase in question is too vague a disclosure to support a diversion of eighty percent of the value of the fund. The isolated snippets of investor testimony are hardly a substitute for a full and fair disclosure of such speculative gambles.

*Fourth*, defendant misstates the standard for materiality. As stated by plaintiff, materiality "does not depend on whether a particular investor would have changed his or her mind, but whether a 'reasonable' investor would have considered it important in making an

10

investment decision" (Br. 11). This order finds that a reasonable investor would have considered important the misleading items set forth above.[8]

With respect to the Investment Advisers Act, the SEC must show a breach of fiduciary duty to the fund itself. *See Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) ("The adviser owes fiduciary duties only to the fund, not to the fund's investors"). And rather than show how much money the fund made and how much Trabulse withdrew, the SEC has, it is said, misguidedly concentrated its efforts on showing *what* Trabulse spent money on. Under the terms of the partnership agreement, Trabulse claims he was entitled to withdraw up to 25% of the fund's net profits from which he must pay expenses and his own compensation. The partnership agreement did not require Trabulse to keep fund expenses separate and distinct from his personal compensation, he says. The primary question, defendant argues, should be whether Trabulse ever withdrew more than 25% of the fund's net profits. Because it did not provide evidence that Trabulse breached his duty to the fund by withdrawing more than the allotted 25%, the defense contends, the SEC has failed to establish a substantial showing of likelihood that there was a violation of the Investment Advisers Act.

The defense argument is rejected. On the one hand, defendant claims that he was entitled up to 25% of the fund's profits and therefore could do whatever he wanted with it — *i.e.*, he could pay expenses and draw his own compensation. On the other hand, Trabulse has not provided a feasible means of calculating the fund's profits or figuring out how much he could draw from the fund. The partnership agreement required that "[t]he books of the Fund shall be closed and balanced at the end of each calendar year and statements shall be delivered to each partner within ninety (90) days after the expiration of said fiscal year showing the income, profit and loss, together with a balance statement showing the accounts of each partner, the distribution to each partner, and each partner's share of profits and/or losses" (Schneider Decl. Exh. 24 at § 5.15). As a fiduciary, Trabulse should be able to account for

---

[8] Even though investor Maffei testified that knowing about the "investment" items would not have necessarily changed his mind about making the investment, he added, "I mean, not that the 10,000 [dollars] is a big number to be concerned with. But I'd still like to know the type of investments he's making" (Schneider Decl. Exh. 26 at 112).

11

1   exactly how he calculated the $50 million. This Court has no faith in the idea that Trabulse was
2   ever entitled to withdraw the millions that he has in "compensation." He has been utterly
3   unable to show that there ever were "net profits" of sufficient magnitude.
4       Nothing in the partnership agreement allowed Trabulse to commingle his personal assets
5   with those of the fund and to use the fund as "his own piggy bank" (Reply Br. 8). Rather, the
6   partnership agreement stated that Trabulse could "draw expenses consistent with *prudent and*
7   *sound management of the trading activities*" (Schneider Decl. Exh. 24 at § 6.06). It is difficult
8   to see, for example, how allowing one's daughter to use the fund debit card to fund her
9   honeymoon adheres to that standard. Furthermore, Trabulse cannot argue that he had the right
10  to make personal expenditures from his 25% of the fund. "Defendant cannot have it both ways:
11  if he purchased the rugs, jewelry, etc., with funds to which he was entitled as his profit share,
12  then those goods he purchased cannot be part of any measurement of the fund's asset value or
13  its profitability" (Reply Br. 9). This order finds that the SEC has made a substantial showing of
14  the likelihood of Trabulse having violated the securities laws.

15      **2.    RISK OF REPEATED VIOLATIONS.**

16      The SEC acknowledges that the October 29 stipulation addressed some of the concerns
17  set forth in its motion. But it also seeks a preliminary injunction to prevent Trabulse from
18  engaging in future violations of securities laws and from making distributions to himself.
19  The SEC is concerned that any distribution made by Trabulse to himself is suspect because
20  "there can be no assurance that Trabulse is entitled to any amount he may describe as his
21  'share'" (Br. 17). And even though he is authorized under the partnership agreement to pay the
22  "legitimate and reasonable expenses incurred in the ordinary operation" of the funds,
23  but because Trabulse has failed to give an accurate accounting of the funds, it would be a
24  further breach for him to make any distribution to himself for "expenses."
25      Defendant counters that the SEC has failed to establish the likelihood of future
26  violations of securities laws. "The parties' existing stipulation and the Court's existing order
27  thereon *already* makes future securities law violations virtually impossible" (Opp. Br. 9).
28

12

This order holds that the SEC has shown the likelihood of future violations of securities laws. While the stipulation prohibits investors from withdrawing from the fund, Trabulse has been left in charge of it. Despite his repeated violations, he still wants to continue to withdraw money without accounting for it. Given the $10 to $50 million discrepancy and defendant's poor record keeping, the SEC has shown that Trabulse is prone to misleading investors. To allow Trabulse to withdraw money from the fund would impose too much risk on the investors.[9]

Trabulse requests that the Court allow him to spend $25,000 per month from the fund to cover fund expenses and living expenses. He also wants to use fund assets to pay for his legal defense. To justify such a request, Trabulse cites the benefits of capping the amount that he can withdraw from the fund for any purpose, adhering to the partnership agreement by focusing on the amount spent (rather than on how it is spent), and to give him a monetary incentive to remain at the fund and manage business affairs there. Defendant claims that the SEC seeks to prevent Trabulse from defending himself.

Not so. The stipulation allows Trabulse "to pay legitimate and reasonable expenses incurred in the ordinary operation" of the fund. This order finds that defense costs in this case are for Trabulse personally and not for the fund. The stipulation does *not* authorize him to withdraw funds for the purpose of paying his lawyers. "Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." *SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993). In *Quinn*, the district court requested that the SEC make a preliminary showing that Quinn's assets could be traced to fraud. When the SEC met this burden, the judge then asked Quinn to show that he possessed assets untainted by fraud. Quinn did not make such a showing. The district court then froze all of Quinn's assets in the

---

[9] Trabulse has included some of the following "expenses" for October 2007: "Personal $4,500.00," "Charity $1,000.00," and "Housekeeping $400.00" (Schneider 2d Decl. Exh. 1). It is unclear at this point whether or not these expenditures were legitimate. It is noteworthy, however, that Trabulse continues to withdraw money for personal expenses from fund assets even when the legitimacy of this conduct is being questioned by the SEC and the Court.

13

1  United States while indicating "willingness to release small amounts so that [Quinn] could
2  defend this suit." *Ibid*.

3  There has been no showing why Trabulse might need an additional $25,000 to pay for
4  fund expenses and personal expenses. Trabulse's assets were never ordered frozen, so he faces
5  less of a burden than the defendant in *Quinn*. Nor has he shown that but for further withdrawals
6  from the fund, he is unable to defend himself.

7  Trabulse is hereby prohibited from withdrawing any money whatsoever from the fund
8  without a prior accounting to the SEC and this Court showing that the fund has made net profits
9  to support further withdrawals. He can still use fund assets to pay for legitimate and reasonable
10 expenses incurred in the ordinary operation of the fund, but again, that does *not* include fees for
11 the defense in this or any related proceeding.

### 3.  AN ACCOUNTING.

13 The SEC requests an order requiring Trabulse to submit a verified accounting for the
14 following two purposes: (i) to identify the location and disposition of all funds received from
15 investors; and (ii) the location and value of all personal or fund assets presently held by
16 Trabulse under his control or over which he exercises actual or apparent investment authority.
17 The SEC seeks the verified accounting for the purposes of determining the scope of Trabulse's
18 allegedly fraudulent scheme, to inform investors as to the value of their respective shares in the
19 Fahey Fund, and to make it more difficult for Trabulse and others to conceal assets.

20 Defendant claims that this accounting will impose an undue burden on him. It is akin to
21 a "litigation-related expert report," he argues (Opp. Br. 13). This order disagrees.
22 An accounting, as required by the partnership requirement, is not an "expert report." The SEC
23 has explained its reasons for requesting such a report — an accounting of the fund's activities
24 would ensure that Trabulse complied with the stipulation and with his duties to the fund and
25 investors. It would also aid in the later determination of monetary awards, should they be
26 necessary. All of this is information that the manager of a fund should have readily available.

27 The accounting must, at a minimum, provide the following:

14

      (i) List all diamonds, pearls, rugs and other property (other than the brokerage accounts) that belong to the fund, stating the exact description and location for each;

      (ii) Identify and produce all title records for all such items;

      (iii) State the true market value for each of the items, stating the basis for the value and identifying and producing all records bearing on the value; and

      (iv) State the original cost of the items to the fund, identifying and producing the bill of sale or other records needed to prove the cost.

Similarly, the accounting must do likewise for all similar items allegedly owned by Trabulse and/or his family (including his wife/ex-wife) that were acquired directly or indirectly from the fund's money or distribution thereon.

### 4. EXPEDITED DISCOVERY.

Citing the need to let investors know the value of their shares so that they can liquidate their assets, the SEC seeks expedited discovery. The SEC claims that it has not yet obtained from defendant evidence substantiating the fund's purported value. Specifically, the SEC requests expedited discovery to documents and depositions relating to the alleged fraud from the defendant, relief defendants and others. The SEC states that because Trabulse has refused to explain any of the documents he produced (and he was the only person who knew how the fund operated), the SEC is forced "to piece together the broken egg by whatever means it can find available, and is therefore in need of immediate discovery to aid in this process" (Reply Br. 13). This order **GRANTS** the SEC's request. Discovery may commence now, even before the case management conference. Time to respond to document requests and interrogatories shall be ten days.

### 5. MONITOR.

The SEC asks for appointment of a monitor, an objective third party to oversee Trabulse's operation of the Fahey Fund as another measure for protecting and preserving the remaining investor assets. Defendant claims that the proposed powers of the monitor are overbroad; they will be able to have full access to all documents, to interview and obtain information from defendant and anyone associated with defendant, to contact and interview investors, and to hire whomever the monitor wants to help in these tasks. The SEC,

15

defendant argues, has not shown that Trabulse failed to preserve investor assets, so there is no justification for imposing the costly burden of having a monitor. Besides, Trabulse has already stipulated to providing monthly reports regarding any fund activity to the SEC.

This order finds that Trabulse's earlier agreement to provide monthly reports is insufficient. As late as October 2007, Trabulse has continued to draw fund assets for personal expenses. Again, given Trabulse's poor accounting history and use of fund assets, there is a need for an objective party to oversee his conduct as he continues to manage funds. A monitor will be appointed.

No expense items in excess of $1000 may be paid by defendant without the prior approval of the monitor, the SEC or the Court. All expense items, regardless of the amount, shall be reviewed by the monitor. The monitor shall also review the overall operation of the fund and shall prepare a report by January 31, 2008, setting forth his or her summary of the overall operation of the funds. The monitor should be a CPA and should vet the accounting to be provided by defendant, and if defendant does not promptly provide such an accounting, then the monitor shall prepare one himself.

If the parties cannot agree on a monitor by **DECEMBER 14, 2007**, both sides shall provide to the Court their names of nominees for the post along with their qualifications, after verifying their willingness to serve.

### 6. PRESERVATION OF EVIDENCE.

The SEC requests this order to protect all remaining documents necessary for full discovery. There is no need for such an order because, according to the supplemental order to order setting initial case management conference in civil cases that was filed on October 12, 2007, defendant is already under a duty to preserve evidence related to the issues presented by the action (Dkt. 9 at ¶ 4). Defendant acknowledges that he is bound by that order (Opp. Br. 15).

### CONCLUSION

For the foregoing reasons, this order **GRANTS** plaintiff's motion for a preliminary injunction enjoining defendant from making distributions to himself. Trabulse is prohibited

from withdrawing any money from the fund without a prior accounting to the SEC and this Court showing that the fund has made net profits to justify further withdrawals. The fund assets can still be used to pay for "legitimate and reasonable expenses incurred in the ordinary operation" of the fund, which does *not* include attorney's fees and costs for defendant or his attorneys.

This order also **GRANTS** plaintiff's request for ancillary relief. This order requires a verified accounting, expedited discovery, and the appointment of a monitor to oversee defendant and relief defendants' operations. Because preventing the destruction of documents has already been addressed in an earlier order, the issue is deemed moot.

**IT IS SO ORDERED.**

Dated: December 7, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

17